No. 12-60694

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

LUMINANT GENERATION CO. LLC, ET AL.,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, ET AL.,

Respondents.

---

## PETITIONERS' OPPOSITION TO MOTION TO DISMISS

---

November 13, 2012

Petitioners Luminant Generation Company LLC and Energy Future Holdings Corp. (collectively "Luminant Petitioners") hereby oppose the U.S. Environmental Protection Agency's ("EPA") motion to dismiss their petition for review. This Court has jurisdiction pursuant to 42 U.S.C. § 7607(b) to review EPA's Notice and Finding of Violation issued to Luminant Petitioners, and thus the motion to dismiss should be denied.

## INTRODUCTION AND BACKGROUND

Petitioner Luminant Generation Company LLC ("Luminant") is a competitive power generation business in Texas that operates power plants and sells electricity. Luminant operates the Big Brown Power Plant in Freestone County, Texas, and the Martin Lake Power Plant in Rusk and Panola Counties, Texas.[1] With these plants and others, Luminant has over 15,000 megawatts of generation, used to supply electricity to approximately three million Texans through the Electric Reliability Council of Texas ("ERCOT").

In June 2008, EPA sent Luminant the first of several requests for information under the Clean Air Act ("CAA") in order "to obtain information *necessary to determine compliance* with the CAA[.]" *See* EPA Information Request at 1 (June 6, 2008) (Att. A) (emphasis added). Thereafter, EPA received and reviewed from Luminant "approximately 415,000 pages of information" in

---

[1] Petitioner Energy Future Holdings Corp., although named in the NOV, neither owns nor operates the plants.

response to "multiple requests for information," and "EPA considered numerous documents and conducted various analyses." Doc. 00512018772 at 2. "[A]t least ten EPA staff engineers and attorneys" participated in EPA's analyses. *Id.*

On July 13, 2012, over four years later, EPA issued to Luminant Petitioners a Notice and Finding of Violation ("NOV"). Pet. For Review, Doc. 00511982816, Att. A.[2] The NOV "finds that Luminant is violating the Clean Air Act" at Big Brown and Martin Lake Power Plants. *Id.* at 1. In the NOV, "EPA *has determined that Luminant has violated and continues to violate*" the Clean Air Act and states that Luminant must take action to come "into compliance." NOV Cover Letter at 1 (July 13, 2012) (Att. B) (emphasis added).

On September 11, 2012, pursuant to 42 U.S.C. § 7607(b)(1), Luminant Petitioners filed a petition for review of the NOV with this Court. On October 12, 2012, EPA moved to dismiss the petition for lack of subject matter jurisdiction.

\* \* \*

The Clean Air Act vests this Court with jurisdiction to review, in addition to certain enumerated actions of EPA, "*any other final action* of the Administrator under [the Clean Air Act]." 42 U.S.C. § 7607(b) (emphasis added). This provision is construed in light of the "presumption in favor of judicial review of agency action." *Asbestos Information Ass'n v. Reich*, 117 F.3d 891, 893 (5th Cir. 1997).

---

[2] A copy of the NOV is attached to the Petition for Review.

In *Harrison v. PPG Industries, Inc.*, the Supreme Court explained that the "expansive language [in 42 U.S.C. 7607(b)] must be construed to mean exactly what it says, namely, *any other* final action." 446 U.S. 578, 589 (1980) (emphasis in original). The Supreme Court then held—at EPA's urging—that this Court had erred in dismissing for lack of jurisdiction a petition for review of an EPA pre-enforcement notice letter issued under the Clean Air Act. The Supreme Court concluded that a letter from EPA informing a party of the regulatory requirements that, in EPA's view, applied to the party's construction activities was "any other final action" reviewable in this Court under 42 U.S.C. § 7607(b).

Similarly and more recently, in *Sackett v. EPA*, 132 S. Ct. 1367 (2012), the Supreme Court reversed the Ninth Circuit and held that an EPA administrative compliance order ("ACO") under the Clean Water Act was subject to *immediate* review as "final action." The Supreme Court held—this time over EPA's objection—that the pre-enforcement order by EPA "has all of the hallmarks of APA finality that our opinions establish." *Id.* at 1371.

Here, EPA ignores *Harrison* and misconstrues *Sackett*. It argues for a categorical rule that *all* NOVs it issues under the Clean Air Act are non-final and insulated from judicial review. But it cites no decision from this Court taking such a position and, indeed, acknowledges that the issue is "one of first impression in this Circuit." Mot. to Dismiss, Doc. 00512018597, at 7.

Nor do the decisions EPA cites establish its sweeping claim that "EPA's NOV [] is not final" "*[a]s a matter of law*." Mot. to Dismiss at 7 (emphasis added). None of these decisions accounts for either *Harrison* or *Sackett,* and they cannot be reconciled with those controlling cases. Two of the three Court of Appeals decisions relied on by EPA (*Union Elec. Co. v. EPA,* 593 F.2d 299 (8th Cir. 1979) and *West Penn Power* Co. *v. Train*, 522 F.2d 302 (3rd Cir. 1975)) were decided *before* the Supreme Court's decision in *Harrison*. Mot. to Dismiss at 7. The third case relied on by EPA (*Pacificorp v. Thomas*, 883 F.2d 661 (9th Cir. 1988)) does not analyze the issue at all and is simply a one-sentence order citing these same two pre-*Harrison* decisions.[3] None of these cases was decided after *Sackett*, and EPA cites no decision applying *Sackett* to an NOV.[4]

*Harrison* and *Sackett* foreclose the categorical rule sought by EPA that *all* NOVs are non-final. Indeed, it has always been the case that the finality analysis is context-specific and does not turn on the title of EPA's order. *See, e.g.*, *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 479 (2001) ("Though the agency has not

---

[3] The district court in *Royster-Clark Agribusiness, Inc. v. Johnson*, 391 F.Supp.2d 21 (D.D.C. 2005), likewise relied on these pre-*Harrison* cases as well as pre-*Sackett* decisions holding that an ACO is not final action, which is not the rule after *Sackett*. *Id*. at 28 n.6.

[4] The only post-*Sackett* decision EPA cites (in footnote 3) is a Freedom of Information Act case, *Ameren Missouri v. EPA*, 2012 WL 4372518 (E.D. Mo. Sept. 25, 2012). But the district court there did not address *Sackett*, nor could it have decided the scope of appellate jurisdiction under 42 U.S.C. § 7607(b).

dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final."). Here, the NOV issued to Luminant Petitioners has all the hallmarks of finality considered in *Harrison* and *Sackett*. Like the letter in *Harrison* and the order in *Sackett*, the NOV was the "consummation" of EPA's decisionmaking process; it came only after more than four years of analysis by EPA and states definitively EPA's determination of Luminant Petitioners' legal status and obligations. Luminant Petitioners have no administrative recourse to contest EPA's determinations. And just as the order issued to the Sacketts obligated them to "restore" their property and exposed them to penalties if they did not, Luminant Petitioners' are obligated, according to the NOV, to immediately seek amendment of their Clean Air Act operating permit or face penalties if they do not.

## ARGUMENT

### I.    *Harrison* and *Sackett* Foreclose The Categorical Rule Sought By EPA

EPA's motion to dismiss entirely ignores the Supreme Court's decision in *Harrison*, and it misapprehends its holding in *Sackett*. These two fundamental Supreme Court precedents—and not the outdated decisions EPA cites—control the outcome here and require denial of EPA's motion to dismiss.

### A.    In *Harrison*, EPA Advanced, and the Supreme Court Accepted, an Expansive View of 42 U.S.C. § 7607(b)

In stark contrast to its position here, EPA in *Harrison* took an expansive view of 42 U.S.C. § 7607(b) and the reviewability of EPA's pre-enforcement actions under the Clean Air Act. Then, EPA argued to the Supreme Court that a three-page *letter* to the petitioner simply notifying the petitioner of "EPA['s] determination" that "new-source regulations apply to PPG's facility" "is a 'final action'" under 42 U.S.C. § 7607(b) directly reviewable in the Court of Appeals. *Harrison*, 446 U.S. at 583; Br. for Pet'rs, *Harrison v. PPG Indus., Inc.*, No. 78-1918, 1979 WL 199728, at *8–9 (Nov. 23, 1979) (Att. C).[5] Indeed, EPA conceded the issue. *Harrison*, 446 U.S. at 586.

The Supreme Court agreed with EPA and reversed this Court's decision dismissing the petition for review for lack of jurisdiction. *Id.* at 594. The Court explained, contrary to EPA's position here, that "the basic purpose of § 307(b)(1) [42 U.S.C. § 7607(b)(1)] [is] to provide prompt *pre-enforcement* review of EPA action." *Id*. at 592 (emphasis added). As the Supreme Court found, Congress amended 42 U.S.C. § 7607(b) in 1977 (adding the phrase "any other final action") "to expand[] the jurisdiction of the regional courts of appeals." *Id*. at 591.

---

[5] Copies of EPA's brief in *Harrison* and other court documents are attached for the Court's convenience, and the Court may take judicial notice of them. *See Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 n.33 (5th Cir. 1978).

**B.     In *Sackett*, the Supreme Court Confirmed the Reviewability of EPA's Pre-Enforcement Final Actions**

Similarly, in its most recent term, the Supreme Court held—this time over EPA's objection—that EPA's pre-enforcement actions under the Clean Water Act are subject to *immediate* judicial review as "final action."  *Sackett v. EPA*, 132 S. Ct. 1367 (2012).   The pre-enforcement action at issue in *Sackett* was an administrative compliance order ("ACO") issued under § 309 of the Clean Water Act (33 U.S.C. § 1319) to the owners of a residential lot in Idaho.   After the Sacketts filled a portion of their lot with dirt and rock, EPA issued an ACO, which contained a number of "Findings and Conclusions," including that the Sacketts violated the Clean Water Act by placing fill material into a wetland without a permit.  *Sackett*, 132 S. Ct. at 1371.  Based on these findings, the ACO directed the Sacketts to "restore the Site in accordance with [an EPA-approved] Restoration Work Plan" and provide EPA access to the lot and to certain documents.  *Id.*

The Sacketts brought an action under the Administrative Procedure Act ("APA") for review of the ACO.[6]   EPA, as it has done here, moved to dismiss

---

[6] Unlike the Clean Air Act, the Clean Water Act (at issue in *Sackett*) does not itself authorize direct judicial review in the Court of Appeals of "any other final action of the Administrator."  *Compare* 42 U.S.C. § 7607(b)(1) (Clean Air Act judicial review provision) *with* 33 U.S.C. § 1369(b) (Clean Water Act judicial review provision).   Thus, in *Sackett*, review proceeded under the APA, which provides for review in the district courts.  5 U.S.C. §§ 702–06.  The concepts of finality, however, are the same.  *Harrison*, 446 U.S. at 586.

arguing the action was not "final." Both the district court and the Ninth Circuit agreed with EPA and found that they lacked jurisdiction. *Id.*

The Supreme Court *unanimously* reversed. It instead concluded that the ACO "has all of the hallmarks of APA finality that our opinions establish." *Sackett*, 132 S. Ct. at 1371. In particular, the Supreme Court applied the two-part test for finality from *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997): (1) "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which 'rights or obligations have been determined,' *or* from which 'legal consequences will flow.'" (Citations omitted) (Emphasis added).

The Supreme Court concluded that the ACO satisfied both *Bennett* prongs. It was the "end" of EPA's decisionmaking process in part because the Sacketts were not entitled to further agency review. *Sackett*, 132 S. Ct. at 1372. The Court rejected EPA's contention that its invitation to the Sacketts to engage in informal discussions, including disputing the accuracy of EPA's findings, meant its decision had not been consummated: "The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Id.*

Furthermore, the ACO determined obligations and had legal consequences. The ACO imposed a legal obligation by requiring the Sacketts to "restore" their

property according to an EPA-approved Restoration Work Plan and to give EPA access to the property and to documents. *Id.* at 1371. And legal consequences flowed from the ACO because it exposed the Sacketts to double penalties in any future enforcement action and limited their ability to obtain a Clean Water Act permit from the U.S. Army Corps of Engineers. *Id.* at 1371–72.

## II. EPA's NOV To Luminant Petitioners Meets The Test For Final Action

EPA's NOV to Luminant Petitioners "has all the hallmarks of APA finality that [the Supreme Court's] opinions establish" and is properly reviewable in this Court under 42 U.S.C. § 7607(b). *Sackett*, 132 S. Ct. at 1371. EPA's motion to dismiss fails entirely to discuss the specific facts of the NOV here and cannot be reconciled with EPA's contrary position in *Harrison*. Given EPA's actions, *this* NOV meets the criteria for finality considered in *Harrison*, *Bennett*, and *Sackett*.

### A. The NOV is the Consummation of More Than Four Years of Investigation and Analysis by EPA

#### 1. The NOV is the end of EPA's decisionmaking process

Here, the plain language of the NOV and the available facts leave no doubt that the NOV is EPA's final determination that Luminant Petitioners are in violation of the Clean Air Act. The NOV contains "findings of violations," not "allegations." There is nothing tentative about EPA's words: "EPA has *determined* that Luminant has violated and continues to violate" the Clean Air Act, and it must take action to come "into compliance." Att. B at 1. "[I]ndeed, the very

name"—Notice *and Finding* of Violation—"makes clear [that] the EPA's 'deliberation' over whether [Luminant Petitioners] are in violation of the Act is at an end[.]" *Sackett*, 132 S.Ct. at 1373.[7]

And the facts *about this NOV* contradict EPA's assertion that it is "simply one early step in EPA's process." Mot. to Dismiss at 12 (citation omitted). According to Steve Thompson, Acting Associate Director of the Air/Toxics and Coordination Inspection Branch at EPA Region 6, *before* EPA issued the NOV, it received and reviewed from Luminant Petitioners "approximately 415,000 pages of information" in response to "multiple requests for information;" "EPA considered numerous documents and conducted various analyses before issuing the NOV;" and "at least ten EPA staff engineers and attorneys have worked on developing the NSR/PSD NOV to Luminant." Doc. 00512018772 at 2.

Indeed, EPA's investigation started at least four years *before* EPA issued the NOV (Att. A), and thus it deviated from what EPA says "typically" occurs when it issues NOVs. "Typically," according to EPA's lawyers, "*at the same time that a Notice of Violation is issued*, EPA also makes requests for documents and information with no pending lawsuit to the potential violator of the Clean Air Act[.]" *See* Hr'g Tr., Doc. 48, at 4:11–4, *Ameren Missouri v. EPA*, No. 11-2051

---

[7] Luminant Petitioners strongly disagree with EPA's findings and, should EPA file a judicial enforcement action, will prove they are false. *See supra* Section II and note 16. Nevertheless, *EPA's determination* is now concrete and the NOV itself reviewable.

(E.D. Mo. July 26, 2012) (Att. D) (emphasis added).[8]  But that is not what happened here.  Here, four years *before* issuing the NOV, EPA directed Luminant to provide EPA with "information *necessary to determine compliance* with the CAA[.]"  Att. A at 1 (emphasis added).  Four years later, EPA's process "to determine compliance" *ended* with the NOV.

Thus, as a final statement of EPA's determination, the NOV here is similar to the ACO in *Sackett*.  The NOV contains 48 paragraphs of factual and legal findings that, among other things, determine that the Luminant Petitioners are "in violation" of various statutory and regulatory provisions.  NOV ¶¶ 37-46.  These are comparable to the "Findings and Conclusions" in the ACO in *Sackett*.  132 S. Ct. at 1370-1.  And the NOV here is significantly more concrete and definitive than the simple letters that were held to be "final" in *Harrison*.  *Harrison* concerned a series of letters from EPA that "confirm[ed]" *petitioner's* "understanding of EPA's requirements regarding the applicability of new source performance standards . . . to the operation of [petitioner's] boilers."[9]  Letters to

---

[8] And in that "typical" situation, this Court has found finality lacking.  *Dow Chem. v. EPA*, 832 F.2d 319, 323 n.27 (5th Cir. 1987) (holding that EPA letter was not final because it was only EPA's "educated guess as to the precise nature of Dow's pre-existing legal duties" and EPA concurrently requested data from Dow).

[9] EPA's argument that the NOV here is like the "guidance letters" in *National Pork Producers*, 635 F.3d 738 (5th Cir. 2011), is demonstrably wrong.  Mot. to Dismiss at 8.  The letters in *National Pork Producers* merely explained the operation of recently revised federal regulations in an informal capacity but did not

PPG Industries, Appendix at 102 (June 8, and Aug. 3, 1977) (Att. F) (emphasis added).  Indeed, as characterized by EPA (which argued *for* finality), the letters merely "advised" the petitioner of EPA's determination and was "declaratory in form."  Att. C at *6, *9.[10]

### 2. Luminant Petitioners have no opportunity for further agency review

Nor do Luminant Petitioners have an opportunity for further agency review of the NOV, which was a determinative fact in *Sackett*.  132 S. Ct. at 1372.  EPA has recently confirmed that NOV recipients have no recourse or appeal at the agency to dispute its findings.  *See* Att. D at 9:10–14 (Court: "But it is your understanding that a regulated entity like Ameren could not have elected to go through the administrative process rather than either have the NOV sit out there, or

---

apply the regulations to a specific entity or make a determination of a violation. *See* Pet. for Review, Exs. A–C, No. 08-61093 (Apr. 2, 2009) (Att. E).

[10] EPA's reliance on *Sierra Club v. Johnson*, 541 F.3d 1257 (11th Cir. 2008), is misplaced.  Mot. to Dismiss at 12.  That case did not involve the question of whether an NOV is reviewable as "final agency action," but rather "whether the EPA Administrator has discretion under 42 U.S.C. § 7661d(b)(2) not to object to a permit when the evidence of noncompliance is merely an agency issued violation notice and a related civil complaint."  541 F.3d at 1263.  Specifically, the Court considered *one* of the potential consequences that might arise from the issuance of an NOV—an EPA objection to the granting of a Title V permit by a State—and held that EPA's determination that it had discretion not to object was entitled to deference.  The case turned, not on an interpretation of 42 U.S.C. § 7607(b), but of 42 U.S.C. § 7661d(b)(2), a provision not at issue here.  *Id*.  In answering the question before it, the Eleventh Circuit did not itself conclude that an NOV is "simply one early step"; rather, it found that EPA's position *in that case* was "reasonable" in that context.  *See Johnson*, 541 F.3d at 1267.

have an enforcement proceeding brought." DOJ Counsel: "That's right."). Instead, EPA holds all the cards, and the recipient must wait for EPA to act. *See id*. at 8:9–11 (DOJ Counsel: "[O]nly EPA can request the administrative option [to seek review of the NOV]. The potential power plant emitter cannot trigger the administrative option."); Mot. to Dismiss at 12 (stating that "[f]ollowing the issuance of an NOV, *EPA* 'may'" take further action) (emphasis added). Here, EPA only gave Luminant Petitioners an informal "opportunity to confer with [EPA] about the violations" and "the steps [Luminant] will take to bring the plants into compliance" (Att. B), but, as in *Sackett*, the chance for a meeting about a *fait accompli* does not defeat finality. 132 S.Ct. at 1372.

The fact that EPA has *judicial* enforcement options it *may* later pursue does not affect finality either, as EPA contends in its motion. Mot. to Dismiss at 12. Tellingly, EPA took a contrary position in *Harrison*, explaining that the fact that "the determination is declaratory in nature" and "short of an enforcement action" "does not alter its status as a final action." Att. C at *8–9, *14. Nor did the argument EPA makes here persuade the Supreme Court in *Sackett*, which found dispositive not whether *EPA alone* had further litigation options, but whether the recipient was entitled to "further agency review." 132 S. Ct. at 1372.

EPA's motion to dismiss thus confuses *the agency's* final determination with a court's later independent determination "whether a violation, in fact, has

occurred." Mot. to Dismiss at 12 (quoting *Sierra Club*, 541 F.3d at 1267). Finality of agency action, for purposes of judicial review, does not hinge on whether a district court may later disagree with EPA after a *de novo* proceeding, but rather on whether *EPA* has reached *its* final decision. *Sackett*, 132 S.Ct. at 1373. Here, EPA's 48-paragraph NOV issued to Luminant Petitioners makes plain that "the *EPA's deliberations* over whether [Luminant Petitioners] are in violation of the Act is at an end." *See id.* (emphasis added).

### B. According to EPA, the NOV Affects Rights and Obligations and has Legal Consequences

To meet the second prong of the finality test, the agency action must "be one by which 'rights or obligations have been determined,' *or* from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177–78 (emphasis added). Here, it did both. EPA disagrees because, its says, "Luminant did not become more or less compliant with the CAA or the Texas SIP simply because EPA shared its views on the matter in advance of any enforcement action." Mot. to Dismiss at 8–9. But this claim is directly contrary to EPA's findings in the NOV and the litigation positions it is currently taking in the Clean Air Act *enforcement* context.

In particular, the NOV "determines" that "Luminant failed, and continues to fail, to submit timely and complete Title V permit[11] applications for the Big Brown

---

[11] A "Title V permit" is an operating permit issued under Title V of the Clean Air Act. *See* 42 U.S.C. §§ 7661–7661f. A Title V permit consolidates all

and Martin Lake Power Plant with information pertaining to the modifications referenced in [the NOV] and with information concerning all applicable requirements, including . . . the requirement to apply, install and operate BACT[.]"[12] NOV ¶ 46.  The NOV further states that "any applicant who fails to submit any relevant fact or who has submitted incorrect information in a permit application [is required] *to promptly submit* such supplementary facts or corrected information *upon becoming aware* of such failure or incorrect submittal."  *Id*. ¶ 29 (emphasis added).   Thus, according to the NOV, Luminant Petitioners must supplement their Title V permit applications for Big Brown and Martin Lake to seek a BACT determination by virtue of the very fact that EPA has "shared its views" on the matter.  This permitting obligation that EPA asserts is, in and of itself, a substantial consequence of the NOV.[13]

---

requirements applicable to a source in one permit.  *See Pub. Citizen, Inc. v. EPA*, 343 F.3d 449, 453 (5th Cir. 2003).  Compliance with a Title V permit "assure[s] compliance with all emission limitations and other substantive CAA requirements that apply to the source."  *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 993 (D.C. Cir. 2005).  The State of Texas administers the Title V permit program in the State.  *See* 30 Tex. Admin. Code ch. 122 (Texas Title V program).  EPA may enforce Title V requirements in some instances.  42 U.S.C. § 7413(a)(2), (3).

[12] "BACT" refers to "Best Available Control Technology," which is "[a]n air pollution control method for a new or modified facility that through experience and research, has proven to be operational, obtainable, and capable of reducing or eliminating emissions from the facility, and is considered technically practical and economically reasonable for the facility."  30 Tex. Admin. Code § 116.10(1).

[13] Just the permitting process for BACT (not to mention its implementation) is a costly and time-consuming undertaking—"an applicant must sometimes spend

EPA itself attaches immediate legal consequences to ignoring this permitting obligation. EPA has pursued judicial enforcement and penalties using *the issuance of the NOV itself* to establish the recipient's awareness that triggers the obligation to "promptly" amend its permit. For example, in an enforcement action currently pending in this Circuit, EPA has sought penalties against Louisiana Generating, LLC ("LaGen") for a Title V permit application EPA claimed was "not true, accurate, and complete" because it lacked applicable BACT requirements. *See generally* Compl., Doc. 1, *United States v. La. Gen., LLC*, No. 09-100 (Feb. 18, 2009) (Att. G); EPA's Resp. in Opp.'n to Mot. for Summ. J., Doc. 155, at 15–16 (Mar. 14, 2011) (Att. H). As in the NOV here, EPA in that case contended that a "source [] has a duty to supplement or correct its application if it fails to submit any relevant facts or has submitted incorrect information." Att. H at 15.

When LaGen argued that this provision was not triggered because EPA had not made a determination that BACT applied to its plants, EPA responded, in part, that it "*provided such notice to LaGen when it issued its initial Notice of Violation on February 15, 2005*" and yet "the defendant continued to fail to identify the [CAA] requirements resulting from the reheater projects, despite EPA's contention [in the NOV] that such projects required the application of BACT[.]" *Id.* at 16–17

---

up to $500,000 on the permit process and [], for a complex project, the time for approval can take from five to seven years." *Alaska Dept. of Env. Conserv. v. EPA*, 540 U.S. 461, 516-7 (2004) (Kennedy, J. dissenting).

(emphasis added). Thus, according to EPA's litigation position in this Circuit, issuing an NOV does in fact trigger a legal obligation—the obligation to seek amendment of the plant's Title V permit.

And, like in *Sackett*, EPA seeks double penalties based on the issuance of an NOV. In the *LaGen* case, EPA sought separate civil penalties of between $27,500 and $37,500 for LaGen's failure to seek an amendment of its Title V permit after receiving the NOV, in addition to penalties for the underlying alleged violation. Att. G ¶¶ 28–29, 59 (citing 42 U.S.C. § 7413(a)(3) and (b) as EPA's authority to seek separate penalties for Title V violations in addition to penalties for underlying violation). Thus, EPA's statement that "[n]o statutory or regulatory provision authorizes separate and additional penalties for 'violating' an NOV" (Mot. to Dismiss at 10) is off the mark. EPA fails to mention its current enforcement position that double penalties accrue for violating Title V and its regulations *by virtue of the issuance of an NOV and the information it imparts to the recipient*. Thus, even though Luminant Petitioners dispute this theory of liability, given EPA's enforcement positions,[14] they ignore the NOV at their peril. Just like the

---

[14] As the Supreme Court in *Sackett* explained, legal consequences flowed from EPA's order, not based on whether EPA's theory of double liability would ultimately be determined to be correct, but on the fact that it was "the Government's current litigating position" that "the order exposes the Sacketts to double penalties in a future enforcement proceeding." 132 S.Ct. at 1372.

Sacketts, should they ignore the NOV, Luminant Petitioners can face EPA's claims for double penalties that would not have accrued. *Sackett*, 132 S. Ct. at 1372.

EPA's further argument that the NOV has no legal consequences because "it does not even direct or request that plaintiffs correct the alleged violations" is also contradicted by its earlier behavior. Mot. to Dismiss at 10. EPA's letter to Luminant Petitioners says they are required, in EPA's view, to take action: "[Our] conference will give you an opportunity to present information on the specific findings of violations *and the steps you will take to bring the plants into compliance*. Please plan for your technical and management personnel to attend the conference *to discuss compliance measures and commitments*. You may have an attorney represent you at this conference." Att. B (emphases added). This is similar to the directive in *Harrison* to contact the regional office "to determine the specifics" of the monitoring that EPA required. Att. F at 105. Further, in *Sackett*, the Supreme Court found finality in part because EPA's action "severely limits the Sackett's availability to obtain a permit for their fill from the Army Corps of Engineers." *Sackett*, 132 S.Ct. at 1372. Here, similarly, finality is established by EPA's position that the NOV is part of the "compliance history" to be considered in the permitting process for these plants, which would require compliance action or an appeal by Luminant Petitioners to affirmatively "demonstrate" compliance. Mot. to Dismiss at 12 n.4 (citing 30 Tex. Admin. Code § 60.3).

### III.    This Court's Review of Threshold Issues Regarding the NOV Would Not Frustrate or Overlap Any Subsequent Enforcement Action by EPA

Finally, this Court's review would not duplicate or be supplanted by an enforcement action that EPA may later file in district court based on the NOV. The nature and scope of *pre-enforcement* review under 42 U.S.C. § 7607(b), which Luminant Petitioners seek here, is necessarily different and more limited than the nature and scope of any judicial enforcement action that EPA may pursue under 42 U.S.C. § 7413(b).  *See Sackett*, 132 S. Ct. at 1374–75 (Ginsburg, J., concurring) (noting the difference between challenging "EPA's authority" underlying the ACO and challenging its "terms and conditions").  Indeed, the division of labor between the Courts of Appeals and the district courts is contemplated by the statute, which makes a valid NOV a prerequisite to judicial enforcement.  42 U.S.C. § 7413(b).

Accordingly, under 42 U.S.C. § 7607(b), issues that go to the legal validity of the NOV itself (in contrast to the substance of EPA's findings) may be reviewed by this Court.  *Cf. Sackett*, 132 S. Ct. at 1374 (noting that pre-enforcement review concerns the "validity" of EPA's action and "the question whether the regulated party is within the EPA's jurisdiction").  Among the issues of this nature that Luminant Petitioners may pursue before this Court are 1) whether EPA possessed the statutory authority that it claims under 42 U.S.C. § 7413(a)(1) to issue the NOV and make the findings of violation it did; 2) whether the NOV on its face satisfied EPA's required notice to Luminant Petitioners and the State of Texas; and 3)

whether EPA was authorized to issue the NOV to Energy Future Holdings Corp., which is neither the owner nor operator of the plants addressed in the NOV.[15]

In contrast, whether any violation of the Clean Air Act as found in the NOV *actually occurred* is a question for the fact-finder in district court should EPA file an enforcement action. In such an action, EPA must prove *de novo* the merits of its case by a preponderance of admissible evidence to prevail, and Luminant Petitioners can dispute EPA's claims with their own evidence. *Cf. Sierra Club*, 541 F.3d at 1268 (contrasting an NOV to a later "civil enforcement action" that involves "a determination of the merits of the substantive dispute").[16]

## CONCLUSION

For all these reasons, the Court should deny EPA's motion to dismiss.[17]

---

[15] This list of issues is intended to be illustrative only and not an exclusive list of issues Luminant Petitioners may raise in their opening merits brief.

[16] Indeed, full litigation in the district court of the substance of the issues raised in the NOV is needed to ensure due process. *Cf. Harrison*, 446 U.S. at 592 n.9. *See also TVA v. Whitman*, 336 F.3d 1236, 1258 (explaining that "[b]efore the Government can impose severe civil and criminal penalties, the defendant is entitled to a full and fair hearing before an impartial tribunal at a meaningful time and in a meaningful manner" including "a reasonable opportunity to be heard and present evidence") (citations omitted).

[17] Alternatively, the motion may be carried with the case, as the Court has done with threshold dispositive motions in other recent environmental cases. *See*, *e.g.*, Order, *Luminant Generation Co., LLC v. EPA*, No. 11-60158 (5th Cir. Aug. 24, 2012) (carrying with the case petitioners' motion for summary vacatur and remand); Order, *Nat'l Pork Producers v. EPA*, No. 08-61093 (5th Cir. July 9, 2009) (carrying with the case EPA's motion to dismiss for lack of finality).

Respectfully submitted,


/s/ P. Stephen Gidiere III
Counsel for Luminant Petitioners


**Counsel for Luminant Petitioners:**

P. Stephen Gidiere III
C. Grady Moore, III
Thomas L. Casey III
Balch & Bingham LLP
1901 Sixth Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

Peter D. Keisler
C. Frederick Beckner III
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
202-736-8000
pkeisler@sidley.com


Stephanie Z. Moore, General Counsel
Luminant Generation Company LLC
1601 Bryan Street, 22nd Floor
Dallas, Texas 75201

Daniel J. Kelly
Associate General Counsel
Energy Future Holdings Corp.
1601 Bryan Street, 41st Floor
Dallas, Texas 75201

## LIST OF ATTACHMENTS

Attachment A    EPA Information Request Under Clean Air Act Section 114 to Luminant (June 6, 2008)

Attachment B    Cover Letter to EPA's Notice and Finding of Violation (July 13, 2012)

Attachment C    Brief for Petitioners, *Harrison v. PPG Industries*, No. 78-8918 (Nov. 23, 1979)

Attachment D    Hearing Transcript (excerpt), *Ameren Missouri v. EPA*, No. 11-2051 (E.D. Mo. July 26, 2012)

Attachment E    Petition for Review, Exhibits A – C, *National Pork Producers v. EPA*, No. 08-61093 (5th Cir. Apr. 2, 2009)

Attachment F    Letters from EPA Regional Administrator to PPG Industries (June 8, and Aug. 3, 1977)

Attachment G    Complaint, *United States v. Louisiana Generating, LLC*, No. 09-100 (Feb. 18, 2009)

Attachment H    EPA's Response in Opposition to Motion for Summary Judgment, *U.S. v. Louisiana Gen., LLC* (Mar. 14, 2011)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 13th day of November, 2012.

<u>/s/ P. Stephen Gidiere III</u>
Counsel for Luminant Petitioners

# Attachment A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 6
1445 ROSS AVENUE, SUITE 1200
DALLAS, TX 75202-2733
JUN 0 6 2008

CERTIFIED MAIL - RETURN RECEIPT REQUESTED: 7003 0500 0003 0866 2055

Mr. Mike McCall
Chief Operations Officer
Luminant Energy
LP 14
500 N. Akard St.
Dallas, TX 75201

Re:     Information Request under Clean Air Act, Section 114
        Luminant Energy

Dear Mr. McCall:

    Enclosed is a request for information (Request) under the authority of the Clean Air Act (CAA). The purpose of this Request is to obtain information necessary to determine compliance with the CAA, including New Source Review Standards, and air permits issued by the Texas Commission on Environmental Quality for Big Brown, Monticello, and Martin Lake Steam Electric Stations.

    Please provide the information requested within thirty (30) days of receipt of this letter to Anupa Ahuja, at the above address, with a copy mailed to Greg Fried at the address below.

    If you have any questions, need to request an extension, or wish to schedule a meeting to discuss this Request, please contact Ms. Ahuja, of my staff, at (214) 665-2701.

Sincerely,

John Blevins
Director
Compliance Assurance and
Enforcement Division

Enclosure

# Attachment B



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 6
1445 ROSS AVENUE, SUITE 1200
DALLAS, TX 75202-2733

July 13, 2012

CERTIFIED MAIL - RETURN RECEIPT REQUESTED: 7001 0360 0003 6675 0813

Mr. Michael McCall
Chief Operating Officer
Luminant Generation Company, LLC
500 North Akard Street
Dallas, TX 75201-3302

Re: Notice and Finding of Violation at Big Brown Power Plant in Freestone County, Texas
    and Martin Lake Power Plant in Rusk and Panola Counties, Texas

Dear Mr. McCall:

The U.S. Environmental Protection Agency (EPA) is issuing the enclosed Notice and Finding of Violation (Notice) to Luminant Generation Company, LLC and Energy Future Holdings Corporation (collectively, Luminant). This Notice is issued in accordance with Section 113(a)(1) of the Clean Air Act (the Act), 42 U.S.C. § 7413(a)(1).

The EPA has determined that Luminant has violated and continues to violate the Prevention of Significant Deterioration (PSD) requirements of the Act, 42 U.S.C. §§ 7470-7492, the federally-approved PSD regulations of the Texas State Implementation Plan, the Operating Permit requirements under Title V of the Act, 42 U.S.C. §§ 7661 – 7661f, and the federally-approved Texas Title V program at its Big Brown Power Plant in Freestone County, Texas and at the Martin Lake Power Plant in Rusk and Panola Counties, Texas. (collectively, the plants)

EPA is offering you an opportunity to confer with us about the violations cited in the Notice. The conference will give you an opportunity to present information on the specific findings of violations and the steps you will take to bring the plants into compliance. Please plan for your technical and management personnel to attend the conference to discuss compliance measures and commitments. You may have an attorney represent you at this conference.

2

Re:  Luminant Generation Company, LLC
     Notice and Finding of Violation


     The EPA contact in this matter is Leonard Schilling.  You may call him at
(214) 665-7166 to request a conference.  You should make your request for a conference
no later than ten (10) calendar days after you receive this letter.

                                    Sincerely,

                                    John Blevins
                                    Director
                                    Compliance Assurance and
                                        Enforcement Division


Enclosure

cc:    Stephanie Zapata Moore
       General Counsel
       Luminant Generation Company, LLC

       (w/o Appendix containing material claimed as Confidential Business Information)
       Ramiro Garcia, Jr., Deputy Director
       Office of Compliance and Enforcement
       Texas Commission on Environmental Quality

3

Re:  Luminant Generation Company, LLC
     Notice and Finding of Violation


bcc:    Leonard Schilling, EPA, Region 6
        Anupa Ahuja, EPA, Region 6
        Gregory Fried, EPA, OECA
        Seema Kakade, EPA, OECA
        Ethan Chatfield, EPA, Region 5

# Attachment C

1979 WL 199728 (U.S.) (Appellate Brief)

Supreme Court of the United States.

Adlene HARRISON, Regional Administrator, and Douglas Costle,

Administrator of Environmental Protection Agency, Petitioners,

v.

PPG INDUSTRIES, INC.

No. 78-1918.

October Term, 1979.

November 23, 1979.

On Writ of Certiorari to the United States Court of Appeals for the Fifth Circuit

**Brief for the Petitioners**

Michele B. Corash, General Counsel, Todd M. Joseph, Deputy Associate, General Counsel, Earl Salo, Attorney, Environmental, Protection Agency, Washington, D.C. 20460, Wade H. McCree, Jr., Solicitor General, James W. Moorman, Assistant Attorney General, William Alsup, Assistant to the Solicitor General, Jacques B. Gelin, Michael P. Carlton, Maryann Walsh, Attorneys, Department of Justice, Washington, D.C. 20530

## *i  INDEX

| | |
|---|---:|
| Opinions below | 1 |
| Jurisdiction | 1 |
| Question presented | 2 |
| Statute and regulations involved | 2 |
| Statement | 3 |
| Summary of argument | 8 |
| Argument | 10 |
| I. The plain meaning of "final action" includes EPA's determination in this case | 12 |
| II. The legislative history demonstrates that Congress intended to expand jurisdiction under Section 307(b) to include EPA's determination in this case | 16 |
| III. The court of appeals incorrectly concluded that channeling review through the district court would advance preenforcement review | 23 |
| Conclusion | 27 |
| Appendix | 1a |

## CITATIONS

Cases:

| | |
|---|---:|
| *Abbott Laboratories v. Celebrezze,* 352 F.2d 286 | 14 |
| *Abbott Laboratories v. Gardner,* 387 U.S. 136 | 9, 14, 25, 26 |
| *Adamo Wrecking Co. v. United States,* 434 U.S. 275 | 10, 25 |
| *Arnold Tours, Inc. v. Camp,* 400 U.S. 45 | 14 |
| *Camp v. Pitts,* 411 U.S. 138 | 10, 24 |
| *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402 | 24, 26 |
| *Data Processing Service v. Camp,* 397 U.S. 150 | 14 |
| *ii  Denver & R.G.W.R.R. v. Brotherhood of Railroad Trainmen,* 387 U.S. 556 | 11 |
| *FPC v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326 | 24 |
| *First Federal Savings & Loan Ass'n of the Bahamas, Ltd. v. SEC,* 358 F.2d 358 | 13 |
| *Frozen Food Express v. United States,* 351 U.S. 40 | 14 |

*Gardner v. Toilet Goods Ass'n,* 387 U.S. 167 .......................... 25

*Hallowell v. Commons,* 239 U.S. 506 .................................... 11

*ITT v. Local 134, IBEW,* 419 U.S. 428 ................................. 12, 14

*Medical Committee for Human Rights v. SEC,* 432 F.2d 659, 14
vacated on other grounds, 404 U.S. 403 ................................

*Lloyd A. Fry Roofing Co. v. EPA,* 415 F. Sup. 799, affirmed, 26
554 F.2d 885 ...........................................................

*National Automatic Laundry and Cleaning Council v. Shultz,* 14
443 F.2d 689 ...........................................................

*New York Stock Exchange v. Bloom,* 562 F.2d 736 ................. 27

*Phillips v. SEC,* 388 F.2d 964 ........................................... 13

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget* 12
*Transatlantic,* 400 U.S. 62 .............................................

*Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367 ................. 13, 14

*Toilet Goods Ass'n v. Gardner,* 387 U.S. 158 ...................... 14, 25, 27

*United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742 14

*United States v. Florida East Coast Ry.,* 410 U.S. 224 ........... 14

*Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609 .... 12

**\*iii** Statutes and regulations:

Administrative Procedure Act 5 U.S.C. 551 *et seq.:*

5 U.S.C. 551(4) ....................................................... 13

5 U.S.C. 551(6) ....................................................... 12

5 U.S.C. 551(13) ..................................................... 12

5 U.S.C. 554 .......................................................... 12

5 U.S.C. 554(e) ....................................................... 12

5 U.S.C. 571-576 ..................................................... 18

5 U.S.C. 704 .......................................................... 9, 10, 14, 26

5 U.S.C. 706 .......................................................... 24

Clean Air Act, 42 U.S.C. 1857 *et seq.:*

Section 307(b), 42 U.S.C. 1857h-5(b) ................................. 7, 16, 19, 22, 25

Section 307(b)(1), 42 U.S.C. 1857h-5(b)(1) .......................... 7, 11, 20, 21, 24

Clean Air Act, as amended 42 U.S.C. (Supp. I) 7401, *et seq.:*

Section 111, 42 U.S.C. (Supp. I) 7411 ................................ 3

Section 111(a)(2), 42 U.S.C. (Supp. I) 7411(a)(2) ................. 4

Section 111(b)(1)(A), 42 U.S.C. (Supp. I) 7411(b)(1)(A) ...... 4

Section 111(b)(1)(B), 42 U.S.C. (Supp. I) 7411(b)(1)(B) ...... 4

Section 111(e), 42 U.S.C. (Supp. I) 7411(e) ........................ 15

Section 111(j), 42 U.S.C. (Supp. I) 7411(j) .......................... 15, 23, 24

Section 112(c), 42 U.S.C. (Supp. I) 7412(c) ......................... 15, 22, 23, 24

Section 113, 42 U.S.C. (Supp. I) 7413 ................................ 14, 22

Section 113(d), 42 U.S.C. (Supp. I) 7413(d) ......................... 23

Section 119, 42 U.S.C. (Supp. I) 7419 ................................ 22, 23

Section 119(c)(2)(A), 42 U.S.C. (Supp. I) 7419(c)(2)(A) ....... 23

**\*iv** Section 119(c)(2)(B), 42 U.S.C. (Supp. I) 7419(c)(2)(B) 23

.......................................................................

Section 119(c)(2)(C), 42 U.S.C. (Supp. I) 7419(c)(2)(C) ....... 23

Section 307(b), 42 U.S.C. (Supp. I) 7607(b) ........................ 2, 12, 15, 21, 25

Section 307(b)(1), 42 U.S.C. (Supp. I) 7607(b)(1) ................ passim.

Section 307(b)(2), 42 U.S.C. (Supp. I) 7607(b)(2) ................ 25

Section 307(e), 42 U.S.C. (Supp. I) 7607(e) ......................... 22

Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 2
Stat. 776 ..............................................................

Clean Air Act Technical and Conforming Amendments, Pub. 22
L. No. 95-190, 91 Stat. 1399 .........................................

91 Stat. 1404 ......................................................... 2

Clean Water Act, 33 U.S.C. 1311 *et seq.* ............................ 17, 18

Section 509, 33 U.S.C. 1369 ......................................... 18

5 U.S.C. 571-576 ..................................................... 17

28 U.S.C. 1331 ........................................ 7

28 U.S.C. 1332 ........................................ 7

28 U.S.C. 1337 ........................................ 7

42 U.S.C. (1964 ed. Supp. V) 1857-1857(e) ........... 16

1 C.F.R. 305.76-4 .................................... 17

1 C.F.R. 305.76-4(d) ................................. 18

1 C.F.R. 305.76-4(d)(3) .............................. 17

1 C.F.R. 305.76-4(d)(3)(5) ........................... 18

40 C.F.R. 60.1-60.15 ................................. 4

40 C.F.R. 60.2(b) .................................... 13

40 C.F.R. 60.2(g) .................................... 5

40 C.F.R. 60.2(h) .................................... 5

40 C.F.R. 60.2(i) .................................... 5

40 C.F.R. 60.4 ....................................... 13

40 C.F.R. 60.5 ................... 3, 5, 6, 8, 13, 15, 16, 27, 1a

*v  40 C.F.R. 60.14 ................................. 5

40 C.F.R. 60.40-60.43 ................................ 3

40 C.F.R. 60.40-60.46 ................................ 4

40 C.F.R. 60.40 ...................................... 1a

40 C.F.R. 60.40(a) ................................... 4

40 C.F.R. 60.40(c) ................................... 4

40 C.F.R. 60.41 ...................................... 2a

40 C.F.R. 60.41(a) ................................... 4

40 C.F.R. 60.42 ...................................... 4, 30

40 C.F.R. 60.43 ...................................... 4, 30

40 C.F.R. 60.44 ...................................... 4

Miscellaneous:

Comment, *Declaratory Orders-Uncertain Tools to Remove    13
Uncertainty?* 20 Ad. L. Rev. 257 (1968) ..............

123 Cong. Rec. H5150 (daily ed. May 26, 1977) .......... 22

123 Cong. Rec. S9478 (daily ed. June 10, 1977) ......... 21

123 Cong. Rec. S9490 (daily ed. June 10, 1977) ......... 22

123 Cong. Rec. H8507 (daily ed. Aug. 3, 1977) .......... 22

123 Cong. Rec. H8534 (daily ed. Aug. 3, 1977) .......... 22

123 Cong. Rec. H8535 (daily ed. Aug. 3, 1977) .......... 22

123 Cong. Rec. H8556 (daily ed. Aug. 3, 1977) .......... 22

123 Cong. Rec. S18372-S18373 (daily ed. Nov. 1, 1977) ...... 23

123 Cong. Rec. H11956-H11957 (daily ed. Nov. 1, 1977) ..... 23

K. Davis, *Administrative Law Treatise* §7:3 (2d ed. 1979) ..... 13

*vi  K. Davis, *Administrative Law Treatise* §4.10 (1970    14
Supp.) ...............................................

36 Fed. Reg. 5931 (1971) ............................. 4

36 Fed. Reg. 15704 (1971) ............................ 4

36 Fed. Reg. 24876 (1971) ............................ 4

41 Fed. Reg. 56767 (1976) ............................ 17

41 Fed. Reg. 56768 (1976) ............................ 18

H.R. Conf. Rep. No. 91-1783, 91st Cong., 2d Sess. (1970) .... 16

H.R. Rep. No. 94-1175, 94th Cong., 2d Sess. (1976) ...... 16, 17

H.R. Rep. No. 95-294, 95th Cong., 1st Sess. (1977) ...... 9, 19, 20, 21, 23, 26

Note, *Administrative Declaratory Orders,* 13 Stan. L. Rev.    13
307 (1961) ...........................................

Note, *Jurisdiction to Review Federal Administrative Action:*    14
*District Court or Court of Appeals,* 88 Harv. L. Rev. 980
(1975) ...............................................

S. Rep. No. 91-1196, 91st Cong., 2d Sess. (1970) ......... 16, 25

Senate Committee on Environment and Public Works, 95th    18
Cong., 2d Sess., A Legislative History of the Clean Water
Act of 1977 (1978) ...................................

Verkuil, *Judicial Review of Informal Rulemaking*, 60 Va. L.
Rev. 185 (1974) ......................................................................    14

## *1 OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-21a) is reported at 587 F.2d 237. The final decision of the Administrator (A. 97-98, 104-106) is unreported.

## JURISDICTION

The judgment of the court of appeals (Pet. App. 22a) was entered on January 8, 1979. A timely petition for rehearing was denied on February 26, 1979. On May 23, 1979, Mr. Justice Powell extended the time within which to file a petition for a writ of certiorari to and including June 26, 1979. The petition was filed on June *2 25, 1979, and was granted on October 1, 1979 (A. 108). The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

## QUESTION PRESENTED

Whether the court of appeals has original jurisdiction under Section 307(b)(1) of the Clean Air Act, 42 U.S.C. (Supp. I) 7607(b)(1), to review a final action by the Administrator applying new-source performance standards to certain power generating facilities.

## STATUTE AND REGULATIONS INVOLVED

1. Section 307(b) of the Clean Air Act, as amended by the Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 776, and by Pub. L. No. 95-190, 91 Stat. 1404, 42 U.S.C. (Supp. I) 7607(b), provides:

> (1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 112, any standard of performance or requirement under section 111, any standard under section 202 (other than a standard required to be prescribed under section 202(b)(1)), any determination under section 202(b)(5), any control or prohibition under section 211, any standard under section 231, any rule issued under section 113, 119, or under section 120, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this Act may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 or section 111(d), any order under section 111(j), under section 112(c), under section 113(d), under section 119, or under section 120, or his action under section 119(c)(2) (A), (B), or (C) (as in effect before the date *3 of enactment of the Clean Air Act Amendments of 1977) or under regulations thereunder, or any other final action of the Administrator under this Act (including any denial or disapproval by the Administrator under title I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement.

2. Pertinent passages of the following provisions are reproduced in the Appendix, *infra*:

**(a) 40 C.F.R. 60.5; and**

**(b) 40 C.F.R. 60.40 through 60.43.**

## STATEMENT

1. Section 111 of the Clean Air Act requires the Administrator of EPA to publish a list of categories of stationary sources which cause or contribute significantly **\*4** to air pollution. 42 U.S.C. (Supp. I) 7411(b)(1)(A). The Administrator is then directed to promulgate regulations establishing standards of performance for new sources within the list of categories. 42 U.S.C. (Supp. I) 7411(b)(1)(B). The Act defines "new source" as "any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source." 42 U.S.C. (Supp. I) 7411(a)(2).

On March 31, 1971, the Administrator published an initial list of stationary sources, which included "fossil fuel-fired steam generators." 36 Fed. Reg. 5931. Proposed regulations for this category were published on August 17, 1971 (36 Fed. Reg. 15704), and became effective on December 23, 1971 (36 Fed. Reg. 24876). These regulations set emission limits for three pollutants including sulfur dioxide. See 40 C.F.R. 60.1-60.15 and 60.40-60.46.

The regulations define a "fossil-fuel-fired steam generating unit" as "a furnace or boiler used in the process of burning fossil fuel for the purpose of producing steam by heat transfer." 40 C.F.R. 60.41(a). Regulated facilities are units having a heat-input rate of at least 250 million BTU per hour. 40 C.F.R. 60.40(a). For such furnaces or boilers, the regulations establish separate standards for particulate matter, 40 C.F.R. 60.42, for sulfur dioxide, 40 C.F.R. 60.43, and for nitrogen oxides, 40 C.F.R. 60.44. The regulations apply only to stationary sources for which construction or a modification was commenced after the proposal of the applicable standard (August 17, 1971). 40 C.F.R. 60.40(c). The regulations specifically provide that upon request by an owner or operator of a facility the Administrator will determine whether action taken or planned constitutes or will constitute construction, **\*5** modification or the commencement of construction or modification. 40 C.F.R. 60.5. [1]

2. Respondent, PPG Industries, Inc., a chemical manufacturing corporation, constructed a power facility at its plant in Lake Charles, Louisiana (A. 8). The power facility was designed to utilize a coordinated system of two gas turbine generators, combined with two so-called "waste-heat" boilers (A. 65-66, 68). Each generator-boiler unit operates the same way. The gas turbine generator burns fossil fuel to create hot gases that turn the turbine to produce electricity. The "waste heat" exhausted from this process is funnelled into a waste-heat boiler to aid in the combustion of additional fossil fuel. This process produces high-temperature, high-pressure steam which turns a turbogenerator to create more electricity. This electricity and the low-pressure, spent steam are then used in PPG's chemical manufacturing process (A. 18-19, 51-52, 68).

In February 1975, Conoco Oil Company, PPG's fuel supplier, advised EPA that Conoco was switching from supplying natural gas to supplying fossil fuel (fuel oil) for PPG's fossil-fuel-fired steam generators in Lake Charles (A. 8). Because such a switch might have been a "modification" of the facility within the terms of 40 C.F.R. 60.14, EPA requested more information from PPG (A. 8-9, 11, 25-26). In May and June 1976, PPG submitted information concerning the boilers used at its plant and stated that the new power facility utilizing waste heat boilers had been designed and ordered in 1970, prior to the applicable date of the New-Source Performance Standard (NSPS) regulations (A. 12-24, 27-48). EPA nevertheless concluded that the waste-heat steam generators were subject to the provisions of the NSPS regulations (A. 49-50, 59-60). In December **\*6** 1976, EPA advised PPG that because the construction of the two steam generators had commenced after the publication of the proposed regulations for fossil-fuel-fired steam generators, the fact that some of the equipment was ordered before this date was irrelevant (A. 59).

In April 1977, PPG submitted a formal request to EPA for a determination under 40 C.F.R. 60.5 that construction of the two waste-heat boilers commenced prior to the effective date of the regulations (so that the boilers were not "new source[s]"), or, in the alternative, for a determination that the NSPS regulations were in-applicable altogether to waste-heat boilers (A. 65-80, 82-94). PPG's submission included a memorandum of facts (A. 68-71) and a memorandum of law (A. 72-80). By letter of June 8, 1977, however, EPA advised PPG that the two waste-heat boilers were new sources subject to the regulations (A. 97-98). [2]

*7  3. On October 4, 1977, PPG filed a petition in the court of appeals for judicial review of EPA's determination that the standards applied to the waste-heat boilers (A. 2-3). The following month, PPG also filed a complaint against the Administrator in the United States District Court for the Western District of Louisiana, seeking an injunction invalidating the agency's action. *PPG Industries v. Costle,* No. 77-1271 (W.D. La.). [3]  PPG then challenged the jurisdiction of the court of appeals, contending that its original jurisdiction extended only to review of those actions of the Administrator specifically enumerated in Section 307(b)(1) (see pages 2-3, *supra*). EPA argued that the jurisdiction of the court of appeals was not limited to review of the actions specifically enumerated in Section 307(b)(1) but expressly included review of "any other final action" of the agency and included the determination in this case.

The court of appeals held that "any other final action" in Section 307(b)(1) did not include EPA's determination that the PPG facility was subject to the NSPS regulations, for three reasons. [4]  First, the court noted (Pet. App. 11a) that prior to the 1977 amendment of Section 307(b), "the district courts and not the courts of appeals had jurisdiction [under 28 U.S.C. 1331] to review determinations of [such] local applications * * *." [5]  Although the 1977 amendment added the phrase "any other final action" to the statutory list of items to be reviewed by the courts of appeals, the court thought *8  that it was "most revealing" that the legislative history of this amendment made no reference to any "massive shift of jurisdiction to the courts of appeals" (Pet. App. 15a). This silence suggested to the court that Congress did not really mean to shift review of numerous local determinations by EPA to the court of appeals. Second, pointing out that the administrative record here consists mostly of correspondence, the court stated that an administrative determination based on a skeletal record should be reviewed by the district court in the first instance so that "[t]he discovery apparatus of district courts" could permit "fact and record development" (*id.* at 17a, 20a). Congress, the court of appeals surmised, must have inserted "any other final action" into Section 307(b)(1) with the "mechanical limitations of the courts of appeals in mind" (*id.* at 21a). Finally, the court noted that Section 307(b)(1) specifically enumerates certain determinations for review in the court of appeals before adding the phrase "and any other final action." This enumeration, the court thought, would be redundant if "any other final action" literally comprehended *any* final action (*id.* at 15a). Therefore, Section 307(b)(1)'s "any other final action" did not include a determination under 40 C.F.R. 60.5 that a specific facility is a new-source subject to NSPS regulations (*id.* at 20a-21a).

## SUMMARY OF ARGUMENT

In the 1977 amendment to Section 307(b)(1), Congress expanded the jurisdiction of the courts of appeals to include review of all "final action [s]" of EPA under the Clean Air Act. The problem presented by this case is whether EPA's determination that PPG's boilers are subject to the new-source regulations is a "final action."

Three considerations support our conclusion that it is. First, EPA's action represents the agency's final determination, short of an enforcement action, of the issue whether the new-source regulations apply to PPG's *9  facility. That the determination is declaratory in form does not alter its status as a final action. Nor does it matter that the determination is the product of fact and law submissions to the agency and the agency's follow-up inquiries rather than the product of an evidentiary hearing. Such administrative declarations have been regarded as "final agency action" for the analogous purpose of review under the Administrative Procedure Act, 5 U.S.C. 704. They also should be regarded as "final" for the administrative review provisions of the Clean Air Act. That Congress so used the phrase in the Clean Air Act is demonstrated by the specific enumeration in Section 307(b)(1) of certain reviewable agency actions that are determined in very much the same way as the determination in this case.

Second, the legislative history shows that the addition of the "final action" clauses was intended to permit review of "essentially locally, statewide, or regionally applicable rules or orders to be reviewed in the U.S. court of appeals for the circuit in which such locality, State or region is located." H.R. Rep. No. 95-294, 95th Cong., 1st Sess. 323 (1977). The legislative history at no point calls for review in the district courts. All references are to review of final actions in the courts of appeals.

Third, the purposes of preenforcement review would be better served by construing Section 307(b)(1) to include EPA determinations of the type in question. One purpose of preenforcement review is to resolve promptly the legal obligations of regulated persons before they are required to act at their peril. See *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-156 (1967). Had the court of appeals resolved the legal issue posed in this case, that purpose would have been served, and PPG would have obtained a final appellate determination of its rights and obligations without risking civil or criminal liability. Another purpose of preenforcement **\*10** review is to establish promptly the validity or invalidity of EPA's regulatory program and its component decisions. Had the Fifth Circuit reviewed EPA's interpretation of the statute and its regulations in this case, EPA would have obtained a prompt and final appellate approval or rejection of its interpretation, at least within the territory of the Fifth Circuit. See generally *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 284 (1978). Significantly, if preenforcement review is unavailable under Section 307(b)(1) because the action is not a "final action," then preenforcement review is also unavailable under the Administrative Procedure Act, which permits review only of a "final agency action." 5 U.S.C. 704. Because the basic point of Section 307(b)(1) is to provide preenforcement review, Congress could hardly have intended any result which would completely frustrate the purposes of preenforcement review.

The court of appeals felt that preenforcement review of agency action based on a "skeletal record" would be better served by routing such cases through the district courts where discovery and additional fact finding could be used to augment the administrative record. Aside from the fact that inserting an additional layer of judicial review would frustrate prompt preenforcement review, it is well established that where an administrative record is too skeletal, the proper course is a remand to the agency for preparation of a more complete record, not judicially supervised discovery and fact finding. *Camp v. Pitts,* 411 U.S. 138, 141-143 (1973).

## ARGUMENT

Prior to the Clean Air Act Amendments of 1977, Section 307(b)(1) provided that certain specifically enumerated actions of nationwide consequences were reviewable only in the District of Columbia Circuit and that certain local actions were reviewable only in the appropriate **\*11** regional circuits. [6] The 1977 amendment added to the list of actions reviewable exclusively in the District of Columbia Circuit "any other nationally applicable regulations promulgated, *or final action* taken" under the Act (emphasis added). In parallel fashion, the amendment added to the list of EPA actions reviewable only in the appropriate regional court of appeals "any **\*12** *other final action* of the Administrator" under the Clean Air Act "which is locally or regionally applicable" (emphasis added). Congress, therefore, clearly meant to confine review of all "final action[s]," in the courts of appeals.

The plain meaning of "final action," the legislative history of Section 307(b), and its purpose all support our conclusion that EPA's determination in this case (that PPG's boilers are subject to its new-source regulations) is a "final action" within the meaning of Section 307(b)(1).

I. The Plain Meaning Of "Final Action" Includes EPA's Determination In This Case

The Clean Air Act does not define the term "final action," but the phrase has a traditional meaning. "[A]gency action" is defined by the Administrative Procedure Act to include "the whole or a part of an agency rule, order * * * or the equivalent * * * thereof * * *." 5 U.S.C. 551(13).

An "order" means "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or *declaratory* in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. 551(6) (emphasis added). [7] Such a declaratory

"order" may be issued to "terminate a controversy or remove uncertainty." 5 U.S.C. 554(e); see *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 625-628 (1973); *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 70-71 (1970); *Red* **13** *Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 372-373 n.3 (1969); *First Savings & Loan Ass'n of the Bahamas, Ltd. v. SEC,* 358 F.2d 358, 360 (5th Cir. 1966); *Phillips v. SEC,* 388 F.2d 964 (2d Cir. 1968); see generally, Comment, *Declaratory Orders-Uncertain Tools to Remove Uncertainty?* 20 Ad. L. Rev. 257 (1968); Note, *Administrative Declaratory Orders,* 13 Stan. L. Rev. 307 (1961).

The ruling in the present case is the agency's final disposition declaring the applicability of its new-source regulations to PPG's boiler operations. Short of an enforcement action, the agency has rendered its last word on the matter. [8] PPG applied for a formal determination under 40 C.F.R. 60.5 concerning whether its facility is subject to the regulations. After consideration of PPG's submissions, including a law memorandum, EPA determined that the facility is subject to the regulations. PPG's disagreement with that determination turns only on an interpretation of the new-source regulations and their application to facts submitted by PPG. No further **14** administrative appeals remain and, unless PPG honors EPA's ruling, it will be enforced through enforcement proceedings under Section 113, 42 U.S.C. (Supp. I) 7413. Such an order, even though made without an evidentiary hearing, is "final agency action." [9] *Red Lion Broadcasting Co. v. FCC, supra,* 395 U.S. at 372-373 n.3; *National Automatic Laundry and Cleaning Council v. Shultz,* 443 F.2d 689, 691-692, 698-699 (D.C. Cir. 1971); *Medical Committee for Human Rights v. SEC,* 432 F.2d 659 (D.C. Cir. 1970), vacated on other grounds, 404 U.S. 403 (1972). See generally K. Davis, *Administrative Law Treatise* §4.10 (1970 Supp.); Verkuil, *Judicial Review of Informal Rulemaking,* 60 Va. L. Rev. 185, 196-205 (1974); Note, *Jurisdiction to Review Federal Administrative Action: District Court or Court of Appeals,* 88 Harv. L. Rev. 980, 989-992 (1975). [10]

**15** That Congress used "final action" in this sense is evident from other provisions in Section 307(b)(1). EPA's determination in this case is akin to other types of actions specifically considered "final" under Section 307(b). For example, Section 307(b) makes "orders" under Section 112(c), 42 U.S.C. (Supp. I) 7412(c), reviewable only in the courts of appeals. Section 112(c) prohibits the construction of any new source which will "in the Administrator's judgment" emit "hazardous air pollutants" for which the Administrator has set a standard unless, among other things, "the Administrator finds that such source if properly operated will not cause emissions in violation of such standard * * *." [11] EPA has no formal procedures for making such judgments, and the statute specifies none. Consequently, such determinations are made by written inquiry and a letter response by the agency. An inquiry to the Administrator for his "judgment" whether a facility would emit hazardous air pollutants and, if so, for his determination that its proper operation would meet the **16** specified effluent levels, is very similar to PPG's request under 40 C.F.R. 60.5 for a determination whether its proposed boilers would be covered by the new-source regulations. In both cases, the new source is not yet operational but the pertinent facts are known. In both cases, no formal hearing is held. In both cases, the applicant has a legitimate need for a final resolution before it proceeds at its peril. [12]

II. The Legislative History Demonstrates That Congress Intended To Expand Jurisdiction Under Section 307(b) To Include EPA's Determination In This Case

From the legislative history of the 1977 Amendments it seems reasonably clear that Congress meant to place review of all "final agency action," as that phrase is traditionally used, in the courts of appeals. Prior to the 1970 amendment, the Clean Air Act did not provide for preenforcement review. See 42 U.S.C. (1964 ed. Supp. V) 1857-1857e. The Clean Air Act Amendments of 1970, however, provided for exclusive preenforcement review in the courts of appeals of certain enumerated actions. Certain standards and regulations of a national character were made reviewable by the District of Columbia Circuit. Certain actions of regional or local significance were made reviewable in the appropriate regional circuit. See generally S. Rep. No. 91-1196, 91st Cong., 2d Sess. 40-42 (1970); H.R. Conf. Rep. No. 91-1783, 91st Cong., 2d Sess. 47-48 (1970).

**17** In 1976, Congress considered-but did not enact-comprehensive amendments to the Act proposed by the House Committee on Interstate and Foreign Commerce. Those amendments would have added a number of specifically enumerated "regulations," "standards," "findings," and "actions" to the national and local lists of actions reviewable in the courts of appeals under Section

307(b). The amendment did not, however, mention any review of "any other final action." Cf. H.R. Rep. No. 94-1175, 94th Cong., 2d Sess. 295, 396-397 (1976). [13]

**\*18** In December 1976, the Administrative Conference of the United States (see 5 U.S.C. 571-576) issued recommendations for amendments to the Clean Water Act, 33 U.S.C. 1311 *et seq.* and the Clean Air Act. 41 Fed. Reg. 56767 (1976), 1 C.F.R. 305.76-4. The Conference observed, among other things, that under the Clean Air Act "it remains possible in some circumstances to obtain non-statutory review under general federal question jurisdictional statutes" because "[n]ot every action of the EPA under the Clean Air Act * * * is made reviewable in the courts of appeals" and that at least "[s]ome of the omissions appear to be inconsistent with the general statutory plan * * *." 1 C.F.R. 305.76-4(d)(3), (5).

Perhaps the overriding recommendation was in urging that

> when Congress reconsiders the judicial review provisions of the principal pollution statutes, it rationalize, alter and clarify them, guided especially by the principle that jurisdictional provisions should draw bright lines to minimize the waste and expense of litigation over whether a case has been brought in the right court. [1 C.F.R. 305.76-4(d. [14] ]

**\*19** It was against this background that a year later the House Committee on Interstate and Foreign Commerce again considered amendments to the Act. This time the committee, in revising Section 307(b), did not attempt to add more specifically enumerated items to the list of reviewable actions. Instead, the committee proposed simply to add all other "final actions" to both the national and regional review provisions of Section 307(b)(1): [15]

A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard under section 112, any standard of performance under section 111, any standard under section 202 (other than a standard required to be **\*20** prescribed under section 202(b)(1)), any determination under section 202(b)(5), any control or prohibition under section 211, [or] any standard under section 231, *any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this Act* may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 or section 111(d), or his action under section 119(c)(2)(A), (B), or (C) or under regulations thereunder, *or any other final action of the Administrator under this Act which is locally or regionally applicable* may be filed only in the United States Court of Appeals for the appropriate circuit.

The committee explained:
Paragraph (1) of [Section 307(b)] makes it clear that any nationally applicable regulations promulgated by the Administrator under the Clean Air Act could be reviewed only in the U.S. Court of Appeals for the District of Columbia. These would include, to mention but a few examples, regulations to carry out the nonattainment policy referred to in section 117 of this bill and regulations to effectuate motor vehicle assembly-line test provisions of section 206 of the act or inspection/maintenance requirements under section 208 of this bill.

[The first two sentences provide] for essentially locally, statewide, or regionally applicable rules or orders to be reviewed in the U.S. court of appeals for the circuit in which such locality, State, or region is located. This provision applies, except as otherwise provided in paragraph (4), to the Administrator's action in approving or promulgating an implementation plan for any State.

H.R. Rep. No. 95-294, *supra,* at 323-324.

**\*21** The committee thus made only one change in the two sentences establishing subject-matter jurisdiction. That change was to make "any other final action" not specifically enumerated reviewable in the courts of appeals. Since it was the only change, the committee obviously intended, in light of the otherwise parallel 1976 bill and Administrative Conference report, to enlarge jurisdiction and to enlarge it to all final actions. There is not the slightest indication that, as the lower court seems

to have believed (Pet. App. 15a), the committee simply meant to confine review to the enumerated items. To the contrary, the House Report expressly cited examples (such as regulations to carry out the nonattainment policy referred to in Section 117 of the bill) of agency actions not expressly enumerated in Section 307(b)(1) which the committee intended to fall under "final action" (see page 20, *supra*). At no time, moreover, did the committee or the Congress refer to preenforcement review in the district courts. [16] All references were to preenforcement review in the courts of appeals.

The "final action" phrase appears to have been the committee's response to the difficult drafting problem of making sure that each action deserving of review under the exhaustive legislation was covered by Section 307(b)(1). From its 1976 drafting, the committee was aware of the tedious task of augmenting the lists of specifically **\*22** reviewable actions. The committee was presumably familiar with the Administrative Conference's observation that at least some EPA actions regarded as "final agency action" under the APA were being reviewed by the district courts under federal-question jurisdiction (see note 16, *supra*). That in 1977 the committee did not attempt again to predict each EPA action worthy of judicial review seems to have been a response to these factors. Instead, the committee preferred the comprehensive language of "final action" to include not only the specific items but also any other final determinations. [17]

**\*23** The Fifth Circuit's contrary view of the legislative history was based on the absence of any mention in the legislative history of a "massive shift" of jurisdiction to the court of appeals (Pet. App. 15a). Aside from the fact that committee reports need not say what is already obvious, the House Report clearly states that the amendment "provides for essentially locally, statewide, or regionally applicable rules or orders to be reviewed in the U. S. court of appeals for the circuit in which such locality, State, or region is located." H.R. Rep. No. 95-294, 95th Cong., 1st Sess. 323 (1977). By contrast, there is no mention of judicial review in the district courts. Moreover, although the number of actions comprehended by "any other final action" is substantial, it would not seem so "massive" that it ineluctably would have provoked comment in the legislative history.

> III. The Court of Appeals Incorrectly Concluded That Channeling Review Through the District Court Would Advance Preenforcement Review

The mainstay of the court of appeals' holding was its view that preenforcement review of EPA's determination in this case (and other actions not specifically enumerated in Section 307(b)(1)) would be better served by review in the district courts where, if necessary, "skeletal" administrative records could be augmented **\*24** by discovery and further fact finding (Pet. App. 17a-20a). This argument is unpersuasive for five reasons.

First, we do not think that the administrative record in this case is "skeletal." PPG had ample opportunity to submit all the information it felt was relevant to the determination, and EPA requested further facts it concluded were relevant. That information is contained in the administrative record.

Second, as we have seen (pages 15-16 and note 11, *supra*), the administrative record in the present case is comparable to the administrative record created during EPA actions under provisions in the Clean Air Act that are specifically required to be reviewed in the courts of appeals by the second sentence of Section 307(b)(1), such as actions under Sections 111(j) and 112(c). It is therefore hard to conclude that Congress intended to exclude from Section 307(b)(1) EPA actions based on similar administrative records.

Third, the court below thought that routing such cases through the district courts would advance preenforcement review by permitting fact development through discovery. Legal issues, however, may be resolved without discovery. Indeed, factual issues are usually resolved by the agency subject only to judicial review to determine whether the findings are based on substantial evidence or are not arbitrary. 5 U.S.C. 706. More fundamentally, if an administrative record is too skeletal to permit meaningful judicial review, the court - whether trial or appellate - must remand to the agency for further determination, not conduct evidentiary proceedings in court. *FPC v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 331 (1976); *Camp v. Pitts,* 411 U.S. 138, 141-143 (1973); cf. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420 (1971).

Fourth, the basic purpose of Section 307(b)(1) - to provide preenforcement review - would be better **25** served by requiring review in the court of appeals of determinations such as the one at issue. One of the purposes of preenforcement review is to permit prompt review of an agency's interpretation of the law it enforces before affected persons act at their peril. See generally *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-156 (1967); *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 170-174 (1967); *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164-165 (1967). That purpose would have been served in this case had the court of appeals resolved the legal issue that casts a shadow over PPG's plans. PPG would have obtained a definitive ruling on the extent and type of abatement equipment required by the Act in order to operate the project rather than having to choose a course of action at the risk of choosing incorrectly. Another purpose of preenforcement review under the Clean Air Act, as the Court observed concerning Section 307(b) in *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 284 (1978), is to assure that EPA's actions are promptly and finally reviewed in order to eliminate undue delay in achieving the goals of the statute. See generally S. Rep. No. 91-1196, 91st Cong., 2d Sess. 41 (1970). Congress specifically precluded judicial review in enforcement actions of any action reviewable under Section 307(b)(1). See Section 307(b)(2), 42 U.S.C. (Supp. I) 7607(b)(2). EPA's reviewable actions are thus final unless challenged on preenforcement review within 60 days. [19] The objective of prompt and final review would have been better served had the court of appeals resolved the question of law at issue. A ruling favorable to EPA would have allowed **26** it to apply the same legal principle in other cases with confidence in its validity at least within the Fifth Circuit. An adverse ruling would have permitted EPA to reconsider its legal theory.

Finally, if preenforcement review is unavailable in the court of appeals because the action is not "final," then, contrary to the assumption of the court of appeals (Pet. App. 11a), preenforcement review is not available at all-even in the district courts. As here, only "final agency action" is reviewable under the Administrative Procedure Act. 5 U.S.C. 704. Such a result would frustrate the purposes of preenforcement review. It would also contravene the established rule that adverse agency action is presumed to be subject to effective judicial review. *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 410 (1971); *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 141. [20]

## *27 CONCLUSION

For the foregoing reasons, the judgment of the court of appeals should be vacated and the case remanded for consideration of the merits.

MICHELE B. CORASH

*General Counsel*

TODD M. JOSEPH

*Deputy Associate General Counsel*

EARL SALO

*Attorney*

*Environmental Protection Agency*

WADE H. MCCREE, JR.

*Solicitor General*

JAMES W. MOORMAN

*Assistant Attorney General*

WILLIAM ALSUP

*Assistant to the Solicitor General*

JACQUES B. GELIN

MICHAEL P. CARLTON

MARYANN WALSH

*Attorneys*

NOVEMBER 1979

## *1A  APPENDIX

### Excerpts from 40 C.F.R. 60.5-60.43

**§60.5 Determination of construction or modification.**

(a) When requested to do so by an owner or operator, the Administrator will make a determination of whether action taken or intended to be taken by such owner or operator constitutes construction (including reconstruction) or modification or the commencement thereof within the meaning of this part.

(b) The Administrator will respond to any request for a determination under paragraph (a) of this section within 30 days of receipt of such request.

*****

**Subpart D-Standards of Performance for Fossil-Fuel Fired Steam Generators**

**§60.40 Applicability and designation of affected facility.**

(a) The affected facilities to which the provisions of this subpart apply are:

(1) Each fossil-fuel-fired steam generating unit of more than 73 megawatts heat input rate (250 million Btu per hour).

(2) Each fossil-fuel and wood-residue-fired steam generating unit capable of firing fossil fuel at a heat input rate of more than 73 megawatts (250 million Btu per hour).

(b) Any change to an existing fossil-fuel-fired steam generating unit to accommodate the use of combustible materials, other than fossil fuels as defined in this subpart, shall not bring that unit under the applicability of this subpart.

(c) Except as provided in paragraph (d) of this section, any facility under paragraph (a) of this section that  **2a**  commenced construction or modification after August 17, 1971, is subject to the requirements of this subpart.

(d) The requirements of §§60.44(a)(4), (a)(5), and (b) and (d), and 60.45(f)(4)(vi) are applicable to lignite-fired steam generating units that commenced construction or modification after December 22, 1976.

## §60.41 Definitions.

As used in this subpart, all terms not defined herein shall have the meaning given them in the Act, and in Subpart A of this part.

(a) "Fossil-fuel fired steam generating unit" means a furnace or boiler used in the process of burning fossil fuel for the purpose of producing steam by heat transfer.

(b) "Fossil fuel" means natural gas, petroleum, coal, and any form of solid, liquid, or gaseous fuel derived from such materials for the purpose of creating useful heat.

(c) "Coal refuse" means waste-products of coal mining, cleaning, and coal preparation operations (e.g. culm, gob, etc.) containing coal, matrix material, clay, and other organic and inorganic material.

(d) "Fossil fuel and wood residue-fired steam generating unit" means a furnace or boiler used in the process of burning fossil fuel and wood residue for the purpose of producing steam by heat transfer.

(e) "Wood residue" means bark, sawdust, slabs, chips, shavings, mill trim, and other wood products derived from wood processing and forest management operations.

(f) "Coal" means all solid fuels classified as anthracite, bituminous, subbituminous, or lignite by the American Society for Testing Material. Designation D 388-66.

## *3a §60.42 Standard for particulate matter.

(a) On and after the date on which the performance test required to be conducted by § 60.8 is completed, no owner or operator subject to the provisions of this subpart shall cause to be discharged into the atmosphere from any affected facility any gases which:

(1) Contain particulate matter in excess of 43 nanograms per joule heat input (0.10 lb per million Btu) derived from fossil fuel or fossil fuel and wood residue.

(2) Exhibit greater than 20 percent opacity except for one six-minute period per hour of not more than 27 percent opacity.

## §60.43 Standard for sulfur dioxide.

(a) On and after the date on which the performance test required to be conducted by §60.8 is completed, no owner or operator subject to the provisions of this subpart shall cause to be discharged into the atmosphere from any affected facility any gases which contain sulfur dioxide in excess of:

(1) 340 nanograms per joule heat input (0.80 lb per million Btu) derived from liquid fossil fuel or liquid fossil fuel and wood residue.

(2) 520 nanograms per joule heat input (1.2 lb per million Btu) derived from solid fossil fuel or solid fossil fuel and wood residue.

(b) When different fossil fuels are burned simultaneously in any combination, the applicable standard (in ng/J) shall be determined by proration using the following formula:

$$\mathrm{PS_{SO_2}} = [y(340) + z(520)]/y + z$$

Where:

$\mathrm{PS_{SO_2}}$ is the prorated standard for sulfur dioxide when burning different fuels simultaneously, in nanograms per joule heat input derived from all fossil  **4a**  fuels fired or from all fossil fuels and wood residue fired.

$y$ is the percentage of total heat input derived from liquid fossil fuel, and

$z$ is the percentage of total heat input derived from solid fossil fuel.

(c) Compliance shall be based on the total heat input from all fossil fuels burned, including gaseous fuels.

***** *

Footnotes

1    The terms "construction," "modification," and "commenced" are specifically defined by the regulations. 40 C.F.R. 60.2(g), (h), (i).

2    EPA's letter of June 8, 1977, stated that performance tests would be conducted while the boilers were using 100% fuel oil. This
     prompted a request for clarification by the company on July 18, 1977 (A. 99-101). PPG expressed its understanding that the emissions
     standards for fossil-fuel-fired boilers would apply only during the performance tests and other times when the system was operating
     with 100% fossil fuel. However, since the planned mode of operation for the boilers depended on partial use of fossil fuel together
     with the turbine exhaust gas as a heat source, the emissions standards would not apply during the routine operation of the system.
     A letter from EPA's Division of Stationary Source Enforcement on August 3, 1977, confirmed this interpretation (A. 102). That
     interpretation was contrary to EPA's previous determination in the June 8, 1977, letter and in similar cases (A. 104). On August 8,
     1977, an EPA representative telephoned an official of PPG to notify it that the August 3d letter was incorrect (A. 103). This advice was
     then confirmed by EPA in its letter of August 18, 1977, in which EPA reaffirmed that the new-source performance standards applied
     to the waste-heat boilers and required PPG to install opacity monitors and to perform alternative monitoring tests (A. 104-106).

3    Continental Oil Company, intervenors in the petition for review, joined PPG as plaintiffs in the district court action. The jurisdiction
     of the district court was purportedly invoked under 28 U.S.C. 1331, 1332, and 1337.

4    The court of appeals did not reach the merits of whether PPG's waste-heat boilers were new sources within the terms of the regulations.
     The district court action involving that issue has been informally stayed pending decision in this case.

5    The preamendment language of Section 307(b)(1), 42 U.S.C. 1857h-5(b)(1), is set forth at note 6, *infra*.

6    Prior to the 1977 amendment Section 307(b)(1), 42 U.S.C. 1857h-5(b)(1), provided:
     A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard,
     any emission standard under Section 112, any standard of performance under Section 111, any standard under section 202 (other than
     a standard required to be prescribed under section 202(b)(1)), any determination under section 202(b)(5), any control or prohibition
     under section 211, or any standard under section 231 may be filed only in the United States Court of Appeals for the District of
     Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section
     110 or section 111(d), or his action under section 119(c)(2)(A), (B), or (C) or under regulations thereunder, may be filed only in
     the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such
     promulgation, approval, or action, or after such date if such petition is based solely on grounds arising after such 30th day.
     The 1977 amendments to Section 307(b)(1), enacted on August 7, 1977, were in effect when PPG filed its complaint, but had not yet
     been enacted at the time EPA made its final decision regarding the PPG facility. The jurisdictional amendments changed only the
     applicable procedures for review, and not substantive law or rights already vested. As such, the amended Section 307(b)(1) applied
     to all subsequent review actions, regardless of the date of the pertinent agency decision. See *Denver & R.G.W.R.R. v. Brotherhood
     of Railroad Trainmen*, 387 U.S. 556, 563 (1967); *Hallowell v. Commons*, 239 U.S. 506, 508 (1916).

7    *ITT v. Local 134, IBEW*, 419 U.S. 428 (1975), held that an NLRB determination under Section 10(k) of the National Labor Relations
     Act is not an "order" under 5 U.S.C. 551(6) and therefore such a proceeding is not an "adjudication" subject to 5 U.S.C. 554. However,
     a Section 10(k) determination merely assesses whether there is "reasonable cause" to believe the striking union is entitled to the

disputed work. See 419 U.S. at 444-446 & n.16. In the present case, in contrast, EPA's determination is not tentative and is its final disposition of the issue presented by PPG.

A "rule" means "the whole or part of an agency statement of general or particular applicability and future effect designed to * * * interpret * * * law or policy * * *." 5 U.S.C. 551(4). Even if the ruling in the present case were not an "order," it is an agency statement of particular applicability designed to interpret the agency's regulations, *i.e.,* an interpretive ruling. It is thus an "agency action." See generally K. Davis, *Administrative Law Treatise* §7:3 (2d ed. 1979).

8       Section 307(b)(1) refers to final action of the Administrator. The June 8, 1977, letter to PPG was signed by the Regional Administrator (A.97-98). "Administrator" is defined for purposes of the NSPS regulations as the Administrator "or his authorized representative." 40 C.F.R. 60.2(b). All requests for determinations on the applicability of the regulations are directed to the appropriate regional office of EPA. 40 C.F.R. 60.4. A final decision by the regional officer is, therefore, a "final action of the Administrator" within the statute.

9       The formal adjudicatory hearing provisions of 5 U.S.C. 554 do not apply to EPA's order inasmuch as Section 554 applies only to adjudications required by statute to be made "on the record." *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 757 (1972); *United States v. Florida East Coast Ry.,* 410 U.S. 224, 238-246 (1973); *ITT v. Local 134, IBEW,* 419 U.S. 428, 438-441 (1975).

10      Nor is finality defeated because the action is interpretive. In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149-152 (1967), the court of appeals held that the rulings at issue were merely interpretive of the statute. See *Abbott Laboratories v. Celebrezze,* 352 F.2d 286, 288-289 (3d Cir. 1965). Without disagreeing with that characterization, this Court held the rulings were "final agency action" under 5 U.S.C. 704, and could be challenged under the Administrative Procedure Act. See also *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 162-163 (1967). *Frozen Food Express v. United States,* 351 U.S. 40, 45 (1956), held that an ICC "order" narrowly interpreting an exemption in a statute it enforced was "final" and ripe for review at the behest of a carrier adversely affected by the interpretation. Although the Court did not specifically address the issue in *Data Processing Service v. Camp,* 397 U.S. 150 (1970), and *Arnold Tours, Inc. v. Camp,* 400 U.S. 45 (1970), it necessarily assumed in those cases that the Comptroller's interpretive regulations challenged in those cases were final agency actions.

11      Similarly, Section 307(b) permits review in the court of appeals of "any order under section 111(j)." Section 111(e), 42 U.S.C. (Supp. I) 7411(e), prohibits the operation of new sources in violation of the new-source standards. Section 111(j), 42 U.S.C. (Supp. I) 7411(j), allows "[a]ny person proposing to own or operate a new source" to "request the Administrator for one or more waivers" in order to "encourage the use of an innovative technological system or systems of continuous emission reduction." The Administrator may grant the request after a public hearing. He may deny it without a hearing. Such "orders" are reviewable under Section 307(b). Once again, a denial of such a request is akin to a denial of PPG's request for a determination that its facility is not subject to the new source regulations at all. The activity in question has not yet occurred but is known. It is important to the requesting party to have a final agency determination and judicial review of the determination rather than to proceed at its peril.

12      Contrary to the suggestion of the court of appeals (Pet. App. 15a), there is no redundancy in the coexistence of the specifically enumerated items and our interpretation of "any other final action." The use of the word "other" eliminates any redundancy. Moreover, it is a well-established tradition in drafting to indulge in some redundancy out of an abundance of caution to make sure that certain specific matters are treated in a certain way rather than to trust to judicial interpretations of general statutory guidelines.

13      The House Committee bill in 1976 would have amended Section 307(b)(1) to read in pertinent part:

A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard under section 112, any standard of performance under section 111 (b), *any finding of the Administrator under section 111(i)(7)(A), any regulation promulgated under section 111(d)(1), 121,* 122, 123, 124(c), *125,* 126(a), 152(f)(3), 154, 160, *207, or 302(i),* any standard under section 202 (other than a standard required to be prescribed under section 202(b)(1) *or required to be prescribed under section 202(a)(3)(A) with respect to vehicles or engines manufactured during or after model year 1983),* any determination under section 202(b)(5) *or under section 202(a)(3)(B),* any control or prohibition under section 211, or any standard under section 231 *or under section 235* may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 or section 111(d), or his action under section 119(c)(2)(A), (B), or (C), *or his action under section 121 (other than the promulgation of regulations),* or under regulations thereunder, *his action in imposing a fee under section 122, his action under section 127(b), his action in approving any plan or making any designation or redesignation under section 160,* may be filed only in the United States Court of Appeals for the appropriate circuit.

H.R. Rep. No. 94-1175, 94th Cong., 2d Sess. 396 (1976) (material that would have been inserted by the amendment is italicized).

14      The Conference recommended, among other things, (a) that judicial review under the Clean Water Act be divided among the courts of appeals as under the Clean Air Act so that "review of * * * determinations affecting single states or facilities be had in the circuit containing the state or facility" (Recommendation A) (41 Fed. Reg. 56768 (1976)), and (b) that both acts enlarge the number of specifically enumerated items to be reviewed in the courts of appeals (Recommendation E). (The Conference did not mention or consider the possibility of placing review of "all final action[s]" in the courts of appeals.)

An amendment to Section 509 of the Clean Water Act, 33 U.S.C. 1369, similar to the 1977 amendment to Section 307(b)(1), was proposed in separate legislation but tabled. See Senate Committee on Environment and Public Works, A Legislative History of the Clean Water Act of 1977, 95th Cong., 2d Sess. 1012-1029 (1978).

15   Bracketed material was to be omitted and italicized material was to be added by the House committee amendment.

The committee proposed to revise the rest of Section 307(b) as follows:

*Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.* [Any such petition shall be filed within 30 days from the date of such promulgation, approval, or action, or after such date if such petition is based solely on grounds arising after such 30th day.] *Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. No determination of the Administrator under section 122 shall be reversed by the court unless such determination is unsupported by substantial evidence on the record.*

H.R. Rep. No. 95-294, 95th Cong., 1st Sess. 440-441 (1977).

16   To be sure, the committee observed that it was adopting in large measure the "venue" recommendation of the Administrative Conference. H.R. Rep. No. 95-294, 95th Cong., 1st Sess. 324 (1977). Necessarily, however, it was also enlarging the subject-matter jurisdiction of the courts of appeals, for it was only the augmentation of subject-matter jurisdiction to include all final actions that necessitated the new assignment of venue along the national-local dichotomy in the first place. Obviously, the venue for the specifically enumerated items in the prior law had already been allocated, and they were not changed by the committee proposal.

17   The House and Senate approved Section 307(b) as proposed by the House Committee. 123 Cong. Rec. H5150 (daily ed. May 26, 1977); S9478, S9490 (daily ed. June 10, 1977). Consistent with the intent to confine review of all final actions to the courts of appeals, the Conference Committee added Section 307(e), which provides that "[n]othing in this Act shall be construed to authorize judicial review of regulations or orders of the Administrator under this Act, except as provided in this section." 123 Cong. Rec. H8507, H8534 (daily ed. Aug. 3, 1977). This reinforces a congressional intention to place judicial review of all final agency decisions in the courts of appeals.

The Conference Committee added "any rule issued under section 120 (relating to noncompliance penalties)" to the list of specifically enumerated items in the first sentence and "any order under section 120" to the list in the second sentence. 123 Cong. Rec. H8535 (daily ed. Aug. 3, 1977). No explanation was given for this insertion. See 123 Cong. Rec. H8556 (daily ed. Aug. 3, 1977). The specification was arguably unnecessary to the extent that it would have been obvious such orders were final actions of local significance. As a drafting matter, however, it would not have been unusual to make such specifications out of an abundance of caution (see note 12, *supra*).

The same is true of the insertion of more specifically enumerated items in the "technical amendments" to the Act made a few weeks later in the Clean Air Act Technical and Conforming Amendments, Pub. L. No. 95-190, 91 Stat. 1399, 1404, which changed Section 307(b) to its present language. This amendment modified the first sentence to specifically enumerate regulations under Sections 113 and 119 and the second sentence to specifically enumerate regional review of orders under Sections 111(j), 112(c), 113(d) and 119 and made clear that orders issued under section 119(c)(2)(A), (B) or (C), as in effect before the 1977 amendments, were to be reviewed in the regional courts of appeals. The very brief legislative history on these amendments shows they were added to implement the "conference agreement providing for review of grant or denial of locally applicable orders in the appropriate circuit court, and review of nationally applicable regulations in the D.C. Circuit Court." 123 Cong. Rec. S18372-18373 (daily ed. Nov. 1, 1977); 123 Cong. Rec. H11956-H11957 (daily ed. Nov. 1, 1977).

19   Section 307(b)(1) provides that a preenforcement review may be sought within 60 days after publication in the Federal Register of the nature of the "action" taken. Aside from defining precisely the time period within which review may be sought, this provision eliminates any possibility that judicial review would be precluded altogether because the affected person miscalculates and assumes the administrative action is not a final agency action. Publication in the Federal Register will put such persons on notice that the agency regards the action as final. They may then seek preenforcement review if they have not already.

EPA did not publish the PPG determination. The only effect of this lapse is a tolling of the running of the 60-day limitation on review. EPA has adopted a policy of publishing in the Federal Register notice of actions such as the determination made in this case. In addition, EPA now has a practice of advising parties such as PPG that the agency regards its action as final and that failure to seek timely preenforcement review will preclude any challenge to the determination in subsequent enforcement actions.

In this connection, EPA enforcement proceedings at the agency level are not "final actions" reviewable under Section 307(b)(1). Once agency action has reached the enforcement stage, preenforcement review is no longer available. See H.R. Rep. No. 95-294,

95th Cong., 1st Sess. 324 n.12 (1977), citing *Lloyd A. Fry Roofing Co. v. EPA,* 415 F. Supp. 799 (W. D. Mo. 1976), later affirmed, 554 F.2d 885 (8th Cir. 1977).

20    Even if preenforcement review were available in the district courts, as the court below held (Pet. App. 11a), direct resolutions by the courts of appeals eliminate a layer of judicial review and thereby allow more prompt validation or rejection of EPA's construction of the Act and its regulations.

It does not follow, however, that the court of appeals must automatically exercise its jurisdiction to review every final action by EPA under the Act challenged in the court of appeals. As *Toilet Goods Ass'n, v. Gardner,* 387 U.S. 158, 162-164 (1967), illustrates, "final agency action" may not, in some circumstances, be ripe for judicial review. Cases may arise under the Clean Air Act where a formal determination by EPA under 40 C.F.R. 60.5 is final but based on sketchy facts and highly hypothetical contingencies. See *New York Stock Exchange v. Bloom,* 562 F.2d 736, 740-742 (D.C. Cir. 1977). In such a case, the court of appeals might well dismiss the petition as premature. Given the concrete facts and live controversy in the present case, however, such a dismissal on ripeness grounds (a course of action not considered below) would not have been proper.

---

**End of Document**                                                                © 2012 Thomson Reuters. No claim to original U.S. Government Works.

# Attachment D

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF MISSOURI

 3

 4
     AMEREN MISSOURI,
 5
              Plaintiff,
 6
          vs.                        NO. 4:11-CV-2051 AGF
 7
     UNITED STATES ENVIRONMENTAL
 8   PROTECTION AGENCY,

 9            Defendant.

10   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11   PRESENT:   The Honorable Audrey G. Fleissig, Presiding

12   ATTORNEYS FOR PLAINTIFF:  Neal H. Weinfield, James J. Virtel

13   ATTORNEYS FOR DEFENDANT:  Andrew J. Lay, Andrew Hansen

14

15

16

17                         Motion Hearing

18                         July 26, 2010

19

20

21

22

23                 TERI HANOLD HOPWOOD, RMR, CRR
                   Thomas F. Eagleton Courthouse
24                   111 South Tenth Street
                   St. Louis, Missouri  63102
25
```

1          THE COURT:  Good morning.  We are here in the matter

2    of Ameren Missouri versus United States Environmental

3    Protection Agency, case number 4:11-CV-2051 AGF, and the

4    plaintiff is represented by Mr. Neal Weinfield?

5          MR. WEINFIELD:  Yes, Your Honor.

6          THE COURT:  Is it Weinfield?

7          MR. WEINFIELD:  Weinfield, Your Honor.

8          THE COURT:  Thank you, sir.  And James Virtel?

9          MR. VIRTEL:  Yes, Your Honor.

10         THE COURT:  And the defendant is represented by

11   Andrew Lay, and do you have someone else with you?

12         MR. LAY:  Yes, Your Honor, sitting with me at

13   counsel table in case I need help is Andrew Hansen from the

14   Department of Justice in Washington D.C.

15         THE COURT:  Okay.  All right.  And this case as you

16   all know involves a request for documents under FOIA, and the

17   parties have filed cross motions for summary judgment, and have

18   fully briefed the matter.  I have reviewed those briefs, I want

19   to let you know that before we get started, and now we are

20   here, I believe, at plaintiff's request for oral argument on

21   the cross motions for summary judgment.

22         MR. WEINFIELD:  Yes, Your Honor.

23         THE COURT:  Now, before we get going on your

24   arguments, I would like each of the parties to take just a

25   couple of minutes and educate me on what is the purpose and

1    effect of a Notice of Violation because I'm not sure that I

2    fully understand that, and I'm going to start with the EPA, and

3    then I'm going to hear from the plaintiff.

4         MR. LAY:  Your Honor, thank you for the opportunity

5    to argue this morning.  From the Government's perspective, the

6    purpose of what a Notice of Violation is has been already

7    resolved by Court cases.  I'm looking at my notes for the

8    actual cite.  The Union Electric case, 593 F2d 89, points out

9    that a Notice of Violation is not a final agency action.  There

10   is another case cited in the EPA's briefs, the Royster-Clark

11   case, 391 F.Supp 2d 21, that discusses that no legal

12   consequences flow from the issuance of a Notice of Violation.

13        THE COURT:  Now you've told me what it's not, and

14   I'd like you to tell me what it is.

15        MR. LAY:  A Notice of Violation, Your Honor, is

16   something that puts an emitter of potential pollution on notice

17   that they may have Clean Air Act liability.  It is not a final

18   agency action that resolves for all time the agency's ultimate

19   finding that the Clean Air Act has been violated.  Instead, it

20   is the beginning of the process.  In plain language basically

21   it says, "Watch out, wake up, there may be problems with your

22   emissions."

23        THE COURT:  From the EPA's perspective, the purpose

24   of the Notice of Violation is simply to put the prospective

25   defendant on notice?

1    MR. LAY:  Yes, enable the potential defendant to

2  take action.

3    THE COURT:  Does the EPA then move forward with

4  enforcement proceedings on some of those Notices of Violation

5  and not others?

6    MR. LAY:  That's exactly what happens.

7    THE COURT:  When a Notice of Violation is filed, are

8  there further proceedings between the parties?  In other words,

9  is there the ability of a regulated entity to dispute that,

10  come forward, deal with that in any administrative sense?

11    MR. LAY:  Typically at the same time that a Notice

12  of Violation is issued, EPA also makes requests for documents

13  and information with no pending lawsuit to the potential

14  violator of the Clean Air Act, and there is generally a

15  dialogue going on over not just what would be produced but what

16  the significance of it is, and sometimes that dialogue leads to

17  no Clean Air Act suit, and sometimes it leads to a referral to

18  DOJ and a filing of a Clean Air Act suit.

19    You can see that process here because a number of

20  violations of were issued for a number of plants, but the Clean

21  Air Act case is a much narrower subset of those NOV's.

22    THE COURT:  Right.  If I understand Mr. Smith's

23  affidavit correctly, the prospect of further litigation as a

24  result of some of those NOV's was still there.

25    MR. LAY:  True.

1          THE COURT:  Let me just hear from the plaintiff with

2     respect to that same issue.  What is your understanding of the

3     purpose and effect of an NOV?

4          MR. WEINFIELD:  Good morning, Your Honor.  Neal

5     Weinfield for Ameren Missouri.  Your Honor, our understanding

6     is different.  What we heard today was different from what I've

7     heard from 25 years of practice.  A Notice of Violation is a

8     numbered document that looks a lot like a complaint filed

9     before this Court.  It's got findings of fact, it's got

10    conclusions of law, it's got allegations, and it also sets

11    forth potential penalties that can be secured.

12          Typically, in most cases, the Notice of Violation is the

13    end of the road for the parties.  Sometimes cases are referred,

14    but usually negotiations revolve around the NOV and its

15    allegations.

16          That is what parties usually see.  They are issued by

17    EPA in every branch, air, water, land.  Penalties are often

18    issued under them.

19          THE COURT:  Penalties issued under them because the

20    parties agreed to those penalties as a resolution of the Notice

21    of Violation, or because some form of administrative

22    proceedings permit the EPA unilaterally to levy penalties?

23          MR. WEINFIELD:  That's a good question, Your Honor.

24    The Notice of Violation the way it's docketed does permit the

25    parties to take the matter through the administrative

1 proceedings before the agency.  Typically, the parties

2 negotiate a result, but not always.  There is an EPA docket

3 where they list the various penalties that have been assessed

4 by the parties.

5        THE COURT:  And did the parties go through

6 administrative proceedings in connection with this matter?

7        MR. WEINFIELD:  The Notices of Violation were

8 issued, there were no hearing-like proceedings in this matter.

9        THE COURT:  Because why?

10       MR. WEINFIELD:  I guess the EPA was apparently

11 satisfied, maybe, with the Notices of Violation, and decided to

12 refer some up to the Judicial Circuit, perhaps because the EPA

13 hasn't decided how to proceed with the other allegations in the

14 NOV.

15       THE COURT:  Could Ameren have requested

16 administrative hearing-like proceedings with respect to the

17 NOV's?  Please understand, folks, I'm not suggesting that any

18 of what I'm asking you is necessarily pertinent.  I just want

19 to understand the lay of the land a little bit better before we

20 launch into the issues that are specifically related to FOIA.

21       MR. WEINFIELD:  Ameren did not request --

22       THE COURT:  Could Ameren have requested that?

23       MR. WEINFIELD:  I guess so.  If the parties had

24 reached an impasse, typically it's the agency that refers

25 internally to itself, actually, to an ALJ to resolve the

1    proceedings.  I've never had a case where a client has said, "I

2    want to go the before the ALJ."  The parties are very pleased

3    to get it resolved.  I guess Ameren could have, if it felt it

4    was necessary, but if EPA hadn't pursued, I don't know why it

5    would.

6              THE COURT:  So on a particular Notice of Violation,

7    we have several options.  One is that the EPA is going to refer

8    that Notice of Violation to DOJ, or DOJ is going to want to

9    pursue it, and we will have litigation like is currently

10   pending before Judge Sippel.

11             MR. WEINFIELD:  Correct.

12             THE COURT:  Another option is that a Notice of

13   Violation will be issued, and either through negotiations or

14   through remediation that is taken by the regulated entity, that

15   there is nothing further that happens with respect to the

16   Notice of Violation.

17             MR. WEINFIELD:  Another possibility.

18             THE COURT:  And another possibility is that either

19   the agency itself or the regulated entity could want further

20   administrative proceedings with respect to the Notice of

21   Violation which could have the effect of narrowing, changing

22   whatever the findings are with respect to that Notice of

23   Violation.

24             MR. WEINFIELD:  Correct, that's the third angle.

25             THE COURT:  All right, am I missing an option?

 1          MR. WEINFIELD:  Just resolution is part of any of

 2    those.

 3          THE COURT:  A negotiated resolution through

 4    mediation or through negotiation.

 5          MR. WEINFIELD:  Yes.

 6          THE COURT:  All right.  Does the EPA have anything

 7    further that it wants to add on just this one narrow issue?

 8          MR. LAY:  One minor point on the Notice of

 9    Violation, if we choose the administrative option, only EPA can

10    request the administrative option.  The potential power plant

11    emitter cannot trigger the administrative option.

12          THE COURT:  And let me pull you back up here.

13    What's the purpose of going through the administrative action?

14          MR. LAY:  You end up before an Administrative Law

15    Judge that creates a record, and my guess is, and let me make

16    sure, you could ultimately get judicial review on the

17    administrative record.

18          MR. HANSEN:  No, I can correct that.

19          THE COURT:  Could you obtain penalties then as a

20    result of that administrative action?

21          MR. HANSEN:  Yes.

22          THE COURT:  So with just the issuance of the

23    violation, there would not be penalties that would result from

24    the issuance of a Notice of Violation.

25          MR. LAY:  You would have to go to the administrative

1    law --

2              THE COURT:  If in fact EPA is going to seek

3    penalties, a different type of proceeding than currently exists

4    before an enforcement proceeding before Judge Sippel, you could

5    take it through the administrative process to attempt to have

6    penalties levied.  Okay.

7              MR. LAY:  Stated another way, you could get

8    penalties from either an administrative law judge or an Article

9    III judge handling a Clean Air Act case.

10             THE COURT:  But it is your understanding that a

11   regulated entity like Ameren could not have elected to go

12   through the administrative process rather than either have the

13   NOV sit out there, or have an enforcement proceeding brought.

14             MR. LAY:  That's right.

15             THE COURT:  But the regulated entity and the EPA

16   would typically engage in discussions with respect to the NOV

17   to see if a negotiated resolution of that NOV could be

18   achieved, is that fair?

19             MR. LAY:  Exactly.

20             THE COURT:  If a negotiated resolution is not

21   achieved, then the NOV either sits out there, or some form of

22   enforcement proceeding or administrative proceeding would be

23   brought.

24             MR. LAY:  Correct.

25             THE COURT:  Okay.  All right.  Thanks.  Now, I'm

# Attachment E

U.S. COURT OF APPEALS
FILED
APR 2 2009
CHARLES R. FULBRUGE III
CLERK

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NATIONAL CHICKEN COUNCIL, and
U.S. POULTRY & EGG ASSOCIATION,

      Petitioners,

    v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY,

      Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

M-08-61093

Case No. _____

09-60236

U.S. COURT OF APPEALS
RECEIVED
APR 0 2 2009
NEW ORLEANS, LA.

## PETITION FOR REVIEW

Pursuant to section 509(b)(1) of the Federal Water Pollution Control Act,

33 U.S.C. § 1369(b)(1), and Rule 15(a) of the Federal Rules of Appellate

Procedure, the National Chicken Council ("NCC") and U.S. Poultry & Egg

Association ("USPOULTRY"), hereby petition the Court for review of the United

States Environmental Protection Agency's ("EPA"): January 16, 2009, letter from

Benjamin H. Grumbles, Assistant Administrator, Office of Water, to The

Honorable Thomas R. Carper, United States Senate (attached hereto as Exhibit A);

January 16, 2009, letter from Benjamin H. Grumbles, Assistant Administrator,

Office of Water, to The Honorable Michael N. Castle, U.S. House of

Representatives (attached hereto as Exhibit B); March 4, 2009, letter from James

1

D. Giattina, Director, Water Protection Division, to Jeff Smith, Corporate

Environmental Manager, Perdue Farms Incorporated (attached hereto as Exhibit

C); and the Final Rule issued by EPA entitled "Revised National Pollutant

Discharge Elimination System Permit Regulation and Effluent Limitations

Guidelines for Concentrated Animal Feeding Operations in Response to the

Waterkeeper Decision" (attached hereto as Exhibit D) as interpreted by the

above-referenced letters.  EPA published the Final Rule at 73 Fed. Reg. 70,418-

486 on November 20, 2008.

Venue is proper in this Court as the United States Judicial Panel on

Multidistrict Litigation, by Order dated January 16, 2009, consolidated all

petitions for review of this Final Rule in the Fifth Circuit.

Respectfully submitted,

James T. Banks
Adam J. Siegel
HOGAN & HARTSON LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile:  (202) 637-5910

Counsel for Petitioners
NCC and USPOULTRY

Dated:  April 1, 2009

2

# EXHIBIT A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

**JAN 1 6 2009**

OFFICE OF
WATER

The Honorable Thomas R. Carper
United States Senate
Washington, D.C. 20510

Dear Senator Carper:

Thank you for your letter of November 21, 2008 to the U.S. Environmental Protection Agency (EPA) concerning the status of EPA's authorization of Delaware's Concentrated Animal Feeding Operation (CAFO) program and request for a path forward to resolve the matter. Administrator Johnson has requested that I respond to you due to my conversation with you on December 5, 2008.

EPA acknowledges that Delaware has adopted a nutrient management law applicable to CAFOs in Delaware. This law and related regulations represent an affirmative step toward meeting the objectives of the Clean Water Act (CWA), including protection of water quality in Delaware and the Chesapeake Bay watershed. EPA acknowledges that Delaware's nutrient management program reaches a larger universe of animal feeding operations than is required to comply with the CWA National Pollutant Discharge Elimination System (NPDES) CAFO program. Under provisions of the CWA, the Delaware Department of Natural Resources and Environmental Control (DNREC) is authorized to administer the federal NPDES program and, as a condition of that authorization, has agreed to implement the program, including laws, regulations and implementation procedures that are at least as stringent as the federal program.

There are a number of programmatic issues that prevent EPA's approval of the CAFO provisions of Delaware's NPDES program. You have noted correctly that the most significant problem has been what triggers the requirement for a CAFO to seek and obtain coverage under an NPDES permit. Delaware maintains that an NPDES permit is only required when a CAFO meets the numerical animal limit, has a discharge into waters of the state, and is in non-compliance with Delaware Nutrient Management Regulations. This is not consistent with the requirements of the CWA and supporting regulations.

The federal CAFO regulations do not include a provision for evaluating "functional equivalency" of a state program. The minimum requirements of the federal regulations serve as a national floor to ensure a level playing field for owners and operators of such facilities. The CWA requires that point source dischargers must have a valid NPDES permit prior to discharging pollutants into the waters of the United States. For CAFO operations, the NPDES permit identifies controls on the discharge and provides other record keeping and reporting

requirements. If a CAFO that discharges or proposes to discharge does not have a valid NPDES CAFO permit, as required under the CWA and 40 CFR 122.23(d) and (f), it is exposing itself to risk of citizen suit and/or federal/state enforcement. While compliance with the Delaware nutrient management program provides many important environmental benefits, it does not constitute automatic compliance with the requirements of the CWA.

As authorized by the CWA, the NPDES permit program controls water pollution by regulating point sources that discharge pollutants into waters of the United States. The CWA prohibits the discharge of "pollutants" through a "point source" into a "water of the United States" except where authorized by an NPDES permit. CAFOs are defined as a point source under Section 502 of the CWA and are further defined in 40 CFR 122.23. The term pollutant is defined very broadly in the CWA and associated regulations. See 40 CFR 122.2. For example, in the case of CAFOs, pollutants include raw materials, products, or byproducts, including manure, litter, and feed. Potential sources of such pollutants at a CAFO could include manure handling and storage activities, feed storage, litter storage, and litter released through confinement house ventilation fans. For CAFOs, any point source discharge of stormwater that comes into contact with these materials and reaches waters of the United States is a violation of the CWA unless authorized by a Clean Water Act NPDES permit.

EPA proposes a two-step process to move forward. The first phase focuses on getting operations that meet the federal Clean Water Act CAFO definition and "discharge or propose to discharge" to seek coverage under an NPDES permit. Under the federal CAFO regulations, as amended in October 2008, dry poultry CAFOs that discharge or propose to discharge pollutants into waters of the United States must seek permit coverage by February 27, 2009, or be subject to federal/state/citizen enforcement for failure to do so. It is important that the State of Delaware inform poultry operations in Delaware of this important date and the actions producers must take in order to be in compliance with the CWA. EPA also suggests that DNREC implement an outreach initiative to poultry operations in Delaware with dry manure handling systems that discharge or propose to discharge, informing them of the need to seek coverage under an NPDES permit by February 27, 2009. EPA can provide materials to facilitate this outreach if necessary. EPA will work expeditiously with the State to achieve these objectives.

The second phase would be for EPA to work with Delaware to provide assistance in making the necessary changes to their CAFO regulations that EPA could approve. Issues that must be resolved include:

- Duty to Apply (40 CFR 122.23);
- State Program Authorization (40 CFR part 123);
- Temporary Stockpiling of Litter and Wet Manure Operations (40 CFR 122.23);
- Conformance with Effluent Limitations Guidelines for CAFOs (40 CFR part 412);
- Public Access and Notification of Nutrient Management Plans (40 CFR 122.23(h) and 40 CFR part 124);
- Entry and Inspection Conditions (40 CFR 123.26); and
- Enforcement Penalties (40 CFR 123.27).

EPA will propose to DNREC and the Delaware Department of Agriculture a meeting within one month to map out a schedule to deal with phase two of this process. We believe that the negotiations on the necessary regulatory changes could be concluded within six months, with approvable regulations in place within one year.

We appreciate the interest expressed by the Delaware Congressional Delegation on this critical environmental matter and share the urgency to get this resolved as soon as possible. If you have any questions or concerns, please do not hesitate to contact me or have your staff contact Mr. Shawn Garvin, EPA's Delaware Liaison, at 215-814-2998.

Sincerely,

Benjamin H. Grumbles
Assistant Administrator

cc:    Donald S. Welsh
       Regional Administrator

# EXHIBIT B



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

**JAN 1 6 2009**

OFFICE OF
WATER

The Honorable Michael N. Castle
U.S. House of Representatives
Washington, D.C. 20515

Dear Congressman Castle:

Thank you for your letter of November 21, 2008 to the U.S. Environmental Protection Agency (EPA) concerning the status of EPA's authorization of Delaware's Concentrated Animal Feeding Operation (CAFO) program and request for a path forward to resolve the matter. Administrator Johnson has requested that I respond to you due to my conversation with Senator Carper on December 5, 2008.

EPA acknowledges that Delaware has adopted a nutrient management law applicable to CAFOs in Delaware. This law and related regulations represent an affirmative step toward meeting the objectives of the Clean Water Act (CWA), including protection of water quality in Delaware and the Chesapeake Bay watershed. EPA acknowledges that Delaware's nutrient management program reaches a larger universe of animal feeding operations than is required to comply with the CWA National Pollutant Discharge Elimination System (NPDES) CAFO program. Under provisions of the CWA, the Delaware Department of Natural Resources and Environmental Control (DNREC) is authorized to administer the federal NPDES program and, as a condition of that authorization, has agreed to implement the program, including laws, regulations and implementation procedures that are at least as stringent as the federal program.

There are a number of programmatic issues that prevent EPA's approval of the CAFO provisions of Delaware's NPDES program. You have noted correctly that the most significant problem has been what triggers the requirement for a CAFO to seek and obtain coverage under an NPDES permit. Delaware maintains that an NPDES permit is only required when a CAFO meets the numerical animal limit, has a discharge into waters of the state, and is in non-compliance with Delaware Nutrient Management Regulations. This is not consistent with the requirements of the CWA and supporting regulations.

The federal CAFO regulations do not include a provision for evaluating "functional equivalency" of a state program. The minimum requirements of the federal regulations serve as a national floor to ensure a level playing field for owners and operators of such facilities. The CWA requires that point source dischargers must have a valid NPDES permit prior to discharging pollutants into the waters of the United States. For CAFO operations, the NPDES permit identifies controls on the discharge and provides other record keeping and reporting

requirements. If a CAFO that discharges or proposes to discharge does not have a valid NPDES CAFO permit, as required under the CWA and 40 CFR 122.23(d) and (f), it is exposing itself to risk of citizen suit and/or federal/state enforcement. While compliance with the Delaware nutrient management program provides many important environmental benefits, it does not constitute automatic compliance with the requirements of the CWA.

As authorized by the CWA, the NPDES permit program controls water pollution by regulating point sources that discharge pollutants into waters of the United States. The CWA prohibits the discharge of "pollutants" through a "point source" into a "water of the United States" except where authorized by an NPDES permit. CAFOs are defined as a point source under Section 502 of the CWA and are further defined in 40 CFR 122.23. The term pollutant is defined very broadly in the CWA and associated regulations. See 40 CFR 122.2. For example, in the case of CAFOs, pollutants include raw materials, products, or byproducts, including manure, litter, and feed. Potential sources of such pollutants at a CAFO could include manure handling and storage activities, feed storage, litter storage, and litter released through confinement house ventilation fans. For CAFOs, any point source discharge of stormwater that comes into contact with these materials and reaches waters of the United States is a violation of the CWA unless authorized by a Clean Water Act NPDES permit.

EPA proposes a two-step process to move forward. The first phase focuses on getting operations that met the federal Clean Water Act CAFO definition and "discharge or propose to discharge" to seek coverage under an NPDES permit. Under the federal CAFO regulations, as amended in October 2008, dry poultry CAFOs that discharge or propose to discharge pollutants into waters of the United States must seek permit coverage by February 27, 2009, or be subject to federal/state/citizen enforcement for failure to do so. It is important that the State of Delaware inform poultry operations in Delaware of this important date and the actions producers must take in order to be in compliance with the CWA. EPA also suggests that DNREC implement an outreach initiative to poultry operations in Delaware with dry manure handling systems that discharge or propose to discharge, informing them of the need to seek coverage under an NPDES permit by February 27, 2009. EPA can provide materials to facilitate this outreach if necessary. EPA will work expeditiously with the State to achieve these objectives.

The second phase would be for EPA to work with Delaware to provide assistance in making the necessary changes to their CAFO regulations that EPA could approve. Issues that must be resolved include:

- Duty to Apply (40 CFR 122.23);
- State Program Authorization (40 CFR part 123);
- Temporary Stockpiling of Litter and Wet Manure Operations (40 CFR 122.23);
- Conformance with Effluent Limitations Guidelines for CAFOs (40 CFR part 412);
- Public Access and Notification of Nutrient Management Plans (40 CFR 122.23(h) and 40 CFR part 124);
- Entry and Inspection Conditions (40 CFR 123.26); and
- Enforcement Penalties (40 CFR 123.27).

EPA will propose to DNREC and the Delaware Department of Agriculture a meeting within one month to map out a schedule to deal with phase two of this process. We believe that the negotiations on the necessary regulatory changes could be concluded within six months, with approvable regulations in place within one year.

We appreciate the interest expressed by the Delaware Congressional Delegation on this critical environmental matter and share the urgency to get this resolved as soon as possible. If you have any questions or concerns, please do not hesitate to contact me or have your staff contact Mr. Shawn Garvin, EPA's Delaware Liaison, at 215-814-2998.

Sincerely,

Benjamin H. Grumbles
Assistant Administrator

cc:    Donald S. Welsh
       Regional Administrator

# EXHIBIT C



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

MAR   4 2009

<u>**CERTIFIED MAIL**</u> 7003 1680 0001 0750 3179
<u>**RETURN RECEIPT REQUESTED**</u>

Jeff Smith
Corporate Environmental Manager
Perdue Farms Incorporated
P.O. Box 1537
Company House
Salisbury, Maryland  21802-1537

   Re: Questions about the federal concentrated animal feeding operation regulations

Dear Mr. Smith:

   Thank you for your questions about the federal concentrated animal feeding operation
(CAFO) regulations. Denise Tennessee, Agricultural Program Coordinator for the United States
Environmental Protection Agency (EPA), Region 4, referred your questions concerning the
CAFO regulations including the revisions that were published in the Federal Register on
November 20, 2008, to my attention.

   As I understand, you are concerned that EPA Regions 3 and 4 may be interpreting the
federal CAFO regulations inconsistently and would like further clarification from Region 4.  The
two specific issues you raised are: (1) Do growers in Alabama, Georgia, Florida, Kentucky,
North Carolina, and South Carolina need to submit federal permit applications or will their
current state permits satisfy their federal compliance obligations?; and (2) Do growers need a
federal permit even if they operate a dry poultry litter farm because of potential runoff from the
production area?  If so, are there examples of dry poultry litter operations having a discharge.

   The Clean Water Act (CWA) prohibits the discharge of pollutants into waters of the
United States from point sources, including CAFOs, except as authorized by the terms and
conditions of a valid national pollutant discharge elimination system (NPDES) permit. CWA
section 301, 33 U.S.C., 1311.  Whether a grower has a non-NPDES permit under a state program
does not affect its duty to apply for a NPDES permit under the CWA.  If the grower is a CAFO
that either discharges or proposes to discharge (*i.e.*, is designed, constructed, operated, or
maintained such that a discharge will occur) pollutants into waters of the United States, then that
grower must apply for an NPDES permit.  It is the responsibility of the grower to decide whether
to apply based on whether its operation discharges or proposes to discharge.  As discussed in the
preamble of the CAFO regulation revisions published on November 20, 2008 (2008 Preamble),
"CAFO operators must objectively assess whether a discharge from the CAFO, including from
the production area or land application areas under the control of the CAFO, is occurring or will

occur for purposes of determining whether to obtain permit coverage." See 73 Fed. Reg. 70,423 (2008).

As part of the November 2008 CAFO regulation revisions, State permitting authorities may allow CAFOs that are not required to seek permit coverage to certify that they do not discharge or propose to discharge. See 73 Fed. Reg. 70,481-83 (2008) (to be codified at 40 CFR 122.23(i)). There is no obligation for unpermitted CAFOs to certify; it is strictly voluntary. However, the no discharge certification option is not available to unpermitted CAFOs until the State permitting authority modifies its regulations and/or statute to allow for this option. As part of the certification process, the CAFO regulations set forth **objective criteria** for a CAFO operator to use to determine if the CAFO qualifies for the no discharge certification. However, "EPA encourages unpermitted CAFOs that choose not to certify to consider the set of criteria for certification eligibility when deciding whether to seek permit coverage, and this final rule provides in § 122.23(j)(2) that these same criteria may be used to establish that a CAFO did not propose to discharge prior to a discharge occurring." See 73 Fed. Reg. 70,424 (2008).

Additionally, EPA did not extend the February 27, 2009 compliance deadline that was published on July 24, 2007 in the Federal Register. See 72 Fed. Reg. 40,250 (2007). As stated in the 2008 Preamble,

> "In this final rule, EPA is not extending the February 27, 2009, compliance deadlines. EPA believes that the time between publication of this final rule and February 27, 2009, is adequate for unpermitted CAFOs that discharge or propose to discharge to develop an NMP and seek permit coverage. EPA notes that most of the technical provisions of the 2003 CAFO rule (*e.g.*, the substantive NMP requirements) were unaffected by the *Waterkeeper* decision, and therefore CAFOs have already had the information they need to develop NMPs and have not needed to wait for further EPA action before doing so. In States where general permits have been issued and have not expired, eligible CAFOs may seek permit coverage under applicable existing permits. Where general permits are not available, CAFOs may seek permit coverage by submitting an individual permit application. As mentioned above, 40 CFR 123.62(e) provides that States will have one year from the promulgation date of this final rule, or two years if statutory changes are needed, to adopt the requirements of this final rule. During this interim period, EPA expects States to issue permits that comply with all technical requirements of the 2003 rule that were unaffected by the *Waterkeeper* decision and, absent regulatory or statutory barriers, to provide for NMP submission, public review of NMPs, and incorporation of the NMP terms into the permit."

See 73 Fed. Reg. 70,457 (2008). All of your growers should be reminded of the compliance deadlines. If a CAFO that discharges or proposes to discharge does not have a valid NPDES permit, as required under the CWA and 40 CFR 122.23(d) and (f), it is exposing itself to the risk of citizen suits and/or federal/state enforcement. As EPA stated in the 2008 Preamble, "with respect to CAFOs subject to permitting as of February 27, 2009, EPA would take into consideration whether a permit application has been submitted and whether the entity is operating in accordance with its NMP and all other applicable requirements of the 2003 CAFO rule and this final rule." 73 Fed. Reg. 70, 457-58 (2008).

2

As stated above, in order to comply with the CWA prohibition against unpermitted discharges, point sources, including CAFOs, must have a valid NPDES permit prior to discharging pollutants into waters of the United States. The term pollutant is defined very broadly in the CWA and associated regulations. See 40 CFR 122.2. For example, in the case of CAFOs, pollutants can include raw materials, products, or byproducts, including manure, litter, and feed. Potential sources of such pollutants at a CAFO could include manure handling and storage activities, feed storage, litter storage, exposed stockpiles of manure/litter, and litter released through confinement house ventilation fans. For CAFOs, any point source discharge of stormwater that comes into contact with these materials and reaches a water of the United States is in violation of the CWA unless authorized by an NPDES permit.

Under the CAFO regulations, as amended in November 2008, dry poultry CAFOs that discharge or propose to discharge (*i.e.*, designed, constructed, operated, or maintained such that a discharge will occur) pollutants into waters of the United States must seek NPDES permit coverage by February 27, 2009, or be subject to federal/state/citizen enforcement for failure to do so. As discussed in the 2008 Preamble, "the agricultural stormwater discharge exemption applies only to precipitation-related discharges from land application areas under the control of the CAFO where application of manure, litter, or process wastewater is in accordance with appropriate nutrient management practices as specified in 40 CFR 122.42(e)(1)(vi)–(ix)." See 73 Fed. Reg. 70,458 (2008). Furthermore, "the exclusion for agricultural stormwater does not apply to discharges from the CAFO production area." See 73 Fed. Reg. 70,458 (2008). If the **only** discharges from the CAFO qualify for the agriculture stormwater exemption, including proper maintenance of documentation supporting the appropriate land application practices, then the CAFO may not have a duty to apply for an NPDES permit. However, if the CAFO has any discharges that do not qualify as agriculture stormwater (*e.g.*, discharges from the production area), then the CAFO is required to apply for an NPDES permit. When deciding whether to seek coverage under an NPDES permit, EPA strongly encourages all CAFOs to perform an objective assessment of their operation as explained above.

While the EPA has made revisions to the CAFO regulations promulgated in 2003 in response to the Second Circuit's 2005 decision in *Waterkeeper Alliance et al. v. EPA*, 399 F.3d 486, the Court's decision did not affect the agricultural stormwater exception provisions in the CAFO regulations. All growers should already be familiar with the requirements to qualify for this exemption. The 2008 Preamble also provides additional clarification about the agricultural stormwater exclusion. I encourage you and your growers to review this information as well as the guidance provided in 2003.

This letter should assure you that EPA Region 4 is interpreting the requirements under the CWA and the federal CAFO regulations consistently with national guidelines, which should also be consistent with guidance you have received from EPA Region 3. After reviewing this letter, if there are any issues where you continue to believe EPA Regions 3 and 4 are inconsistent, please bring those issues to my attention and I will work with Region 3 and EPA Headquarters to resolve any perceived conflicts.

In addition to the November 20, 2008 Federal Register publication, I encourage you and your growers to view the additional information available about the federal CAFO regulations on

EPA's website at http://cfpub.epa.gov/npdes/afo/cafofinalrule.cfm and the compliance assistance information available on EPA's website at http://cfpub.epa.gov/npdes/afo/virtualcenter.cfm.

If you have any additional questions or concerns, please contact Sam Sampath, Regional CAFO Permitting Coordinator, at (404) 562-9229. Legal inquiries should be directed to Laurie Dubriel, Associate Regional Counsel, at (404) 562-9574.

Sincerely,

James D. Giattina
Director
Water Protection Division

# Attachment F

Furthermore, we did not think we could justify the inclusion of waste materials in determining compliance with NSPS simply because the Agency, when it established NSPS for fossil fuel-fired steam generators on December 23, 1971, had gathered data for *only* units which burn 100 percent fossil fuel.

On November 22, 1976, EPA amended NSPS to permit blending of wood residue and fossil fuel during the performance tests. Several companies requested this amendment to enable them to comply with the $SO_2$ standard by burning a combination of wood residue and high sulfur fossil fuels. However, this amendment applies only to combinations of fossil fuel and food residue and to no other combination of fossil fuel and waste material. Therefore, any steam generator, which is burning a combination of fossil fuel and gas turbine exhaust gases and is subject to NSPS, is required to conduct the performance tests, as required by section 60.8, while burning 100% fossil fuel. This is to prevent interference from the gas turbine exhaust gases which might adversely affect emissions of $NO_x$.

In accordance with this ruling, it will be necessary for PPG either to obtain lower sulfur fuel oil or to combine FGD with 1% fuel oil in order to comply with the $SO_2$ standard.

If either PPG or the Regional Office is not satisfied with the present regulation, we suggest that you express your concerns to the Emissions Standards and Engineering Division in Durham, N.C.

If you have any further questions on this determination do not hesitate to contact Craig Cobert of my staff at 755-2564.

/s/ *Ed*
EDWARD E. REICH

[Italicized material appears as handwritten material in record]

Received
EPA Region VI
1977 May 11 PM 12:12
Enforcement Division

ENVIRONMENTAL PROTECTION AGENCY

Jun 8 1977

CERTIFIED MAIL—
RETURN RECEIPT REQUESTED #560130

Mr. George P. Cheney, Jr.
Assistant Counsel
PPG Industries, Inc.
One Gateway Center
Pittsburgh, Pennsylvania 15522

Dear Mr. Cheney:

We have reviewed your letter of April 13, 1977, and the memoranda attached thereto, concerning the two "waste heat" boilers of "Power Plant C" at PPG's Lake Charles, Louisiana plant. We considered your letter as a request for reconsideration of the determination given in our letter of October 5, 1976. After consulting with the Division of Stationary Source Enforcement, we reaffirm our prior determination that the two "waste heat" boilers are subject to provisions of Standards of Performance for Fossil Fuel Fired Steam Generators. 40 CFR, Part 60, Subpart D.

As stated in our letter of December 22, 1976, to PPG, the determination of when a facility (subject to a Standard of Performance) commenced construction depends solely on the construction of that facility. Therefore, we cannot favorably consider your request that the commencement of construction of two "waste heat" boilers be tied to the construction of the entire Power Plant C.

The two boilers each have the capability of operating at more than 250 million British thermal units per hour heat input. For this reason the boilers come within the scope of the Standards of Performance for fossil fuel fired steam generating units even though the boilers can burn a combination of fuel and turbine exhaust gases.

As to the question of how to determine compliance, on April 17, 1972, the Office of Enforcement ruled, in a similar case that:

98

The combustion turbine facility clearly is not subject to the present Federal regulations, and both the combustion effluent and thermal energy from the turbine may be discharged to the atmosphere without being limited by the standards. There would be no logic, then in penalizing an owner or operator who chooses to use the exhaust heat, which otherwise would be wasted, in a waste heat recovery steam generator unit, with or without supplemental fuel.

Accordingly, we agree that both the heat input and the emission contribution of the combustion turbine will be excluded in determining whether the steam generator plant complies with the standards. Compliance will be judged only on the amount of heat and combustion effluents added by supplemental fuel used in the waste heat recovery steam generator, which is the affected facility.

Therefore, it is necessary for the performance tests to be conducted on 100% fossil fuel.

If you have any additional questions on this matter, please contact Mr. James Veach at (214) 749-2142.

Sincerely yours,

/s/ J. Paul Comola for
JOHN E. WHITE
Regional Administrator

bcc: Larsen, DSSE
knudson (6S&A)

[Concurrence and routing notations and handwritten
notations omitted in printing]

---

99

*Vernet*

### CLEARY, GOTTLIEB, STEEN & HAMILTON
1250 Connecticut Avenue, N.W.
Washington, D.C. 20036

(202) 223-2161

Cable: Clearygoeuw Washington
Twx 7108220108

ROBERT C. BARNARD
FRED D. TURNAGE
R. MICHAEL DUNCAN
DONALD L. MORGAN
CHARLES D. MAHAFFIE, JR.
J. EUGENE MARANS
DOUGLAS E. KLIEVER
DANIEL B. SILVER
KENNETH L. BACHMAN, JR.
CHARLES F. LETTOW
RICHARD deC. HINDS
RESIDENT PARTNERS

MATTHEW NALE
WASHINGTON COUNSEL

SARA D. SCHOTLAND
ERIC SCHWARTZ
JOHN B. MAGNEY
HENRY J. PLOG, JR.
EDWARD C. MODELL
RICHARD E. GARDINER
LEE C. BUCHHEIT
JOHN W. WILMER, JR.
EUGENE M. GOOTT
THOMAS C. NILD
JOSEPH HENREBOH

GEORGE W. BALL
COUNSEL

NEW YORK OFFICE
ONE STATE STREET PLAZA
NEW YORK 10004

PARIS OFFICE
41, AVENUE DE FRIEDLAND
75008 PARIS, FRANCE

BRUSSELS OFFICE
RUE de la LOI, 23
1040 BRUSSELS, BELGIUM

LONDON OFFICE
WINCHESTER HOUSE
77 LONDON WALL
LONDON EC2N 1DA, ENGLAND

July 18, 1977

Mr. Edward E. Reich
Director, Division of Stationary Source Enforcement
Environmental Protection Agency
401 M Street, S. W.
Washington, D. C. 20460

Dear Mr. Reich:

By letter dated June 8, 1977, from Mr. John C. White, Region VI Administrator, to Mr. George P. Cheney, Jr. of PPG Industries, Inc., the Agency stated its decision that two waste-heat boilers being constructed at PPG's Lake Charles, Louisiana works were subject to certain provisions of the Standards of Performance for Fossil-Fuel Fired Steam Generators, 40 C.F.R. Part 60, Subpart D. Mr. White's letter emphasized that the waste-heat boilers were capable of operation with 100 percent fossil fuel without use of turbine exhaust gases, even though the boilers normally would operate with a sub-

102

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY
Washington, D.C. 20460

August 3, 1977

Charles F. Lettow, Esq.          OFFICE OF ENFORCEMENT
Cleary, Gottlieb, Steen and Hamilton
1250 Connecticut Ave., N.W.
Washington, D.C. 20086

Dear Mr. Lettow:

Your letter of July 18, 1977, requests confirmation of your understanding of EPA's requirements regarding the applicability of new source performance standards for fossil-fuel fired boilers (40 CFR § 60.40 *et seq.*) to the operation of PPG's Lake Charles, Louisiana waste-heat boilers.

This letter is to confirm your understanding: (1) that except for the time of the performance test or other periods when a boiler is operating on 100 percent fossil fuel, the standards for fossil-fuel fired boilers would not apply to the operation of PPG's waste-heat boilers in their planned mode of operation (significant heat input from turbine exhaust gas); and (2) that any new source performance standard for waste-heat boilers which would be proposed and promulgated in the future would not apply to PPG's Lake Charles, Louisiana waste-heat boilers which commenced construction prior to the proposal date of the new standard.

If you have any questions on this matter, please contact Doug Farnsworth of my staff at (202) 755-2570.

Sincerely yours,

/s/ *Edward E. Reich*
EDWARD E. REICH, Director
Division of Stationary
Source Enforcement
(EN-341)

*CONFLICT*
*WITH D-1*

[Italicized material appears as handwritten notation in the record; some handwritten notations omitted]

103

MEMORANDUM TO FILES      August 17, 1977

SUBJECT: NSPS Determination for PPG's Lake Charles, La., facility

FROM:    Doug Farnsworth, Attorney-Advisor

I called Mr. Douglas Kliever, a partner at Cleary, Gottlieb, Steen and Hamilton, counsel for PPG, on August 8, 1977. I informed Mr. Kliever of the possibility that the determination in our August 3, 1977, letter to Mr. Lettow of his firm would be changed. I told him we would make a decision as soon as possible, but not to rely on the August 3, 1977, letter as an accurate statement of Agency policy.

I received a call from Mr. George Cheney, PPG house counsel, on August 8, 1977. He expressed his displeasure at our possible retraction of the August 3, 1977, letter. I informed him that we would make a decision as soon as possible.

I returned a phone call from Mr. Charles Lettow, counsel for PPG, on August 12, 1977, and read part of the letter we intended to mail out that day to correct our earlier letter of August 3, 1977. He requested that we delay sending the letter until after he had a chance to meet with DSSE personnel during the week of August 22, 1977. I responded that we would let him know early next week.

Rich Biondi and I spoke to Charles Lettow on August 16, 1977, and explained that PPG would not have to install monitors for $SO_2$ or $NO_x$. He indicated that because of that decision, no meeting would be necessary.

[Handwritten notations omitted in printing]

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY

August 18, 1977

OFFICE OF ENFORCEMENT

Mr. Charles F. Lettow
Cleary, Gottlieb, Steen and Hamilton
1250 Connecticut Ave., N.W.
Washington, D.C. 20036

Dear Mr. Lettow:

A re-examination of our August 3, 1977, letter to you concerning PPG's Lake Charles, Louisiana, waste-heat boilers reveals a misstatement of the applicable regulatory requirements affecting the PPG facility. On August 8, 1977, a member of my staff, Douglas Farnsworth, telephoned Mr. Douglas Kliever, of your firm, to notify him of the possible re-determination.

Our August 3, 1977, letter stated that your understanding was correct

that except for the time of the performance test or other periods when a boiler is operating on 100 percent fossil fuel, the standards for fossil fuel-fired boilers would not apply to the operation of PPG's wasteheat boilers in their planned mode of operation (significant heat input from turbine exhaust gas)
. . . .

That statement is not consistent with previous EPA determinations in similar cases, nor is it consistent with EPA Region VI's June 8, 1977, determination letter to Mr. George P. Cheney, Jr. of PPG. It is correct that during a performance test the boiler must operate at 100 percent fossil fuel. However, subsequent to the performance test, compliance will be judged on the amount of heat and emissions attributed to the fossil fuel used in the waste heat boiler. Thus, the standards of performance for a fossil fuel-fired steam generator will apply to the PPG facility at all other times after the performance test as well. However, compliance with the standard will be determined based on the heat input from the fossil

---

fuel and the emissions directly related to the combustion of that fossil fuel. Any heat input or emissions caused by the waste-heat will be disregarded in determining compliance.

As stated in 40 CFR § 60.11(a), compliance with standards shall be determined only by performance tests established by 40 CFR § 60.8. However, sources subject to new source performance standards are required, pursuant to 40 CFR § 60.11(d), "to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions." Since PPG has chosen low sulfur fuel as the method for meeting the standard, the regulations require burning such fuel at all times subsequent to the performance test.

As was indicated to you during your August 17, 1977, telephone conversation with Doug Farnsworth and Rich Biondi of my staff, in-stack continuous monitors for $NO_x$ and $SO_2$ will not have to be installed on the PPG facility. However, an opacity monitor must be installed and operational prior to conducting performance tests (40 CFR 60.13(b)). In addition, PPG will be required to perform some form of alternative monitoring. This may include monitoring and reporting on the sulfur content of the fossil fuel burned in the boiler. PPG should contact our Region VI office in Dallas, Texas, to determine the specifics of the alternative monitoring requirements, as well as the opacity monitor.

The second point made in the August 3, 1977, letter which confirmed that PPG's Lake Charles, Louisiana, facility would not be subject to any new source performance standard for waste-heat boilers which might be proposed and promulgated in the future, is accurate in that a standard more stringent than the present one would not be applicable to the PPG facility.

I apologize for the incorrect statement made in our earlier letter. However, the position taken above is consistent with Region VI's original June 8, 1977, determination to PPG. If you have any questions on this mat-

106

ter, please contact Douglas Farnsworth of my staff at (202) 755-2570.

Sincerely yours,

/s/ *Edward E. Reich*
EDWARD E. REICH, Director
Division of Stationary
Source Enforcement

cc: Director, Enforcement Division
Region VI
Jack Farmer, SDB

[Italicized material appears as handwritten material in record; some handwritten notations omitted]

107

[PPG Emblem]

**INDUSTRIES**

PPG Industries, Inc./Industrial Chemical Division
P.O. Box 100/Lake Charles, La. 70601

September 6, 1977

CERTIFIED MAIL—RETURN
RECEIPT REQUESTED

Ms. Adlene Harrison, Administrator
U. S. Environmental Protection Agency
First International Building
1201 Elm Street
Dallas, TX 75270

Re: Waste Heat Steam Generator
Notification of Initial Start-up

Dear Ms. Harrison:

In compliance with paragraph 60.7(a)(3) of 40 CFR 60, Standards of Performance for New Stationary Sources, this *is to advise* that initial start-up of the first waste heat boiler of Powerhouse C at PPG Industries, Inc., Lake Charles, Louisiana facility, was achieved on August 24, 1977.

Yours truly,

/s/ *James E. Wyche III*
JAMES E. WYCHE III
Coordinator Environmental Systems

/as

cc: J. F. Coerver
Louisiana Air Control Commission

G. P. Cheney, Jr.
PPG Industries, Inc.

[Handwritten notations and date received stamps omitted in printing]

# Attachment G

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LOUISIANA GENERATING, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges:

## NATURE OF THE ACTION

1.  This is a civil action brought against Louisiana Generating, LLC ("Louisiana Generating") (or "defendant") pursuant to Sections 113(b) and 167 of the Clean Air Act ("the Act"), 42 U.S.C. § 7413(b) and 7477, for injunctive relief and the assessment of civil penalties for violations of the Prevention of Significant Deterioration ("PSD") provisions of the Act, 42 U.S.C. §§ 7470-92; the federally approved Louisiana PSD regulations of the Louisiana State Implementation Plan ("SIP"); Title V of the Act, 42 U.S.C. §§ 7661-7661f, and the federally approved Louisiana Title V program, or any rule or permit issued thereunder.

- 1 -

2.     The defendant owns and operates two electric generating units at a plant in Louisiana which underwent modification without appropriate and/or adequate permits, and without installing and employing the best available control technology ("BACT") to control emissions of nitrogen oxides ("NO$_x$") and/or sulfur dioxide ("SO$_2$") as the Act requires.

3.     As a result of defendant's operation of the generating units following these unlawful modifications and the absence of appropriate controls, significant amounts of NO$_X$ and SO$_2$ pollution each year have been, and still are being, released into the atmosphere.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction of the subject matter of this action pursuant to Sections 113(b) and 167 of the Act, 42 U.S.C. §§ 7413(b) and 7477, and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

5.     Venue is proper in this District pursuant to Sections 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b), (c), and 1395(a), because violations occurred and are occurring in this District, the facilities at issue are operated by the defendant in this District, and Defendant has its headquarters and principal place of business in this District.

## NOTICES

6.     On December 8, 2006, the EPA issued a Notice and Finding of Violations ("NOV") to the defendant pursuant to Section 113(a)(1) and (3) of Act, 42 U.S.C. §§ 7413(a)(1) and (3), and provided a copy of the NOV to the State of Louisiana.

7.     The United States has provided notice of the commencement of this action to the State of Louisiana as required by Section 113(b) of the Act, 42 U.S.C. § 7413(b).

- 2 -

8.     The 30-day period established in 42 U.S.C. § 7413, between issuance of the NOV and commencement of a civil action, has elapsed.

## THE DEFENDANT

9.     The defendant Louisiana Generating owns and operates the Big Cajun II Power Plant ("Big Cajun II"), a coal-fired electric utility steam generating power plant located four miles northeast of New Roads, Point Coupee Parish, Louisiana.  The defendant is a limited liability corporation incorporated in the State of Delaware, and a wholly owned subsidiary of NRG Energy, Inc. ("NRG Energy").

10.     The defendant is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

## STATUTORY BACKGROUND

11.     The Clean Air Act is designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

The National Ambient Air Quality Standards

12.     Section 109 of the Act, 42 U.S.C. § 7409, requires the Administrator of EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS" or "ambient air quality standards") for those air pollutants ("criteria pollutants") for which air quality criteria have been issued pursuant to Section 108 of the Act, 42 U.S.C. § 7408. The primary NAAQS are to be adequate to protect the public health with an adequate margin of safety, and the secondary NAAQS are to be adequate to protect the public welfare, from any

- 3 -

known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

13.     Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is termed an "attainment" area.  An area that does not meet the NAAQS is termed a "nonattainment" area.  An area that cannot be classified due to insufficient data is termed "unclassifiable."

14.     At times relevant to this complaint, Big Cajun II which is the subject of this action has been located in an area that had been classified as attainment for $SO_2$ and unclassifiable-attainment for NOx.

15.     Pursuant to 42 U.S.C. § 7410, each State must adopt and submit to EPA for approval a State Implementation Plan ("SIP") that provides for the attainment and maintenance of the NAAQS.  The State of Louisiana has adopted a SIP that has been approved by EPA. 40 C.F.R. Part 52, Subpart T.

The Prevention of Significant Deterioration Requirements

16.      Part C of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration ("PSD") of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS.  These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the

- 4 -

consequences of such a decision and after public participation in the decision making process. 42 U.S.C. § 7470. These provisions are referred to herein as the "PSD program."

17. Section 161 of the Act, 42 U.S.C. § 7471, requires that each applicable SIP contain a PSD program. On April 24, 1987, EPA approved a revision to the Louisiana SIP which provides for State issuance and enforcement of permits to prevent the significant deterioration of air quality. 52 *Fed. Reg.* 13671. EPA also has approved subsequent revisions to Louisiana's PSD regulations. 40 C.F.R. §§ 52.970(c) and 52.999(c). The PSD program in the Louisiana SIP is codified at the Louisiana Administrative Code ("LAC") 33:III.509.

18. Section 165(a) of the Act, 42 U.S.C. § 7475(a), among other things, prohibits the construction and operation of a "major emitting facility" in an area designated as attainment or unclassifiable unless a permit has been issued that comports with the requirements of Section 165 and the facility is subject to BACT for each pollutant subject to regulation under the Act that is emitted from the facility. Section 169(1) of the Act, 42 U.S.C. § 7479(1), designates fossil-fuel fired steam electric plants of more than 250 million British thermal units ("BTUs") per hour heat input and that emit or have the potential to emit 100 tons per year ("tpy") or more of any pollutant to be "major emitting facilities."

19. Section 169(2) of the Act, 42 U.S.C. § 7479(2), defines "construction" as including "modification" (as defined in Section 111(a) of the Act). "Modification" is defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a), to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

- 5 -

20.     Applicable provisions in the PSD regulations in the Louisiana SIP have at all

relevant times prohibited a major stationary source from constructing or operating a major

modification in an area designated as attainment or unclassified without, among other things,

first obtaining a PSD permit, undergoing a BACT determination, and applying BACT pursuant to

such determination for each relevant pollutant.  LAC 33:III.509.B, 509.I, 509.J.3, 509.R (which

correspond to 40 C.F.R. §§ 52.21(b)(12), 52.21(j), 52.21(r)(1)).  The definitions contained in the

PSD regulations in the Louisiana SIP have at all relevant times defined "major modification" to

include "a physical change in or change in the method of operation of a major stationary source

that would result in a significant net emissions increase of any pollutant subject to regulation

under [the Clean Air Act]."  LAC 33:III.509.B (which corresponds to 40 C.F.R. § 52.21(b)(2)(i)).

The regulations have at all relevant times defined "major stationary source" to include fossil fuel-

fired steam electric plants of more than 250 million BTUs per hour heat input.  LAC 33:III.509.B

(which corresponds to 40 C.F.R. § 52.21(b)(1)(i)).

Title V

21.     Title V of the Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit

program for certain sources, including "major sources."  The purpose of Title V is to ensure that

all "applicable requirements" for compliance with the Act, including PSD requirements, are

collected in one place.

22.     Louisiana's Title V operating permit program was granted full approval by EPA

on September 12, 1995 (60 *Fed. Reg.* 47296, effective October 12, 1995).  Louisiana's Title V

operating permit program is found at LAC 33:III Chapter 5.

- 6 -

23.     Section 502(a) of the Act, 42 U.S.C. § 7661a(a), and the Louisiana Title V operating permit program have at all relevant times made it unlawful for any person to violate any requirement of a permit issued under Title V, or to operate a Part 70 source except in compliance with a permit issued by a permitting authority under Title V.

24.     Section 503(c) of the Act, 42 U.S.C. § 7661b(c), provides that any person required to have a permit must submit to the permitting authority a compliance plan describing how the source will comply with all applicable requirements, and an application for a permit signed by a responsible official who must certify the accuracy of the information submitted.

25.     Section 504(a) of the Act, 42 U.S.C. § 7661c(a), implementing regulations of the Act, 40 C.F.R. Part 70, and the Louisiana Title V operating permit program regulations have at all relevant times required that each Title V permit include, among other things, enforceable emission limitations and such other conditions as are necessary to assure compliance with applicable requirements of the Clean Air Act, including any applicable PSD requirement to comply with an emission rate that meets BACT.

26.     The Louisiana Title V operating permit program regulations require that a source submit a timely and complete permit application which, among other things, identifies all applicable requirements (including any requirement to meet BACT pursuant to PSD), certifies compliance with all applicable requirements, and contains a compliance plan for all applicable requirements for which the source is not in compliance.   LAC 33:III.501.C, 517.C and 517.D (which correspond to 40 C.F.R. § 70.5).

27.     The Louisiana Title V operating permit program regulations require that any permit issued must incorporate all federally applicable requirements.  No construction,

- 7 -

modification, or operation of a facility which ultimately may result in an initiation or increase in emissions may begin until a permit has been approved and issued by LDEQ. LAC 33:III.501.C, 517.A.3, and 517.B.2 (which correspond to 40 C.F.R. § 70.6).

## ENFORCEMENT PROVISIONS

28. Sections 113(a)(1) and (3) of the Act, 42 U.S.C. § 7413(a)(1) and (3), provide that the Administrator may bring a civil action in accordance with Section 113(b) of the Act whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of, *inter alia*, (1) the Prevention of Significant Deterioration requirements of Section 165(a) of the Act, 42 U.S.C. § 7475(a); (2) Title V of the Act, 42 U.S.C. §§ 7661-7661f, or any rule or permit issued thereunder; or (3) the Louisiana SIP or any permit issued thereunder.

29. Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the Administrator to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $25,000 per day for each violation occurring before January 31, 1997; up to $27,500 per day for each such violation occurring between January 31, 1997 and March 15, 2004; $32,500 for each such violation occurring between March 15, 2004 and January 12, 2009; and $37,500 for each such violation occurring after January 12, 2009; pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, against any person whenever such person has violated, or is in violation of, *inter alia,* the requirements or prohibitions described in the preceding paragraph.

30.    Section 167 of the Act, 42 U.S.C. § 7477, authorizes the Administrator to initiate

an action for injunctive relief, as necessary to prevent the construction or modification of a major

emitting facility which does not conform to the PSD requirements in Part C of the Act.

## DEFENDANT'S COAL-FIRED GENERATING UNITS

31.    The defendant is the owner and operator of the Big Cajun II Power Plant, a fossil

fuel fired electric utility steam generating plant that consists of three units, known as Units 1, 2,

and 3 located in New Roads, Louisiana.  Big Cajun II Units 1 and 2 were initially permitted in

1976, but began operation in 1981.

32.    Cajun Electric Power Cooperative, Inc. ("Cajun Electric") is the former owner and

operator of Big Cajun II.  In 1994, Cajun Electric filed a Chapter 11 petition in the United States

Bankruptcy Court for the Middle District of Louisiana ("Bankruptcy Court").

33.    In November 1996, Cajun Electric wrote to LDEQ that the company had operating

problems with the boilers at Big Cajun II, Units 1 and 2 from the time they began operation in

1981.  As a result of repairs to the pulverizers and boiler combustion chambers, the company

stated that the boilers were able to generate steam output equivalent to their original maximum

heat input capacity of 5863 million BTU/per hour.  Cajun Electric also stated that in 1994 and

1995 it replaced certain turbine components at Big Cajun II, Units 1 and 2.

34.    In the fall of 1998, Cajun Electric replaced major portions of the primary and high-

temperature boiler reheater with new pre-fabricated tube bundles at Unit 1 of the Big Cajun II

Power Plant at an estimated cost of $5,000,000.

35.    In the spring of 1999, Cajun Electric replaced major portions of the primary and

high-temperature boiler reheater with new pre-fabricated tube bundles at Unit 2 of the Big Cajun

- 9 -

II Power Plant at an estimated cost of $5,000,000. At or near the time the reheater elements were replaced at Unit 2, other construction projects also were performed, including the replacement of waterwall panels.

36.     In September 1999, Cajun Electric wrote to LDEQ that Big Cajun II, Units 1 and 2, had "higher operating capacity in 1999."

37.     In March 2000, Cajun Electric reported to the LDEQ as part of its annual Criteria Pollutant Emissions Certification Statement that for reporting year 1999 the boilers at Units 1 and 2 of Big Cajun II had a maximum heat input capacity of 6420 million BTU/per hour.

38.     In February 2000, Cajun Electric reported to the United States Energy Information Administration ("EIA") on Form EIA-860 that for reporting year 1999 Big Cajun II Units 1 and 2 each had a maximum generator nameplate capacity of 611 megawatts ("MW"). In May 2001, the defendant reported to the EIA on Form EIA-860 that for reporting year 2000 Big Cajun II Unit 1 had a maximum generator nameplate capacity of 638 MW, and that Big Cajun II Unit 2 had a maximum generator nameplate capacity of 632.5 MW.

39.     On September 21, 1999, the defendant, NRG Energy, and Ralph R. Mabey, as Chapter 11 Trustee of Cajun Electric, entered into a Fifth Amended and Restated Asset Purchase and Reorganization Agreement ("Asset Purchase Agreement"). Pursuant to the Asset Purchase Agreement, the defendant acquired substantially all of the assets of Cajun Electric (section 2.1) and assumed any environmental liabilities that attached to the owner of the acquired assets, including Big Cajun II, by operation of law (section 2.4).

40.     On October 14, 1999, the Bankruptcy Court confirmed Cajun Electric's Second Amended and Restated Creditors' Plan of Reorganization ("Reorganization Plan"). As part of the Reorganization Plan, the Bankruptcy Court approved the Asset Purchase Agreement.

41.     On March 10, 2000, the defendant filed a certificate with the Secretary of State of Louisiana authorizing it to do business in the State of Louisiana.

42.     On March 17, 2000, the defendant and Cajun Electric notified LDEQ regarding Cajun Electric's intent to transfer its environmental permits to the defendant pursuant to the terms of the Asset Purchase Agreement. As part of that notification, the defendant certified and accepted responsibility, coverage, and liability for the permits and permit application of Big Cajun II. On March 30, 2000, LDEQ approved the change in ownership of Big Cajun II from Cajun Electric to Louisiana Generating.

43.     Beginning on April 1, 2000, the defendant became the owner and operator of the assets formerly owned by Cajun Electric, including Big Cajun II and Cajun Electric's other generation assets.

44.     On September 14, 2001, the defendant submitted a revised Title V permit application for the Big Cajun II facility to LDEQ. The defendant submitted supplemental information to LDEQ dated October 4, December 17, and December 26, 2001; March 14 and July 1, 2002; July 31, 2003; August 11, 2004; and March 30, 2005.

45.     The defendant's Title V application, as supplemented, was not complete because it failed to identify and describe all applicable requirements and other specific information that may be necessary to implement and enforce applicable requirements of the Act or to determine the applicability of such requirements, including, but not limited to, a description of the reheater

- 11 -

modifications performed in 1998 and 1999 and a plan and compliance schedule for determining

and complying with BACT at Big Cajun II, Units 1 and 2. The defendant's Title V application

also did not include the relevant requirements of Section 165(a) of the Act, 42 U.S.C. § 7475(a)

and L.A.C. 33:III.509J - O for Units 1 and 2.

46.    On August 22, 2005, LDEQ issued a Title V permit (Permit No. 2260-00012-VO)

to Big Cajun II. Because of the deficient application, the Title V permit does not require the

defendant to comply with all applicable federal and Louisiana requirements with respect to the

determination and installation of BACT at Big Cajun II, Units 1 and 2.

47.    At all times relevant to this complaint, the Big Cajun II Power Plant was a "major

emitting facility" and "major stationary source," within the meaning of the Act and the PSD

regulations in the Louisiana SIP for NOx and/or $SO_2$. At all times relevant to this complaint, the

Big Cajun II Plant was a "major source" within the meaning of Title V of the Act and the

Louisiana Title V program regulations.

### FIRST CLAIM FOR RELIEF

(PSD Violations at the Big Cajun II Plant, Unit No. 1)

48.    Paragraphs 1 through 47 are realleged and incorporated herein by reference.

49.    In 1998, Cajun Electric commenced construction of one or more major

modifications, as defined in the Act and the Louisiana SIP, at the Big Cajun II Plant without

applying for or receiving a PSD permit. These modifications included one or more physical

changes or changes in the method of operation at Unit No. 1 of the Big Cajun II Plant, including

the replacement of major portions of the primary and high-temperature boiler reheater at Unit

No. 1. These modifications resulted in significant net emissions increases, as defined by the

- 12 -

relevant PSD regulations, of $SO_2$ and/or $NO_X$.  LAC 33:III.509.B (which corresponds to 40

C.F.R. § 52.21(b)(2), (b)(3), and (b)(23).

50.     Since April 1, 2000, the defendant has owned and operated Unit 1 of the Big

Cajun II Plant without having or seeking a PSD permit covering the major modifications

identified in paragraph 49.

51.     The defendant has not complied with the PSD requirements in the Louisiana SIP

with respect to the major modifications at Big Cajun II.  Among other things, the defendant has

failed to obtain a PSD permit as required by the Louisiana SIP prior to operation of the major

modifications at Unit 1 of Big Cajun II.  LAC 33:III.509.I (which corresponds to 40 C.F.R. §

52.21(i).  As a result, the defendant failed to comply with the PSD requirements of LAC

33:III.509.J-O (which correspond to 40 C.F.R. §§ 52.21(j) - (o), including the requirement to

apply BACT for control of $NO_x$ and $SO_2$ at Unit 1 of Big Cajun II.

52.     The defendant has violated and continues to violate Section 165(a) of the Act, 42

U.S.C. § 7475(a), and the PSD provisions of the Louisiana SIP, LAC 33:III.509, at Unit 1 of Big

Cajun II.  Unless restrained by an order of this Court, these and similar violations of the Act will

continue.

53.     As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of

the Act, 42 U.S.C. § 7477, the violations set forth above subject the defendant to injunctive relief

and civil penalties of up to $27,500 per day for each such violation occurring between January

31, 1997 and March 15, 2004; $32,500 for each such violation occurring between March 15,

2004 and January 12, 2009; and $37,500 for each such violation occurring after January 12,

- 13 -

2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. §

2461, as amended.

## SECOND CLAIM FOR RELIEF

(Title V Violations at Big Cajun II Plant, Unit No. 1)

54.     Paragraphs 1 through 53 are realleged and incorporated herein by reference.

55.     As set forth above, the defendant commenced construction or operation of one or

more major modifications at Big Cajun II, Unit No. 1, as defined under the PSD regulations in

the Louisiana SIP.  As a result, these modifications triggered the requirements to, *inter alia,*

obtain a PSD permit establishing emissions limitations that meet BACT and operate in

compliance with BACT.  The defendant failed to satisfy these requirements.

56.     The defendant failed to submit a complete application for a Title V operating

permit for Big Cajun Unit No. 1 that identifies all applicable requirements, accurately certifies

compliance with such requirements, contains a compliance plan for all applicable requirements

for which the source was not in compliance (including the requirement to meet BACT pursuant

to a new BACT determination under PSD), and other specific information that may be necessary

to implement and enforce the applicable requirements of the Act, Title V, or to determine the

applicability of such requirements.

57.     The defendant has failed to obtain a proper or adequate Title V operating permit

for Big Cajun II that contains emission limitations for $NO_x$ and/or $SO_2$ at Unit 1 that meet BACT

pursuant to a new BACT determination.  The defendant thereafter has operated Big Cajun Unit

No. 1 without meeting such limitations and without having an adequate operating permit that

- 14 -

requires compliance with such limitations or that contains a compliance plan for all applicable requirements for which the source is not in compliance.

58.    The defendant's conduct has violated and continues to violate Sections 502(a), 503(c), and 504(a) of the Act, 42 U.S.C. §§ 7661a(a), 7661b(c), and 7661c(a), 40 C.F.R. §§ 70.5-70.6, and the Louisiana Title V operating permit program regulations. LAC 33:III.507, 517. Unless restrained by an order of this Court, these and similar violations will continue.

59.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject the defendant to injunctive relief and civil penalties of up to $27,500 per day for each such violation occurring between January 31, 1997 and March 15, 2004; $32,500 for each such violation occurring between March 15, 2004 and January 12, 2009; and $37,500 for each such violation occurring after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended.

## THIRD CLAIM FOR RELIEF

(PSD Violations at the Big Cajun II Plant, Unit No. 2)

60.    Paragraphs 1 through 59 are realleged and incorporated herein by reference.

61.    In 1999, Cajun Electric commenced construction of one or more major modifications, as defined in the Act and the Louisiana SIP at the Big Cajun II Plant without applying for or receiving a PSD permit. These modifications included one or more physical changes or changes in the method of operation at Unit No. 2 of the Big Cajun II Plant, including the replacement of major portions of the primary and high-temperature boiler reheater at Unit No. 2. These modifications resulted in significant net emissions increases, as defined by the

- 15 -

relevant PSD regulations for one or more of the following: $SO_2$ and $NO_x$.  LAC 33:III.509.B

(which corresponds to 40 C.F.R. § 52.21(b)(2), (b)(3), and (b)(23)).

62.    Since April 1, 2000, the defendant has owned and operated Unit 2 of the Big

Cajun II Plant without seeking a PSD permit for the major modifications identified in paragraph

61.

63.    The defendant has not complied with the PSD requirements in the Louisiana SIP

with respect to the major modifications at Unit 2 of Big Cajun II.  Among other things, the

defendant has failed to obtain a PSD permit as required by the Louisiana SIP prior to operation of

the major modifications at Unit 2 of Big Cajun II.  LAC 33:III.509.I (which corresponds to 40

C.F.R. § 52.21(i).  As a result, the defendant failed to comply with the PSD requirements of LAC

33:III.509.J-O (which correspond to 40 C.F.R. §§ 52.21(j) - (o), including the requirement to

apply BACT for control of $NO_x$ and/or $SO_2$ at Unit 2 of Big Cajun II.

64.    The defendant has violated and continues to violate Section 165(a) of the Act, 42

U.S.C. § 7475(a), and the PSD provisions of the Louisiana SIP, LAC 33:III.509, at Big Cajun II.

Unless restrained by an order of this Court, these and similar violations of the Act will continue.

65.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), and Section 167 of

the Act, 42 U.S.C. § 7477,  the violations set forth above subject the defendant to injunctive

relief and civil penalties of up to $27,500 per day for each such violation occurring between

January 31, 1997 and March 15, 2004; $32,500 for each such violation occurring between March

15, 2004 and January 12, 2009; and $37,500 for each such violation occurring after January 12,

2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. §

2461, as amended.

- 16 -

## FOURTH CLAIM FOR RELIEF

(Title V Violations at Big Cajun II Plant, Unit No. 2)

66.    Paragraphs 1 through 65 are realleged and incorporated herein by reference.

67.    As set forth above, the defendant commenced construction or operation of one or more major modifications at Big Cajun II, Unit No. 2, as defined under the PSD regulations in the Louisiana SIP.  As a result, these modifications triggered the requirements to, *inter alia,* obtain a PSD permit establishing emissions limitations that meet BACT and operate in compliance with BACT.  The defendant failed to satisfy these requirements.

68.    The defendant failed to submit a complete application for a Title V operating permit for Big Cajun Unit No. 2 that identifies all applicable requirements, accurately certifies compliance with such requirements, contains a compliance plan for all applicable requirements for which the source was not in compliance (including the requirement to meet BACT pursuant to a new BACT determination under PSD), and other specific information that may be necessary to implement and enforce the applicable requirements of the Act, Title V, or to determine the applicability of such requirements.

69.    The defendant has failed to obtain a proper or adequate Title V operating permit for Big Cajun II that contains emission limitations for $NO_x$ and/or $SO_2$ at Unit 2 that meet BACT pursuant to a new BACT determination.  The defendant thereafter has operated Big Cajun Unit No. 2 without meeting such limitations and without having an adequate operating permit that requires compliance with such limitations or that contains a compliance plan for all applicable requirements for which the source is not in compliance.

- 17 -

70.    The defendant's conduct has violated and continues to violate Sections 502(a), 503(c), and 504(a) of the Act, 42 U.S.C. §§ 7661a(a),7661b(c), and 7661c(a), 40 C.F.R. §§ 70.5-70.6, and the Louisiana Title V operating permit program regulations.  LAC 33:III.507, 517. Unless restrained by an order of this Court, these and similar violations will continue.

71.    As provided in Section 113(b) of the Act, 42 U.S.C. § 7413(b), the violations set forth above subject the defendant to injunctive relief and civil penalties of up to $27,500 per day for each such violation occurring between January 31, 1997 and March 15, 2004; $32,500 for each such violation occurring between March 15, 2004 and January 12, 2009; and $37,500 for each such violation occurring after January 12, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended.

## **PRAYER FOR RELIEF**

WHEREFORE, based upon all the allegations set forth above, the United States of America requests that this Court:

1. Permanently enjoin the defendant from operating Units 1 and 2 of the Big Cajun II Power Plant, except in accordance with the Clean Air Act and any applicable regulatory requirements;

2. Order the defendant to remedy its past violations by, among other things, requiring the defendant to install and operate, as appropriate, BACT at Units 1 and 2 of the Big Cajun Power Plant, for each pollutant subject to regulation under the Clean Air Act;

3. Order the defendant to apply for permits that are in conformity with the requirements of the PSD and the Louisiana Title V Operating Permits program;

- 18 -

4. Order the defendant to conduct audits of its operations to determine if any additional modifications have occurred which would require it to meet the requirements of PSD and report the results of these audits to the United States;

5. Order the defendant to surrender emission allowances or credits to offset and mitigate the illegal emissions under the PSD and the Louisiana Title V Operating Permits program;

6. Order the defendant to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged above;

7. Assess a civil penalty against the defendant of up to $27,500 per day for each violation of the Clean Air Act and applicable regulations which occurred between January 31, 1997 and March 15, 2004; $32,500 for each violation that occurred between March 15, 2004 and January 12, 2009; and $37,500 for each violation occurring after January 12, 2009;

8. Award the United States its costs of this action; and,

9. Grant such other relief as the Court deems just and proper.

Dated: February 11, 2009

Respectfully submitted,

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources
     Division
United States Department of Justice

- 19 -

_Richard Gladstein_
RICHARD GLADSTEIN, T.A.
Senior Counsel, D.C. Bar No. 362404
Environmental Enforcement Section
Environment and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-1711
Fax: (202) 514-8395
Email: Richard.Gladstein@usdoj.gov

DAVID R. DUGAS
UNITED STATES ATTORNEY


 s/ John J. Gaupp
John J. Gaupp, LBN: 14976
ASSISTANT U.S. ATTORNEY
777 Florida St., Suite 208
Baton Rouge, LA 70801
Telephone: (225) 389-0443
Facsimile: (225) 389-0685
E-mail: john.gaupp@usdoj.gov

CHERYL BARNETT
Assistant Enforcement Counsel
U.S. EPA, Region 6
1445 Ross Avenue
Dallas, Texas 75202

ILANA S. SALTZBART
Attorney-Advisor
U.S. EPA
1200 Pennsylvania Ave., N.W.  (2242A)
Washington, D.C. 20460

- 20 -

# Attachment H

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

_____

| | )
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **LOUISIANA DEPARTMENT OF** | ) |
| **ENVIRONMENTAL QUALITY** | ) |
| | ) |
| **Plaintiff-Intervenor** | ) |
| **v.** | ) |
| **LOUISIANA GENERATING, LLC,** | ) |
| **Defendant.** | ) |

**Civil Action No. 09-100-RET-CN**

_____ )

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT: TITLE V CLAIMS

Dated: March 14, 2011

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     OVERVIEW OF LEGAL FRAMEWORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    RESPONSE TO LaGEN's STATEMENT OF UNDISPUTED
        MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.     STANDARD FOR SUMMARY JUDGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.      ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.    Plaintiff's Title V Claims Are Not Based Entirely on Plaintiff's
              PSD Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.    Plaintiff's Have Alleged Conduct by LaGen Creating Liability Under Title V
              and the Relevant Louisiana Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

              1.    LaGen Failed to Identify All "Applicable Requirements" in its Title V
                    Permit Application for Big Cajun II . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

              2.    Title V Created Liability for Operating With an Inadequate Permit . . . . 21

        C.    EPA's Title V Claims Should Not Be Dismissed as an Inappropriate Attach
              on the Big Cajun II Title V Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

              1.    EPA's Objection to the Issuance of Big Cajun II's Title V Permit
                    Is Not a Prerequisite to EPA's Enforcement Action . . . . . . . . . . . . . . . 24

              2.    The United States Can Pursue Relief for Alleged Permit Deficiencies
                    In an Enforcement Action in this Court . . . . . . . . . . . . . . . . . . . . . . . . 27

              3.    Injunctive Relief and Civil Penalties Flow from the Plaintiff's
                    Title V Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ala. Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Allsteel, Inc. v. EPA*, 25 F.3d 312 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670
(7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29

*Commonwealth of Pennsylvania v. Allegheny Energy, Inc.*, No. Civ. A. 05-885,
2006 WL 1509061 (W.D. Pa. Apr. 19, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15, 22, 30

*Sierra Club v. Dairyland Power Co-op.*, No. 10-cv-303-bbc,
2010 WL 4294622 (W.D. Wisc. Oct. 22, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 23, 30

*Envtl. Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Heckler v. Chaney*, 470 U.S. 821 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650
(W.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*New York v. Niagara Mohawk*, No. 02-CV-24S, 2003 WL 23356447
(W.D.N.Y. Dec. 31, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 22

*New York Public Interest Research Group v. Johnson*, 427 F.3d 172
(2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 22, 28

*Sierra Club v. Johnson*, 541 F.3d 1257 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . 12, 25, 28, 29

*Sierra Club v. EPA*, 557 F.3d 401 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25, 29

*State Farm Life Ins.Co. v. Gutterman*, 896 F.2d 116 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Am General Corp.*, 34 F.3d 472 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. East Ky. Power Co-op.*, 498 F. Supp. 2d 1010
(E.D.Ky. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Solar Turbines, Inc.*, 732 F. Supp. 535 (M.D. Pa. 1989) . . . . . . . . . . . . . . . . . . 28

*Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## FEDERAL STATUTES AND REGULATIONS

42 U.S.C. § 7401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

42 U.S.C. § 7411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

42 U.S.C. § 7413 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9, 23, 25, 28, 30

42 U.S.C. § 7470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. §§ 7470–7492 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 7475(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 10, 14

42 U.S.C. § 7479 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. §§ 7501-7508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 7661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim


40 C.F.R. § 51.166(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 C.F.R. § 70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11, 18

40 C.F.R. § 70.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

40 C.F.R. § 70.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

40 C.F.R. § 70.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 13, 15, 16

40 C.F.R. § 70.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 30

40 C.F.R. § 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 22

43 Fed. Reg. 26,380 (June 19, 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

54 Fed. Reg. 09,783 (Mar. 8, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

60 Fed. Reg. 47,296 (Sept. 12, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## FEDERAL RULES

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10

## STATE RULES

LAC 33:(III).501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 20, 21

LAC 33:(III).502.A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

LAC 33:(III).507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15, 20

LAC 33:(III).509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 19

LAC 33:(III).517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

La. R.S. 30:2057(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Case 3:09-cv-00100-JJB-DLD   Document 155   03/14/11   Page 5 of 38

## I. **INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.2, the United States of America, on behalf of the Environmental Protection Agency ("EPA") and the Louisiana Department of Environmental Quality ("LDEQ") (collectively the "Plaintiffs"), file this Response In Opposition to the Motion for Summary Judgment on Plaintiffs' Title V Claims filed by Louisiana Generating LLC ("LaGen" or "defendant"). LaGen's Motion for Summary Judgment on Title V claims is essentially a repetition of arguments already presented by LaGen in their previous motions to dismiss.[1] As set forth below, the defendant's Motion for Summary Judgment should be denied both because there is a genuine dispute as to material facts asserted by LaGen, and because even if there were no such dispute, the defendant is not entitled to judgment as a matter of law on plaintiffs' Title V claims.

LaGen is the owner and operator of the Big Cajun II electric generating station, the largest source of air pollution in the State of Louisiana.[2] Two of the generating units at the Big Cajun II plant underwent major modification without first obtaining the required permits, or installing the necessary pollution controls in violation of the Clean Air Act ("Act" or "CAA"), 42 U.S.C. § 7401 *et seq.* These modifications—each one a multi-million dollar capital improvement project—violated the requirements of (1) the Prevention of Significant Deterioration ("PSD") provisions of the 1977 CAA Amendments, 42 U.S.C. §§ 7470–7492; (2)

---

[1] *See* Doc. Nos. 47, 56, 73, 79, 87, 91, 93, 100, 105, 114, 116, 124, 126, 138, 139. The Court heard oral argument on LaGen's motions to dismiss on July 21, 2010 (Doc. 89), which have been fully briefed since the parties submitted their respective proposed findings of fact and conclusions of law on August 20, 2010. Doc. Nos. 97, 98.

[2] The Big Cajun II facility is the largest emitter of sulfur dioxide ("$SO_2$") and nitrogen oxide ("$NO_x$") in Louisiana, discharging more than 37,000 tons of sulfur dioxide and 12,500 tons of nitrogen oxide annually into the environment. *See* Ex. 1 (Excerpts from ARP Emissions Report for State of Louisiana, Feb 3, 2011).

- 1 -

the Title V Operating Permit program established by the 1990 CAA Amendments, 42 U.S.C. §

7661; and (3) the Louisiana State Implementation Plan ("Louisiana SIP").

  As the owner and operator of Big Cajun II, LaGen is responsible for complying with the

applicable PSD and Title V requirements of the CAA, federal regulations, and the Louisiana SIP

for the Big Cajun II facility.  LaGen purchased Big Cajun II from Cajun Electric Power Coop.,

Inc. ("Cajun Electric") pursuant to the Fifth Amended and Restated Asset Purchase and

Reorganization Agreement between LaGen, Ralph R. Mabey, as Chapter 11 Trustee of Cajun

Electric, and NRG Energy, Inc. ("NRG") ("Fifth APA") on September 21, 1999.[3/]  Under the

Asset Purchase Agreement, LaGen acquired substantially all of the assets of Cajun Electric and

expressly assumed any environmental liabilities that attach to the owner of the acquired assets,

including Big Cajun II, by operation of law.  While the major modifications at issue were

undertaken at Big Cajun II Unit 1 in 1998 and Unit 2 in 1999, LaGen assumed legal and

contractual responsibility for and has continued to operate and receive the benefit of those

modifications for the last decade.

## II. OVERVIEW OF LEGAL FRAMEWORK

  The CAA was enacted "to protect and enhance the quality of the Nation's air resources

so as to promote the public health and welfare and the productive capacity of its population."  42

U.S.C. § 7401(b)(1).  In 1970, Congress added the New Source Performance Standards

("NSPS") program to establish industry-wide performance standards for new or modified

facilities in certain categories of stationary sources.  *Id.* § 7411.  Because the NSPS program did

too little to achieve the CAA's goals, Congress amended the CAA in 1977 to establish a

---

[3/] *See* Defendant's Memorandum in Support of Summary Judgment on PSD Claims ("Defendant's Brief"), Ex. D.

statutory PSD program "aimed at giving added protection to air quality" while fostering

economic growth in a manner consistent with preservation of existing clean air resources.  *See*

*Envtl.  Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007).  The PSD program directly

addresses the impact on ambient air quality resulting from new construction of, and

modifications to, large pollutant-emitting facilities in areas of the country that have not violated

air quality standards.  *Id.*; 42 U.S.C. §§ 7470, 7475(a)(3).  The PSD program is part of the larger

New Source Review ("NSR") program, which also includes a nonattainment component for

areas not satisfying ambient air standards.  42 U.S.C. §§ 7501-7508.

Under the PSD program, "[n]o major emitting facility . . . may be constructed . . . unless"

various requirements are met, including obtaining a permit setting forth emission limitations and

applying "best available control technology." 42 U.S.C. §§ 7475(a), 7479(3).  The term

"construction" includes the modification (as defined in Section 7411(a) of this Title) of any

source or facility.  42 U.S.C. § 7479(2).  Section 7411(a)(4) defines "modification" as:

> any physical change in, or change in the method of operation of, a stationary source
> which increases the amount of any air pollutant emitted by such source or which results
> in the emission of any air pollutant not previously emitted. 42 U.S.C. § 7411(a)(4).

Thus, determining whether an activity is a "modification" – and is therefore subject to PSD –

involves a two-step process:  (1) whether there will be "any physical [or operational] change"

and (2) if so, whether the change will increase emissions.  *Id.*  A company therefore may trigger

PSD if it renovates a plant in a manner that increases emissions.  *See United States v. Cinergy*

*Corp.*, 458 F.3d 705, 709 (7th Cir. 2006), *cert. denied*, 549 U.S. 1338 (2007); *Wis. Elec. Power*

*Co. v. Reilly*, 893 F.2d 901, 908-09 (7th Cir. 1990); *Ala. Power Co. v. Castle*, 636 F.2d 323, 400

(D.C. Cir. 1979).

- 3 -

EPA first promulgated regulations to implement the statutory PSD program in 1978. 43 Fed. Reg. 26,380 (June 19, 1978). It revised those regulations in 1980, 1992, and 2002. *See* 40 C.F.R. § 51.166(b). The Louisiana SIP, which provides the regulations underlying the enforcement action in this case, includes an EPA-approved PSD program that is based on the requirements of EPA's PSD regulations. *See* 54 Fed. Reg. 09,783 (Mar. 8, 1989) (approving original Louisiana PSD regulations). The Louisiana SIP contains both an integrated construction and operating permit program and requires the implementation of BACT for any "major modification" as a condition of operation. *See* LAC 33:(III).501, 509. The CAA authorizes federal enforcement of SIP provisions. 42 U.S.C. § 7413(b).

Title V of the Clean Air Act, 42 U.S.C. §§ 7661-7661f, establishes a comprehensive federally mandated operating permit program to be implemented by the states. The Title V program was created in order that all emissions limitations and operating conditions necessary to assure a source's compliance with all applicable requirements of the CAA would be contained in one easily accessible and enforceable document and to implement some uniformity in state operating permit programs. Pursuant to the CAA, it is unlawful for any person to violate any requirement of a permit issued under Title V, or to operate a major source except in compliance with a permit issued by a permitting authority under Title V. 42 U.S.C. § 7661a(a). The applicant must submit a timely and complete permit application that includes a compliance plan describing how the source will comply with all applicable requirements of the CAA. 42 U.S.C. § 7661b. Each permit issued under Title V must include enforceable emissions limitations and standards, a schedule of compliance, the results of any monitoring, and such other conditions as are necessary to assure compliance with applicable requirements of the CAA and the applicable

- 4 -

state implementation plan.  42 U.S.C. § 7661c(a).

The EPA promulgated regulations for the Title V permits program, which are codified at 40 C.F.R. Parts 70 and 71.  EPA approved Louisiana's Title V operating permit program, which is substantially the same as the EPA program, on September 12, 1995.  60 Fed. Reg. 47,296 (Sept. 12, 1995).  The Louisiana operating permit program regulations are located primarily at LAC 33:(III).507 and 517.  EPA regulations provide that "[a]ll sources subject to these regulations shall have a permit to operate that assures compliance by the source with all applicable requirements."  40 C.F.R. § 70.1(b); 40 C.F.R. § 70.6(a)(1).  Similarly, Louisiana regulations provide that "[a]ny permit issued under the requirements of this Section shall incorporate all federally applicable requirements for each emissions unit at the source." LAC 33:(III).507A.3.  "Applicable requirements" include the PSD program since the requirements of the PSD program are set forth under Title I of the CAA and are included in implementation plans under Title I.[4]

A number of Title V provisions aim to ensure that all applicable requirements are timely identified and included in the Title V permit.  *See* 42 U.S.C. § 7661b.  Pursuant to the Part 70 rules, sources, such as LaGen's Big Cajun II plant, are required to submit a "timely and complete permit application in accordance with" 40 C.F.R. §§ 70.5, 70.7; LAC 33:(III).507.B.2; LAC

---

[4]The term "applicable requirement" is defined, *inter alia*, as:

> (1) Any standard or other requirement provided for in the applicable implementation plan approved or promulgated through rulemaking under Title I of the Act that implements the relevant requirements of the Act, including any revisions to that plan promulgated in part 52 of this chapter.

> (2)  Any term or condition of any preconstruction permits issued pursuant to regulations approved or promulgated through rulemaking under Title I, including parts C or D, of the Act.

*See* 40 C.F.R. § 70.2; LAC 33:(III).502.A.

- 5 -

33:(III).507.C; LAC 33:(III).517.A.  Completeness of the application is judged against a number of elements that the EPA specifies must be included in a "standard application form," such as identifying information, a description of the source's processes and products, emissions-related information, air pollution control information, and a compliance plan.  40 C.F.R. § 70.5(c)(1)-(10); LAC 33:(III).517.B; LAC 33:(III).517.C.[5]

These provisions put the burden squarely on the source to identify the applicable requirements.  *See* 40 C.F.R. § 70.5(c)(8); LAC 33:(III).517.E.4.

### III. RESPONSE TO LaGEN'S STATEMENT OF UNDISPUTED MATERIAL FACTS

As set forth in plaintiffs' separately filed Local Rule 56.2 Statement of Material Facts, the defendant owns and operates Big Cajun II, a coal-fired electric utility steam generating power plant that consists of three units, known as Units 1, 2, and 3 located in New Roads, Louisiana.  Big Cajun II Units 1 and 2 were initially permitted in 1976, but began operation in 1981.  The defendant is a limited liability corporation incorporated in the State of Delaware, and a wholly owned subsidiary of NRG.  (EPA Compl. ¶¶ 2, 9, 31; LDEQ Compl. 60, ¶¶ 2, 10, 32).

In the fall of 1998, Cajun Electric commenced construction of one or more major modifications, as defined in the Act and the Louisiana SIP, at Big Cajun II without applying for or receiving a PSD permit.  These modifications included one or more physical changes or

---

[5]The EPA regulations state that information submitted "must be sufficient to evaluate the subject source and its application and to determine all applicable requirements."  40 C.F.R. § 70.5(a)(2).  Similarly, Louisiana regulations provide that the application must contain "information which is required by any applicable federal or Louisiana regulations, or which may be necessary to implement and enforce applicable requirements of the federal Clean Air act or federal or Louisiana regulations, or which may be necessary to determine the applicability of such requirements."LAC 33:(III).517.D.16.  The Part 70 rules also contain a duty to supplement or correct an application.  "Any applicant who fails to submit any relevant facts . . . shall, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts.  40 C.F.R. § 70.5(b);LAC 33:(III).517.C.  Each application must contain certification by a responsible official as to the truth, accuracy and completeness of the application.  40 C.F.R. § 70.5(d); LAC 33:(III).517.B.1.

- 6 -

changes in the method of operation at Unit 1 of Big Cajun II, including the replacement of the primary reheater with a new primary reheater at Unit 1 of Big Cajun II at an estimated cost of $5,000,000. (EPA Compl. 1, ¶ 34, 49; LDEQ Compl. 60, ¶¶ 35, 50).

In the spring of 1999, Cajun Electric commenced construction of one or more major modifications, as defined in the Act and the Louisiana SIP, at Big Cajun II without applying for or receiving a PSD permit. These modifications included one or more physical changes or changes in the method of operation at Unit 2 of Big Cajun II, including the replacement of the primary reheater with a new reheater at Unit 2 of Big Cajun II at an estimated cost of $5,000,000. (EPA Compl. 1, ¶ 35, 61; LDEQ Compl. 60, ¶¶ 36, 62).

On September 21, 1999, the defendant, NRG, and Mr. Mabey, as Chapter 11 Trustee of Cajun Electric, entered into the Fifth APA. Section 2.2 states that subject to any adjustment provided in Section 2.3, the purchase price for the acquired assets was $1,026,000,000. In Section 2.4 of the Agreement, LaGen agreed to assume or be liable for "*any Environmental Liabilities that attach to the owner of any of the Acquired Assets by operation of law*." [Emphasis added]. (EPA Compl. 1, ¶ 39; LDEQ Compl. 60, ¶ 40).

On March 17, 2000, the defendant and Cajun Electric notified LDEQ regarding Cajun Electric's intent to transfer its environmental permits to the defendant pursuant to the terms of the Fifth APA. As part of that notification, the defendant certified and accepted responsibility, coverage, and liability for the permits and permit application of Big Cajun II. On March 30, 2000, LDEQ approved the change in ownership of Big Cajun II from Cajun Electric to LaGen. (EPA Compl. 1, ¶ 42; LDEQ Compl. 60, ¶ 43).

On September 14, 2001, Cajun Electric submitted an initial Title V application for the

- 7 -

Big Cajun II facility to LDEQ.  The defendant submitted supplemental information to LDEQ

dated October 4, December 17, and December 26, 2001; March 14 and July 1, 2002; July 31,

2003; August 11, 2004; and March 30, 2005.   (Doc. 1, ¶ 44; Doc. 60, ¶ 45).

        The defendant failed to submit a complete application for a Title V operating permit for

Big Cajun Unit Nos. 1 and 2 that identified and described all applicable requirements and other

specific information that was necessary to implement and enforce applicable requirements of the

Act or to determine the applicability of such requirements, including, but not limited to, a

description of the reheater modifications performed in 1998 and 1999 and a plan and compliance

schedule for determining and complying with BACT at Big Cajun II Units 1 and 2.  The

defendant's Title V application also did not include the relevant requirements of Section 165(a)

of the Act, 42 U.S.C. § 7475(a) and LAC 33:(III).509J - O.  (Doc. 1, ¶¶ 45, 56, 68; Doc. 60, ¶¶

46, 57, 69).

        On May 22, 2005, EPA sent comments to LDEQ advising that EPA had issued a Notice

of Violation ("NOV") to LaGen, alleging that LaGen had violated the PSD requirements of the

Act, federal regulations, the Louisiana SIP and operating permit program.[6/]

        On August 22, 2005, LDEQ issued a Title V permit (Permit No. 2260-00012-VO) to Big

Cajun II.  Because of the deficient application, the Title V permit does not require the defendant

to comply with all applicable federal and Louisiana requirements with respect to the

determination and installation of BACT at Big Cajun II Units 1 and 2.  (Doc. 1, ¶ 46; Doc. 60,

---

[6/]*See* Defendant's Memorandum in Support of Motion for Summary Judgment: Title V Claims,  Doc. 139-1, Ex. G
(EPA Comments to LDEQ, May 23, 2005).

- 8 -

¶ 47).[7]

On August 22, 2005, the same day that LDEQ issued the Title V permit, LDEQ responded to EPA's comments, stating "LDEQ believes that the Title V permit was not the proper venue to resolve the alleged [PSD] violations. Any permitting action on the part of LDEQ should be supported by a final enforcement action on the part of EPA or a decision by a judicial entity that [PSD] violations did indeed occur.[8]

The defendant has failed to obtain a proper or adequate Title V operating permit for Big Cajun II that contains emission limitations for $NO_x$ and/or $SO_2$ at Unit 1 and Unit 2 that meet BACT pursuant to a new BACT determination. The defendant has operated Big Cajun Unit Nos. 1 and 2 without meeting such limitations and without having an adequate operating permit that requires compliance with such limitations or that contains a compliance plan for all applicable requirements for which the source is not in compliance. (Doc. 1, ¶ 57, 69; Doc. 60, ¶ 58, 70).

On December 8, 2006, the EPA issued a second NOV to the defendant pursuant to Section 113(a)(1) and (3) of Act, 42 U.S.C. §§ 7413(a)(1) and (3), and provided a copy of the NOV to the State of Louisiana. The second NOV notifies LaGen of violations of the PSD requirements of the Louisiana SIP and of the Title V permitting requirements at Big Cajun II Units 1 and 2. (Doc. 1, ¶ 6; Doc. 60, ¶ 7 ).[9]

On February 19, 2010, LaGen submitted an renewal Title V application for the Big Cajun

---

[7] *See* Ex. 2 (Excerpts from LaGen's Operating permit for the Big Cajun II Power Plant, No. 2260-00012-VO, Aug. 22, 2005).

[8] *See* Defendant's Memorandum in Support of Motion for Summary Judgment: Title V Claims, Doc. 139-1, Ex. H (LDEQ Response to EPA Comments, at 5, August 22, 2005).

[9] *See* Ex. 3 (Notice of Violation issued to Louisiana Generating, December 8, 2006).

II facility to LDEQ.  Contrary to General Condition A of LaGen's Title V Permit, the defendant has failed to submit a complete renewal application prior to the permit expiration date because the renewal application for Big Cajun Unit Nos. 1 and 2 fails to identify and describe all applicable requirements and other specific information that is necessary to implement and enforce applicable requirements of the Act or to determine the applicability of such requirements, including, a description of the reheater modifications performed in 1998 and 1999 and a plan and compliance schedule for determining and complying with BACT at Big Cajun II Units 1 and 2.  The defendant's Title V application also did not include the relevant requirements of Section 165(a) of the Act, 42 U.S.C. § 7475(a) and LAC 33:(III).509J - O.[10]

Since April 1, 2000, the defendant has owned and operated Units 1 and 2 of Big Cajun II without seeking or obtaining a PSD or Title V permit, which would require, *inter alia*, the application of BACT for control of $NO_x$ and $SO_2$ at Unit 1 of Big Cajun II with respect to the major modifications identified in paragraphs 34-35 and 49, 61 of the United States' Complaint and paragraphs 35-36 and 50, 62 of LDEQ's Complaint.  (Compl. 1, ¶¶ 50, 51, 62, 63; LDEQ Compl. 60, ¶¶ 51, 52, 63, 64).

## IV.  STANDARD FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is proper where the court finds that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Inferences to be drawn from the underlying facts contained in the moving party's materials must be viewed in the light most favorable to the non-moving party. *See* Adickes *v. S.H. Kress & Co.*, 398 U.S. 144, 158-59

---

[10] *See* Ex. 4 (Excerpts from LaGen's Renewal Application for Operating Permit for the Big Cajun II Power Plant, No. 2260-00012-VO, Feb. 19, 2010, especially Part 1 at 8, 12, 14 and Part 2 at 5, 17).

- 10 -

(1970); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)*; State Farm Life Ins. Co.*

*v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990).  Because LaGen's Motion contains material

facts as to which there exists a genuine dispute to be tried, and is neither supported by the Clean

Air Act's language nor applicable precedent, plaintiffs respectfully request that this Court deny

LaGen's Motion for Summary Judgment on Plaintiffs' Title V Claims.

## V.  <u>ARGUMENT</u>

Contrary to the defendant's contentions, LaGen is not entitled to judgment on plaintiffs'

Title V claims as a matter of law.  *See* Def. Brief at 9.  As set forth in counts 2 and 4 of the

Complaints, LaGen has violated and continues to violate Title V (42 U.S.C. §§ 7661a, 7661b,

7661c), federal regulations (40 C.F.R. Part 70), and the Louisiana Operating Permit Program

regulations (LAC 33:(III).507), since it has failed to submit a complete permit and permit

renewal application, including a compliance plan for implementing BACT, and has operated Big

Cajun II Units 1 and 2 "without a proper or adequate Title V operating permit."  *See* Compl. ¶¶

21-27, 42-46, 55-59,67.

Plaintiffs' Title V and PSD claims are independently actionable, and LaGen has failed to

demonstrate that it is entitled to summary judgment on plaintiffs' Title V claims.  Rather, the

defendant has violated Title V, federal regulations, and the Louisiana Operating Permits Program

by failing to submit a permit and permit renewal application that addresses the BACT

requirements triggered by the modifications described in the Complaints.  LaGen has submitted

numerous defective permit applications and supplements from 2001 through 2005, and now an

inadequate renewal application that fails to include all applicable requirements, and a

compliance plan for meeting such requirements.  The Title V permit issued by LDEQ on August

- 11 -

22, 2005 does not cure the deficiency because LaGen did not ask for or obtain the required BACT emission limits.  LaGen has continued to operate Big Cajun II Units 1 and 2 in violation of Title V, federal regulations, and the Louisiana Operating Permits Program from the date it began operation of the facility on April 1, 2000, to the present.

Courts that have examined Title V allegations in complaints against power plants under the CAA similar to those raised in the instant case have concluded that the plaintiffs have stated claims for  relief and denied similar motions to dismiss or motions for summary judgment.  *See Sierra Club v. Dairyland Power Co-op.*, No. 10-cv-303-bbc, 2010 WL 4294622 (W.D. Wisc. Oct. 22, 2010); *United States v. East Ky. Power Co-op.*, 498 F. Supp. 2d 1010 (E.D.Ky. 2007); *Commonwealth of Pennsylvania v. Allegheny Energy, Inc.*, No. Civ. A. 05-885, 2006 WL 1509061, at *7-8 (W.D. Pa. Apr. 19, 2006); *New York v. Niagara Mohawk Power Corp.*, No. 02-CV-24S, 2003 WL 23356447, at *1-4 (W.D.N.Y. Dec. 31, 2003); *see also New York Public Interest Research Group v. Johnson*, 427 F. 3d 172, 178 n. 1 (2nd Cir. 2005).

Contrary to LaGen's claims, plaintiffs are fully entitled to seek relief for LaGen's failure to comply with Title V requirements in the instant civil enforcement action.  The defendant incorrectly contends that the United States' Title V claims amount to "an impermissible collateral attack" on LaGen's Title V permit.  The courts have held that where EPA issued a notice of violation or commenced a civil action, more was necessary to trigger EPA's non-discretionary duty to object to a proposed Title V permit.  *See Sierra Club v. United States Environmental Protection Agency*, 557 F. 3d 401 (6th Cir. 2009); *Sierra Club v. Johnson*, 541 F. 3d 1257 (11th Cir. 2008); *East Ky. Power Co-op.*, 498 F. Supp. 2d at 1018; *Allegheny Energy, Inc.*, 2006 WL 1509061 at *7-8.  LaGen accepted that permit and continued to operate the units

- 12 -

knowing full well that EPA contended that the Big Cajun II units addressed in this case require BACT. Accordingly, LaGen is not entitled to summary judgment on plaintiffs' Title V claims.

A.    Plaintiffs' Title V Claims Are Not Based Entirely On Plaintiffs' PSD Claims

Contrary to LaGen's assertions, plaintiffs' Title V claims are not merely duplicative of their PSD claims against the defendant. Rather, the plaintiffs have alleged direct claims under Title V against LaGen. Since its acquisition of Big Cajun II, LaGen has directly violated Title V by failing to supplement and amend the Title V application for Big Cajun II to contain all applicable requirements, including those for PSD, and by operating without a Title V permit in violation of such requirements.

Title V is an operating permit program that imposes ongoing duties on owners and operators of major sources such as power plants. One of those continuing duties is to submit complete operating permit application. 42 U.S.C. §§ 7661b(b) and (c); 40 C.F.R. §§ 70.5(a), 70.7(c), and (d); LAC 33:(III).507, 517. Further, owners and operators have a continuing duty to supplement their permit applications to incorporate any other requirements of the Act that may come to apply to the facility. *See, e.g.*, 40 C.F.R. § 70.5(b); LAC 33:(III).517.C ("Any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application shall, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.").

LaGen cannot have it both ways. Either the PSD requirements of the CAA, federal regulations, and Louisiana SIP create ongoing obligations related to the operation of Big Cajun II, as plaintiffs contend, or they do not. If, as Lagen argues, the PSD requirements pertain solely to the construction or modification, but not the operation of a facility, then there is no duplication

- 13 -

or overlap between the PSD and Title V requirements because LaGen cannot dispute that Title V governs the operation of facilities. Regardless of whether the plaintiffs' or LaGen's view of the PSD requirements is accepted, under Title V the defendant has an independent duty to operate Big Cajun II in accordance with all applicable requirements that is ongoing and renewed each day that the defendant continues to operate Big Cajun II.

A case relied on heavily in LaGen's Memorandum in Support of its Motion for Summary Judgment on PSD Claims, *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650 (W.D.N.Y. 2003) ["*Niagara Mohawk I*"], supports plaintiffs' Title V claims. In *Niagara Mohawk I,* the court dismissed PSD claims against utility asset purchasers who acquired a coal-fired power plant. Yet subsequently the same court in *New York v. Niagara Mohawk Power Corp.*, No. 02-CV-24S, 2003 WL 23356447 (W.D.N.Y. Dec. 31, 2003) ["*Niagara Mohawk II*"] granted leave to the State of New York to pursue "deficient operating permit" claims against the current owner/operator that are similar to those asserted here against LaGen. *Niagara Mohawk II*, 2003 WL 23356447, at *1. The *Niagara Mohawk II* court explained that its prior ruling only "addressed the State's *preconstruction* claims brought against the NRG defendants under the *preconstruction* provisions of 42 U.S.C. § 7475(a)," while the "[t]he State's proposed amendment . . . alleges claims under the *operating* permit program . . . ." *Id.* at *2. As here, the defendants in *Niagara Mohawk II* argued that the Court should reject the deficient operating permit claims because "Title V does not impose additional substantive requirements on sources." *Id.* The court, however, explained that "the Facilities' Title V operating permits incorporate substantive requirements found in the Clean Air Act [such as BACT] that were applicable to the

- 14 -

Facilities *at the time that they were modified*." *Id.* [Emphasis added].[1]  *See also Dairyland Power Co-op.*, 2010 WL 4294622, at *16-18; *East Kentucky Power Co-op.*, 498 F. Supp. 2d at 1018; *Allegheny Energy, Inc.*, 2006 WL 1509061, at *8.

B.    Plaintiffs Have Alleged Conduct by LaGen Creating Liability Under Title V and the Relevant Louisiana Regulations

1.    LaGen Failed to Identify All "Applicable Requirements" in its Title V Permit Application for Big Cajun II

Plaintiffs' allegations that LaGen failed to submit a complete Title V permit application, including a compliance plan to meet BACT, *see* Compl. ¶¶ 56, 68, does not misconstrue LaGen's duties under the relevant Title V and Louisiana regulations.  The Title V program is designed not only to impose responsibility on a source to make an initial determination of application requirements.  40 C.F.R. § 70.5(a)(1); LAC 33:(III).507.C; LAC 33:(III).517.A.2.  A source also has a duty to supplement or correct its application if it fails to submit any relevant facts or has submitted incorrect information. 40 C.F.R. § 70.5(b); LAC 33:(III).517.C.

A source is only deemed to be in compliance with Section 502(a) of the CAA, only if it is operating in compliance with a Title V permit that was "issued in accordance with this subchapter."  42 U.S.C. § 7661c(f).  The permit must be issued in accordance with all requirements of Title V.  One of the key requirements imposed by Title V is the facility's duty to submit an application that is true, accurate, and complete.  42 U.S.C. § 7661a(c); 40 C.F.R. § § 70.5(a), (b), (d).  Section 502(a), in turn, requires sources to have a Title V permit as a condition of operation, and operate in compliance with a "permit issued under this subchapter."  42 U.S.C.

---

[1] Although LaGen relied heavily on the *Niagara Mohawk I* decision dismissing the State's PSD claims in its Memorandum in Support of Motion for Summary Judgment on PSD Claims, the defendant has failed to even mention in any of its summary judgment briefs *Niagara Mohawk II*, the subsequent decision finding that the State had asserted a claim for relief for the same violations under Title V.

- 15 -

§ 7661a(a). Here, defendant's Title V permit lacks applicable PSD requirements because it is based on an application that was not true, accurate, and complete. Thus, the permit was not issued in accordance with the requirements of Title V and as such cannot be raised as a shield to the plaintiffs' claims.

Whether the defendant's Title V application included all applicable requirements must be evaluated objectively, not from the subjective standpoint of what LaGen *post hoc* contends it believed at the time it submitted its revised Title V application in September 2001. In fact, the regulatory standard for the identification of applicable requirements is "*reasonable* inquiry." 40 C.F.R. § 70.5(d) [emphasis added]. The plaintiffs allege that the defendant's application was incomplete when it was submitted because the revised application failed to include a compliance plan for meeting BACT resulting from the major modifications that occurred at Big Cajun II Units 1 and 2 in 1998 and 1999 respectively. LaGen submitted additional supplemental information on October 4, December 17, and December 26, 2001; March 14 and July 1, 2002; July 31, 2003; August 11, 2004, but did not include any information related to the reheater projects at issue in this litigation.

The defendant claims that it had no responsibility to identify PSD requirements related to the major modifications performed at Units 1 and 2 because at that time neither EPA nor LDEQ had made any determination regarding the potential application of PSD to the Unit 1 and 2 projects at issue. LaGen's duty to identify all applicable requirements was not dependent on advance notice by the EPA or LDEQ since the source has the burden under the regulations of identifying applicable requirements. Even if LaGen's duty to submit an application that included a compliance schedule for applying BACT were triggered by notice from the EPA or LDEQ, the

- 16 -

EPA provided such notice to LaGen when it issued its initial Notice of Violation on February 15, 2005. Although LaGen submitted further supplemental information to LDEQ on March 30, 2005, the defendant continued to fail to identify the PSD requirements resulting from the reheater projects, despite EPA's contention that such projects required the application of BACT at Units 1 and 2. LaGen's Title V permit for Big Cajun II was not issued until August 22, 2005.

The fact that the Unit 1 and 2 projects at issue were performed by Cajun Electric before LaGen's acquisition of those units is especially irrelevant for Title V purposes since Title V clearly governs a source's ongoing operations. As alleged in the Complaint, on March 17, 2000, the defendant and Cajun Electric notified LDEQ regarding Cajun Electric's intent to transfer its environmental permits to the defendant pursuant to the terms of the Fifth APA. As part of that notification, LaGen certified and accepted responsibility, coverage, and liability for the permits and Title V permit application of Big Cajun II. On March 30, 2000, LDEQ approved the change in ownership of Big Cajun II to LaGen.[17]

The "White Paper for Streamlined Development of Part 70 Permit Applications" prepared by EPA in 1995 does not help LaGen avoid liability. LaGen never asked for or obtained an applicability determination from LDEQ or EPA that the 1998 and 1999 reheater projects did not give rise to PSD requirements, including a compliance plan. Nor is there any evidence of record that Cajun Electric itself made any applicability determination regarding the reheater projects at issue. As the White Paper indicates:

> EPA expects companies to rectify past noncompliance as it is discovered. Companies remain subject to enforcement actions for any past noncompliance with requirements to obtain a permit or meet air pollution control obligations. In addition, the part 70 permit shield is not available for noncompliance with applicable requirements that occurred

---

[17] *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment: Title V Claims, Doc. 136-12, Ex. 34 (LDEQ Change of Ownership from Cajun Electric to Louisiana Generating, March 30, 2000).

- 17 -

prior to or continues after submission of the application.[13]

*See also* LAC 33:(III).507.G, 507.I.3.b.  The quote emphasizes that sources that do not include applicable requirements in their Title V applications do so at their own risk.  LaGen clearly is not entitled to judgment as a matter of law since the defendant failed to address the reheater projects in its 2001 permit applications and supplemental submissions.

Further, LaGen also has violated General Condition A of its current Title V permit. General Condition A requires that:

> An application for a renewal of this 40 CFR Part 70 permit shall be submitted to the administrative authority no later than 180 days prior to the permit expiration date. Should a timely and complete permit application not be submitted prior to the permit expiration date, a facility's right to operate is terminated pursuant to 40 CFR Section 70.7 (c)(ii).

On February 19, 2010, LaGen submitted a renewal Title V application for the Big Cajun II facility to LDEQ.  But, contrary to General Condition A, the defendant has failed to submit a complete renewal application prior to the permit expiration date because the renewal application, like all of LaGen's other submittals, fails to identify and describe all applicable requirements, including, a description of the reheater modifications performed in 1998 and 1999 and a plan and compliance schedule for determining and complying with BACT at Big Cajun II Units 1 and 2.[14]

Contrary to LaGen's assertion, LDEQ's historical practices with respect to the issuance of Consolidate Compliance Orders and Notices of Potential Penalties ("Compliance Orders") make clear that LaGen is responsible for reviewing past actions at the facility for purposes of Title V implementation and Title V liability.  *See* Def. Brief at 12.  During the course of

---

[13] *See* Defendant's Memorandum in Support of Motion for Summary Judgment: Title V Claims,  Doc. 139-1, Ex. D (EPA Title V White Paper, at 25-26).

[14] *See* Ex. 4 (Excerpts from LaGen's Renewal Application for Operating Permit for the Big Cajun II Power Plant, No. 2260-00012-VO, Feb. 19, 2010, especially Part 1 at 8, 12, 14 and Part 2 at 5, 17).

- 18 -

discovery, LaGen served interrogatories, requests for production, and a Rule 30(b)(6) deposition notice, asking LDEQ *inter alia* to describe and produce any actions taken by LDEQ in which the agency has issued "a notice of violation, filed a complaint, or taken any other kind of administrative action against an entity for allegedly failing to submit a complete permit application pursuant to the Title V or Louisiana Title V Operating Permit Program, including but not limited to an alleged failure to submit a compliance plan for an applicable requirement." In response, LDEQ produced the table attached as Exhibit 5 that lists 137 instances in which LDEQ has issued Compliance Orders against entities for violations of the Louisiana SIP, including the operating permits program (LAC 33:(III).507, 517) and general permitting requirements (LAC 33:(III).501).[15] In particular, the table includes references to 31 Compliance Orders in which LDEQ found that the respondent failed to operate a facility with a Title V permit that included all applicable requirements, summaries of which are attached as Exhibit 7.

For instance, in *In the Matter of Motiva Enterprises LLC*, No. AE-PP-10-00121 (March 23, 2010), the respondent began modifying a residue catalytic cracking unit ("RCCU") in March of 2003 and ended in March of 2004. The RCCU previously operated under Title V permit No. 2602-V1, issued on January 13, 2004, and Title V Permit No. 2602-V2 issued on April 9, 2009. The facility failed to apply for a PSD review before the beginning of the RCCU project, which was a violation of LAC 33:(III).509.I.1, La. R.S. 30:2057(A)(1) and La. R.S. 30:2057(A)(2). The facility submitted a Title V permit renewal application for the RCCU in July 2003, but failed to address the RCCU improvement project modification in its renewal application, which was a

---

[15] *See* Ex. 6 (LDEQ Rule 30(b)(6) Deposition of Celena Cage, at 14, 28-29, Nov. 16, 2010). At her deposition, Ms. Cage, the Administrator of the Environmental Services Division, testified that the table that lists 137 actions "contains actions that were issued to companies that failed to either submit a permit application prior to construction or operation of a facility or an emission source without authorization, as well as in some cases, operating those sources."

- 19 -

violation of LAC 33:(III).507.D.2, La. R.S. 30:2057(A)(1) and La. R.S. 30:2057(A)(2). Further, the facility operated the modified RCCU unit without approval from the permitting authority prior to operation of a facility which may ultimately result in an initiation or increase in air contaminants, which was a violation of LAC 33:(III).501.C.2, La. R.S. 30:2057(A)(1) and La. R.S. 30:2057(A)(2).[16]

In *In the Matter of Praxair, Inc.*, No. AE-CN-08-0166 (September 30, 2008), Praxair purchased a chemical production facility from Liquid Carbonic, Inc. in January 1996. The facility operated under Title V Permit Nos. 0180-00031-VO and V-1, but currently operates under Title V Permit No. 0180-00031-V2 issued in January 2008. The respondent informed LDEQ that 40 CFR 60 Subpart III had been applicable to the facility since it was built in 1993, but was not included in the previous owner's original permit application. The respondent's failure to obtain a Part 70 permit prior to operating the facility as a major source of hazardous air pollutants was a violation of LAC 33:(III).507.A.1 and La. R.S. 30:2057(A)(2). The respondent was required to take any and all steps necessary to achieve and maintain compliance with specified emissions standards, including the submission of a Title V permit modification request to ensure that the emissions from the facility were properly permitted.[17]

Further, in several Compliance Orders issued to Saint Gobain Containers, Inc., LDEQ held the present owner and operator liable for modifications to a glass container manufacturing facility performed by a former owner and operator of the facility. In 1992, Ball-Icon Glass Packaging, a former owner and operator of the facility, applied for and obtained a permit that

---

[16] *See* Exhibit 8 (Compliance Order, *In the Matter of Motiva Enterprises LLC*, No. AE-CN-10-00121 (March 23, 2010)).

[17] *See* Exhibit 9 (Compliance Order, *In the Matter of Praxair, Inc.*, No. AE-CN-08-0166 (September 30, 2008)).

- 20 -

underestimated furnace production capabilities for Glass Melting Furnace Nos. 1 and 2, and failed to recognize that a "significant" "net increase" would occur from the construction and operation of Glass Melting Furnace No. 2. Based on a re-evaluation by the present owner and operator, LDEQ determined that Glass Melting Furnace Nos. 1 and 2 were subject to PSD and required Saint Gobain, the present owner and operator, to submit a revised Title V permit application, including a PSD application containing appropriate permit limitations for the furnaces.[18]

Finally, in *In the Matter of Lake Charles Carbon Company*, No. AE-C-00-0407 (January 1, 2001), the respondent failed to submit complete and timely Title V and state air permit applications and to obtain a permit modification prior to installing and operating two anode grooving saws related to the saw operation, which was a violation of LAC 33:(III).501.C.2, LAC 33:(III).517.A.1, and Section 2057(A)(2) of the Act. In addition, the respondent failed to apply for a permit modification for and operated mechanized stub hole equipment without emission controls in violation of LAC 33:(III).501.C.2, LAC 33:(III).905, Section 2057(A)(2) of the Act.[19]

2.    Title V Creates Liability for Operating With an Inadequate Permit

The defendant erroneously contends that LaGen's operation of Big Cajun II Units 1 and 2 under an inadequate permit creates no ongoing violation of Title V and its implementing regulations. *See* Def. Brief at 14-15. The three courts that have examined this issue in cases involving power plants under the CAA have disagreed with the defendant.

---

[18] *See* Exhibit 10 (*In the Matter of Saint-Gobain Containers, Inc.*, Compliance Order, No. AE-CN-05-0098, Aug. 8, 2005; Compliance Order, No. AE-CN-05-0098A, Sept. 18, 2006; Compliance Order, No. AE-CN-05-0098B, Oct. 19, 2007).

[19] *See* Exhibit 11 (Compliance Order, *In the Matter of Lake Charles Carbon Company*, No. AE-C-00-0407, January 1, 2001).

As discussed above, in *Niagra Mohawk II*, the court allowed the State of New York to amend its complaint to add Title V claims similar to those asserted against LaGen in counts 2 and 4 of the instant Complaints. In its amended complaint, the State alleged, *inter alia*, that the NRG defendant, the same parent of LaGen, was operating the facilities with deficient permits in violation of Section 504(a) of the CAA, 42 U.S.C. § 7661c(a), and the New York SIP. As in the instant case, the State contended that the defendants operated the facilities without obtaining valid operating permits containing emissions limitations for sulfur dioxide and nitrogen oxide that met BACT, and without operating in compliance with BACT. Despite the arguments presented by NRG, the court allowed the State to file an amended complaint adding its Title V operating permit claims against the NRG defendants. *See Niagara Mohawk II*, 2003 WL 23356447 at *1-4; *see also NYPIRG v. Johnson*, 427 F. 3d 172, 178 n. 1 (2nd Cir. 2005).

In *Allegheny Energy, Inc.*, 2006 WL 1509061, at *7-8, a number of states contended that Allegheny submitted applications for Title V operating permits at three facilities which failed to provide information and requirements necessary to implement air pollution control standards, such that when Allegheny was issued Title V operating permits at those facilities it operated them in violation of the CAA and Pennsylvania law. The court agreed, holding that "[s]ince it is unlawful for any person to violate any requirement of a Title V permit, or to operate a source subject to Title V regulations that is not in compliance with all applicable requirements of a Title V operating permit, 42 U.S.C. 7661a(a), 40 C.F.R. 71.1(b) & 71.12," plaintiffs claims state viable claims under Title V which should not be dismissed. *Id*. at *8.

Further, in *United States v. East Ky. Power Co-op.*, 498 F. Supp. 2d 1010, 1011-1013 (E.D. Ky. 2007), as in the instant case, the United States alleged that East Ky. Power "failed to

- 22 -

submit a complete application for a Title V operating permit for [the unit] that identified all applicable requirements, that accurately certified compliance with such requirements, and that contained a compliance plan for all applicable requirements for which the source was not in compliance [including BACT]." *East Ky. Power Co-op.,* 498 F. Supp 2d. at 1016.

In denying the defendant's motion for summary judgment on these claims, the court held the CAA granted very broad enforcement authority to the EPA, giving it authority to bring a civil action whenever it finds that "any person has violated, or is in violation of, any other requirements or prohibition of . . .subchapter V [regarding Title V permits], including, but not limited to, a requirement or prohibition of any rule, plan, order, waiver, or permit promulgated, issued, or approved under those provisions or subchapters. . . ." 42 U.S.C. § 7413(3)(c). The court rejected the defendant's argument that the only remedy available to EPA for a deficient permit was the reopening and revision of the permit. Further, the court found that the permit shield provision did not help the defendant. As in the instant case, the PSD requirements were not included or specifically identified in the Title V permit. Thus, the court denied the defendant's motion for summary judgment. *East Ky. Power Co-op.,* 498 F. Supp 2d at 1018.

Most recently, in *Dairyland Power Co-op.*, 2010 WL 4294622, at * 16-18, Sierra Club brought an action for declaratory, injunctive relief and civil penalties under the citizens' suit provision of the CAA, 42 U.S.C. § 7604, alleging that Dairyland had violated the PSD and Title V provisions of the CAA. Dairyland moved to dismiss, contending that injunctive and civil penalty claims related to the alleged PSD violations were time-barred and that Sierra Club's Title V claims constituted an impermissible collateral attacks on the permitting process. With respect to Sierra Club's Title V claims, the court concluded that the plaintiff could proceed and denied

- 23 -

the defendant's motion to dismiss, finding that the plaintiff was entitled to challenge the

defendant's alleged false certification of compliance and failure to apply for a permit and to

supplement or correct information after the defendant made modifications to its plants. *Id.*

C.   EPA's Title V Claims Should Not Be Dismissed as an Improper Attack on the
     Big Cajun II Title V Permit

The plaintiffs do not seek through this lawsuit to enforce the specific terms of the Big

Cajun II Title V permit issued by LDEQ, but rather seek injunctive relief and civil penalties

resulting from LaGen's failure to submit a complete Title V application that included all

applicable requirements. While neither EPA nor LDEQ objected to the issuance of LaGen's

Title V permit, the courts have held that neither EPA nor states are required to object to the

issuance of a Title V permit in order to pursue an enforcement action against a defendant for the

submission of an inadequate application for a Title V permit. Thus, counts 2 and 4 of the

Complaints do not constitute an impermissible attack on the 2005 Big Cajun II Title V permit.

1.   EPA's Objection to the Issuance of Big Cajun II's Title V Permit Is Not a
     Prerequisite to EPA's Enforcement Action

LaGen erroneously contends that under the Title V program and the Louisiana SIP, EPA

can <u>only</u> address deficiencies in proposed permits by commenting on or objecting to a proposed

permit. *See* Def. Brief at 13-14. LaGen incorrectly contends that the plaintiffs should be

precluded from alleging Title V claims based on Section 505(b)(1) of the CAA. Section

505(b)(1) provides that the Administrator must object to a proposed permit if EPA determines

that the permit is not in compliance with all applicable requirements, including a SIP. 42 U.S.C.

§ 7661d(b)(1).

Determinations by EPA under Section 505(b)(1) are discretionary.[20] Moreover, the issuance of a notice of violation alleging PSD violations is not a "determination" within the meaning of Title V that would require EPA to object to the issuance of a Title V permit. *See Sierra Club v. EPA*, 557 F.3d 401 (6th Cir. 2009); *Sierra Club v. Johnson*, 541 F.3d 1257, 1265-66 (11th Cir. 2008). Moreover, the Seventh Circuit has confirmed that Title V permitting actions present no bar to an enforcement action under the Clean Air Act unless an express shield is included in the Title V permit. *See Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670, 678-79 (7th Cir. 2008). *Id.* § 7661c(f). This provision would hardly be necessary if EPA was supposed to resolve all alleged violations of the CAA in the permitting process.

The draconian result of precluding EPA from taking action to protect public health and welfare would go well beyond the plain language of the CAA. It is well-settled that statutes must be interpreted as a whole. Section 113(b) of the CAA, the judicial enforcement provision, exists and functions independently of Section 505d(b), the permit objection provision. 42 U.S.C. § 7413(b); *East Ky. Power Co-op.,* 498 F. Supp 2d at 1018. Section 113(b) authorizes the Administrator to commence a civil action for injunctive relief and recover civil penalties whenever any person has violated *inter alia* any requirement or prohibition of an applicable implementation plan or permit, any requirement or prohibition of Title V, or any rule, order, waiver or permit promulgated, issue, or approved under the CAA. If Congress had intended to preclude EPA from filing civil actions if it failed to object to a Title V permit, such a restriction would have been expressly stated in either Section 113(b) or Section 505d(b) of the CAA.

In the instant case, LDEQ issued a Title V permit to the defendant for Big Cajun II on

---

[20] It is a long standing rule that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion" and therefore "generally unsuitable for judicial review. *Heckler v. Chaney,* 470 U.S. 821, 831 (1985).

August 22, 2005.  Before LaGen's Title V permit was issued, on May 22, 2005, EPA sent

comments to LDEQ advising that EPA had issued a notice of violation to LaGen, alleging that

LaGen had violated the PSD requirements of the CAA, federal regulations, the Louisiana SIP

and operating permit program.  On August 22, 2005, the same day that LDEQ issued the Title V

permit, LDEQ  responded:

> LDEQ believes that the Title V permit was not the proper venue to resolve the alleged
> NSR violations.  Any permitting action on the part of LDEQ should be supported by a
> final enforcement action on the part of EPA or a decision by a judicial entity that NSR
> violations did indeed occur.[21]

In a subsequent Public Comments Response Summary, LDEQ elaborated, stating that

"[t]he current situation is essentially equivalent to that described in a recent EPA Order Denying

Petition for Objection to Permit.  See Section IV.A. of 'In the Matter of Georgia Power

Company, signed by EPA Administrator Stephen L. Johnson on January 8, 2007."  Here, as in

that case, EPA had issued NOVs to the utility, alleging PSD violations at coal-fired power

plants.  Georgia Power did not include PSD requirements in its Title V application as applicable

requirements, nor a compliance schedule.  Subsequently, EPA filed a complaint in federal

district court alleging similar violations.  The petitioners asserted that where EPA had issued an

NOV alleging PSD violations, the Title V permit must include compliance schedules.  In

response, the EPA held that "the issuance of an NOV and/or the filing of a complaint alone is not

sufficient evidence to make the requisite 'demonstration' under 505(b)(2)" to require EPA to

object to the permits.  42 U.S.C. § 7661d(b)(2).

After summarizing the above Georgia Power Order, LDEQ stated that  "while the permits

do not contain PSD as applicable requirements, they also do not provide any safe harbor from

---

[21]*See* Defendant's Memorandum in Support of Motion for Summary Judgment: Title V Claims,  Doc. 139-1, Ex. G
(EPA Comments to LDEQ, May 23, 2005); Ex. H (LDEQ Response to EPA Comments, at 5, August 22, 2005).

enforcement of PSD requirements.  Thus, the permit does not disturb any ongoing or future enforcement action against Georgia Power for violations of PSD requirements.  Such is also the case with proposed [LaGen] Permit No. 2260-00012-V1."[22]

Brian Johnson, the former Administrator for the Air Permits Division for LDEQ, corroborated this view at his deposition. When asked for his position as to whether certain language should be included in LaGen's permit, Mr. Johnson responded: "The language essentially says that by issuance of this permit, we're not - or the permit does not represent LDEQ's position that a PSD significant modification did not occur.  So I did not see the harm of including it, because that would be our position, that just because we issue a permit, you know, unless the specific project is addressed through a permit shield, it's not protection from something that may have happened in the past."[23]

### 2. The United States Can Pursue Relief for Alleged Permit Deficiencies in an Enforcement Action in this Court

The courts that have examined this issue in power plant cases under the CAA have agreed with the United States' position, consistently holding that EPA or a State is not required to object to a proposed Title V permit.  Several courts have made clear that EPA or a State need not object to a permit as a prerequisite for filing a civil complaint.[24]

---

[22] *See* Exhibit 12 (LDEQ, Office of Environmental Services, Public Comments Response Summary, Big Cajun II).

[23] *See* Defendant's Memorandum in Support of Motion for Summary Judgment: Title V Claims,  Doc. 139-1, Ex. J (Deposition of Brian Johnson, at 106).

[24] The cases relied on by the defendant are inapposite.  While the case of *United States v. Am General Corp.*, 34 F. 3d 472, 475 (7th Cir. 1994) is not on point because it involved a citizen-suit filed in connection with a permit issued under a state operating permit (as opposed to Title V), the case sheds light on the present suit brought by EPA under 42 U.S.C. 7413 since the Court concluded that "it is an unsettled question whether operating under a duly issued permit, albeit one that should not have been issued because it failed to impose requirements found in a state implementation plan, violates that plan.  The statutory language implies "yes," 42 U.S.C. 7413(a)(1), but  *United States v. Solar Turbines, Inc.*, 732 F. Supp. 535, 539 (M.D. Pa. 1989), holds "no" and *Allsteel, Inc. v. EPA*, 25 F. 3d 312 (6th Cir. 1994), leaves the question open."  *East Ky. Power Co-op.*, 498 F. Supp. 2d at 1018.  Since 1994, this

- 27 -

Significantly, in *Niagara Mohawk II*, the case involving LaGen's parent, the court allowed New York to amend its complaint to add Title V claims even though the permitting branch of the same agency had failed to object to the Title V permit before it was issued. Subsequently, in *NYPIRG v. Johnson*, 427 F. 3d 172 (2nd Cir. 2005), the Second Circuit held that EPA should have objected to the same Title V permit in response to a petition by a public interest group. But nowhere did the appellate court indicate that EPA's failure to object or the State's issuance of the Title V permit prevented the State or EPA from taking judicial enforcement action against holder of the defective permit. In fact, the Court expressly stated that the State's Title V claim "afforded a valid claim against NRG, on the theory that NRG could be held liable for operating a plant without proper operating permits." *NYPIRG*, 427 F.3d at 178.

In *Sierra Club v. Johnson*, 541 F. 3d 1257 (11th Cir. 2008), environmental advocacy groups challenged EPA's denial of a petition to object to Title V operating permits issued for two Georgia coal-fired power plants owned by Georgia Power Company. EPA has refused to object to the issuance of the permits even though it had previously served a notice of violation and filed a civil enforcement action related to the same violations at the same units. In response, the Eleventh Circuit held that EPA had the discretion not to object to the proposed Title V permits since EPA had offered a reasonable interpretation of the Title V provisions of the CAA entitled to deference. Although EPA had made an administrative finding and initiated judicial proceedings alleging the applicability of PSD requirements to the plants at issue, "the applicability of PSD limits to the Bowen and Scherer plants was still very much unresolved." *Johnson*, 541 F.3d at 1269.

---

question has been answered in the Title V context by subsequent decisions in the Second, Sixth, Seventh, and Eleventh Circuit Courts of Appeals.

- 28 -

Likewise, in *Citizens Against Ruining the Environment v. EPA*, 535 F. 3d 670 (7th Cir. 2008), the Seventh Circuit reached the same conclusion, when environmental groups and the Illinois attorney general challenged EPA's failure to object to Title V operating permits proposed by the Illinois EPA for Midwest Generation, an operator of multiple coal-fired power plants. The Seventh Circuit held that "where, as here, there is contested evidence of a potential violation requiring further investigation and analysis, the CAA allows the EPA reasonable discretion to determine that the petition failed to demonstrate noncompliance and to refer the matter to the enforcement process." *Citizens Against Ruining the Environment*, 535 F.3d at at 679. Finally, in *Sierra Club v. EPA*, 557 F. 3d 401 (6th Cir. 2009), an environmental organization petitioned for review of an EPA order denying its petition to require EPA to object to a permit issued by the State of Kentucky to East Ky. Power Co-op. In response, the Sixth Circuit held that EPA reasonably construed Sections 113 and 505(b) of the CAA, in finding that a prior notice of violation and civil enforcement action by EPA did not constitute an adequate demonstration under Section 505(b) requiring EPA to object to a permit related to the same violations. *Sierra Club v. EPA*, 557 F.3d at 404-412.

In addition, the courts in power plant cases in which defendants have contended that plaintiffs' Title V claims constituted an improper collateral attack on validly issued Title V permits have disagreed with the defendants' position. *See Dairyland Power Co-op.*, 2010 WL 4294622, at * 16-18 *Allegheny Energy, Inc.*, 2006 WL 1509061, at *7-8; *East Ky. Power Co-op.*, 498 F. Supp. 2d at 1018.

3.   <u>Injunctive Relief And Civil Penalties Flow From Plaintiffs' Title V Claims</u>

Because LaGen failed to submit an accurate and complete Title V application that

- 29 -

identifies PSD as an "applicable requirement" for Big Cajun II, Units 1 and 2, and has continued to operate without a valid Title V permit, each day that LaGen operates Big Cajun II, Units 1 and 2, is another day the company violates the Title V requirements of the CAA. Should the United States prevail on its modification claims, LaGen will need to comply with these applicable requirements. Moreover, LaGen should be assessed penalties for every day that it has operated the modified units without complying with all applicable Title V requirements, including the stringent BACT emissions limitations. The amount of such penalties may be determined by this Court at the remedy phase of this case. *See* 42 U.S.C. §§ 7413 (a)(1), 7413(a)(3), 7413(b), and 40 C.F.R. § 70.6(f)(3)(ii).

## VI. **CONCLUSION**

For the foregoing reasons, the defendant's Motion for Summary Judgment should be denied.

March 14, 2011

Respectfully submitted,

 /s/ Richard Gladstein
Richard M. Gladstein (DCN 362404)
Trial Attorney
Elias Quinn (CON 42159)
David Dubay
Bradford T. Mclane
Andrew Hanson
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
(202) 514-1711
(202) 616-7915
E-mail: Richard.Gladstein@usdoj.gov

- 30 -

—

DAVID R. DUGAS
UNITED STATES ATTORNEY

/s/ John J. Gaupp
John J. Gaupp, LBN 14976
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0685
Email: john.gaupp@usdoj.gov

OF COUNSEL:

Ilana S. Saltzbart
Attorney -Advisor
Air Enforcement Division
U.S. Environmental Protection Agency
1200 Pennsylvania, Ave., N.W.
Washington, D.C. 20460

Cheryl Barnett
Assistant Regional Counsel
U.S. EPA, Region 6
1445 Ross Avenue
Dallas, Texas   75202

HERMAN ROBINSON (LA #2077)

Executive Counsel
Louisiana Department of Environmental Quality

s/  Dwana C. King
Dwana C. King, Trial Attorney (LA #20590)
Christopher A. Ratcliff, Atty. Supervisor (Bar # 18675)
Louisiana Department of Environmental Quality
P. O. Box 4302
Baton Rouge, Louisiana 70821-4302
Telephone:  (225) 219-3985
Facsimile:  (225) 219-4068
E-mail:  DWANA.KING@LA.GOV

- 31 -

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a copy of the foregoing Memorandum was filed electronically with the Clerk of the Court using the CM/ECF system and sent to the following counsel of record on March 14, 2011:

R. Patrick Vance
Jones, Walker
201 St. Charles Ave.
New Orleans, LA 70170

Kent Mayo
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004-2400

Megan H. Berge
Baker Botts LLP
1299 Pennsylvania Avenue, NW.
Washington, DC  2004-2400

Ryan Estes Johnson
Jones, Walker – B.R.
8555 United Plaza Blvd., Suite 500
Baton Rouge, LA  70809-7000

      /s/ Richard M. Gladstein
RICHARD M. GLADSTEIN
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044
(202) 514-1711
(202) 616-7915
E-mail: Richard.Gladstein@usdoj.gov

- 32 -